E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT IN AND FOR MAHASKA COUNTY

| | |
|---|---|
| CHRISTINA L. KRUSE, an individual; THE GUARDIANSHIP AND CONSERVATORSHIP OF CHRISTINA KRUSE, by and through VERDA KRUSE, as sole surviving guardian and conservator of CHRISTINA KRUSE; and HARLEY J. HUDSON, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID M. REPP, an individual; DICKINSON, MACKAMAN, TYLER & HAGEN, P.C. (a/k/a DICKINSON LAW FIRM a/k/a DICKINSON, THROCKMORTON, PARKER, MANNHEIMER & RAIFE), a corporation; ZACHARY I. GUINN, an individual; BRADLEY J. VAN VARK, an individual; and FIRST STATE BANK OF LYNNVILLE, IOWA (a/k/a FIRST STATE BANK), a corporation, <br><br> Defendants. | CASE NO. CVEQ088740 <br><br> **FIRST AMENDED PETITION AT LAW AND JURY DEMAND** <br><br> (Aiding and Abetting Fraudulent Transfers, Tortious Interference with Enforcement of Judgment, Conspiracy to Commit Fraudulent Transfers, Conspiracy to Tortiously Interfere with Enforcement of Judgment, Civil RICO Liability under 18 U.S.C. §1962(c), §1962(d), and §1964(c), and Outrageous Conduct Causing Emotional Distress Against Defendants Repp and Dickinson Law Firm) <br><br> (Transferee Liability under Iowa Code Chapter 684 (Iowa Uniform Fraudulent Transfer Act), Legal and/or Equitable Subordination, Aiding and Abetting Fraudulent Transfers, Tortious Interference with Enforcement of Judgment, Conspiracy to Commit Fraudulent Transfers, Conspiracy to Tortiously Interfere with Enforcement of Judgment, Civil RICO Liability under 18 U.S.C. §1962(d) and §1964(c), Outrageous Conduct Causing Emotional Distress, and Request for Equitable, Declaratory, and Injunctive Relief Against Defendants Guinn, Van Vark, and First State Bank of Lynnville, Iowa) |

COME NOW Plaintiffs Christina L. Kruse, the Guardianship and Conservatorship of

Christina Kruse (by and through Verda Kruse), and Harley J. Hudson, by and through counsel,

and, pursuant to Iowa Rule of Civil Procedure 1.402(4), amends their Petition at Law and Jury Demand to read as set forth in this First Amended Petition at Law and Jury Demand and in support of their causes of action against the above-named Defendants, state as follows:

## PARTIES

1.      Plaintiff Christina L. Kruse ("Kruse") was at all material times hereto and is a resident of Davis County, Iowa. As a result of injuries sustained by Kruse in the automobile collision described herein, Kruse filed a voluntary petition for guardianship and conservatorship in the Iowa District Court for Davis County on January 10, 2014.  That guardianship and conservatorship is a named Plaintiff herein.  Plaintiff Verda Kruse (Kruse's mother) is the sole guardian and conservator of Kruse. Hereafter, unless otherwise specified or indicated by the context, "Kruse" or "Plaintiffs" refer to all named Plaintiffs.

2.      Plaintiff Harley J. Hudson ("Hudson") is a resident of Davis County, Iowa and is the son of Kruse.

3.      Defendant Dickinson, Mackaman, Tyler & Hagen, P.C., a/k/a Dickinson Law Firm, a/k/a Dickinson, Throckmorton, Parker, Mannheimer & Raife ("DMTH") was at all material times hereto and is an Iowa law firm and corporation with its registered office and principal place of business at 699 Walnut Street, Suite 1600, Des Moines, Polk County, Iowa 50309.

4.      Defendant David M. Repp ("Repp") was at all material times hereto and is a resident of Polk County, Iowa.  Repp was at all material times hereto and is an attorney practicing law with, a member of, and employed by DMTH.

2

5.      Repp and DMTH were at all material times hereto legal counsel for Steven Weller, Weller Farms LLC, the Steven J. Weller Revocable Trust, and Cody Weller (collectively referred to herein as "the Weller Group") in connection with the formation of Weller Farms LLC and the fraudulent transfers of assets into it, as well as throughout the ongoing fraudulent transfer scheme and cover up in connection therewith.  DMTH is liable for all of the acts of its attorneys, employees, members, officers and agents under the doctrine of respondeat superior because (among other things): (a) DMTH benefited from its employees' illegal conduct; (b) the conduct occurred substantially within the time and space limits authorized by employment; (c) the employees were motived (wholly or in part) by a purpose to serve DMTH; and (d) the conduct was of a kind that the employee(s) was hired to perform.  The actions of DMTH's attorneys, employees, members, officers and agents were otherwise within the scope of their employment. In the alternative, DMTH ratified or affirmed the illegal actions of its employees, which caused injury to Plaintiffs.

6.      Defendant First State Bank of Lynnville, Iowa ("First State") is an Iowa bank with its principal place of business at 413 East Street, Lynnville, Jasper County, Iowa 50153. First State is liable for all actions of its loan officers (including Zachary I. Guinn and Bradley J. Van Vark) and other employees and officers under the doctrine of respondeat superior because (among other things): (a) First State benefited from its employees' illegal conduct; (b) the conduct occurred substantially within the time and space limits authorized by employment; (c) the employees were motived (wholly or in part) by a purpose to serve First State; and (d) the conduct was of a kind that the employee(s) was hired to perform.  The actions of First State's employees and officers were otherwise within the scope of their employment.  In the alternative,

3

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

First State ratified or affirmed the illegal actions of its employees, which caused injury to Plaintiffs.

7.      Defendant Zachary I. Guinn ("Guinn") was at all material times hereto and is a resident of Poweshiek County, Iowa.  His address is 417 Park Street, Grinnell, Iowa 50112. Guinn was and is a Loan Officer and is now Assistant Vice President at First State.

8.      Defendant Bradley J. Van Vark ("Van Vark") was at all material times hereto and is a resident of Marion County, Iowa.  His address is 1230 Shadow Lane, Pella, Iowa 50219. Van Vark was a Loan Officer and is Vice President at First State. Upon information and belief, Van Vark was the immediate supervisor of Guinn, and the actions of Guinn were done with the approval, knowledge and under the supervision of Van Vark.

9.      At all times material, Guinn, Van Vark, and First State were the bankers/loan officers and bank, respectively, for the Weller Group.

## **NON-PARTIES**

10.      Steven James Weller ("Weller") was and is a resident of Mahaska County, Iowa. Weller has done business as a farmer and insurance agent.

11.      Weller is the trustee of the Steven J. Weller Revocable Trust ("the Trust"), which was formed by Weller in Mahaska County, Iowa on March 14, 2012. Weller was and is the Trustor and Trustee of the Trust.  Weller was and is also the sole primary beneficiary of the Trust.

12.      Weller Farms LLC ("Weller Farms") is an Iowa limited liability company with its registered office and principal place of business at 3133 195th Street, Rose Hill, Iowa 52586.

This is also Weller's personal residence. Weller is the registered agent of Weller Farms.  The members of Weller Farms are Weller and his son, Cody Weller.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the parties and the subject matter herein.  The amount of damages in controversy sustained by Plaintiffs, exclusive of interest, costs, and attorney fees, exceeds the jurisdictional amount for small claims set forth in Iowa Code Chapter 631, and jurisdiction is proper in the Iowa District Court pursuant to Iowa Code §602.6101.

14.     Pursuant to Iowa Code §616.1, venue in Mahaska County is required because Plaintiffs request determinations of their rights and interests in the real estate in Mahaska County, Iowa.  Venue is also proper in this county pursuant to Iowa Code § 616.18 because Plaintiffs have sustained damages in Mahaska County in that Plaintiffs have been hindered, delayed or defrauded in their ability to levy upon the real estate situated in Mahaska County, Iowa, and the action includes claims for damages arising from those injuries.  Joinder of all claims and all parties is proper under Rules 1.232 and 1.233, Iowa R. Civ. P., because all of the transactions, occurrences, and series of transactions or occurrences asserted herein involve one or more common questions of law or fact.

## RELATED ACTIONS

15.     On January 10, 2014, Kruse filed a personal injury action against Weller in Davis County Case No. LALA012548.  Trial in that action was held on April 21-23, 2015 before the Honorable Judge Randy S. DeGeest. That action resulted in Judge DeGeest's Ruling and Judgment in favor of Kruse on May 1, 2015 and his May 5, 2015 Corrected Judgment. (Plaintiffs' Exhibits 5 and 6, which are attachments incorporated herein).  Weller was

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

represented by insurance defense counsel, William Nicholson ("Nicholson"), in that action. References in this Petition to the "personal injury action" refer to Davis County Case No. LALA012548.

16.     On January 22, 2016 and February 5, 2016, judgment debtor examinations of Weller were held in Davis County Case No. LALA012548.  References in this Petition to "examinations" refer to these judgment debtor examinations.

17.     On March 3, 2016, Kruse filed a fraudulent transfer action in Mahaska County Case No. EQEQ088047. The matter was tried before the Honorable Judge Shawn Showers on February 6-9, 2018. A copy of the Court's March 13, 2018 Trial Order and Verdict, containing the Judgment and Decree, is attached as Plaintiffs' Exhibit 7 and incorporated herein by reference. Weller was represented by Repp and other attorneys from DMTH in that action.  On May 18, 2018, the Court entered its Order Re: Attorney Fees in that action, a copy of which is attached as Plaintiffs' Exhibit 9 and incorporated by reference.  References in this Petition to the "fraudulent transfer action" refer to Mahaska County Case No. EQEQ088047.

18.     There is a pending mortgage foreclosure action in Mahaska County Case No. EQEQ088681, in which First State is the plaintiff and Kruse, her guardianship and conservatorship, and Hudson, among others, are named as defendants.  (Plaintiffs' Exhibit 12, which is attached is a copy of the Foreclosure Petition in that action).  References in this Petition to "pending foreclosure action" refer to Mahaska County Case No. EQEQ088681.

**Exhibit A, Page 6 of 184**

## FACTS COMMON TO ALL COUNTS

**The Horrific Accident Resulting in Kruse's Personal Injury Judgment Against Weller**

19.     The following facts are taken from the Ruling and Judgment in Kruse's personal injury action (Plaintiffs' Exhibit 5):

a.  "On January 28, 2012, the life of … Kruse was tragically altered by a horrific motor vehicle collision at the intersection of Troy Road and Timber Avenue in rural Davis County, Iowa."

b.  "As [Kruse] was driving her Ford Taurus through the intersection, a Ford pickup pulling a livestock trailer ran a stop sign and hit her broadside.  The driver of the pickup truck [Weller] stated he did not see the stop sign and has ***admitted that he was totally at fault***" (emphasis added).

c.  "[Kruse] now lives in the Bloomfield Nursing and Rehab Center in Bloomfield, Iowa."

d.  "She cannot walk and needs the help of two people to get in and out of bed, to dress and go to the bathroom."

e.  "She is incontinent approximately three times per week."

f.  "She is frustrated by her limitations and she wants to go home."

g.  "At the time of the collision, [Kruse] was leading a normal life."

h.  "It has been clearly established that [Kruse] will require 24-hour care for the rest of her life."

i.  "She has suffered extreme pain and suffering as a result of the accident, and the pain and suffering will continue to a lesser degree for the rest of her life.  [Kruse] has lost the

7

E-FILED 2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

function of her right arm and leg, and her closed brain injury affects how her entire body functions."

j. "[Kruse] suffered from depression before the collision, but it was well controlled. After the collision, her depression has increased and may likely continue for the rest of her life."

k. Kruse has a shortened life expectancy because of the collision. This is due in part to Kruse's sedentary lifestyle of being wheelchair-bound as a result of the collision, which can lead to life-shortening conditions, such as pulmonary thrombosis and cardio vascular issues. Kruse's shortened life expectancy reduces the damages caused by Weller to an amount lower than they otherwise would have been.

l. Kruse was awarded the following damages:

    i. Past medical costs of **$395,097**;

    ii. Future medical costs, including nursing home care for the rest of her life in the amount of **$1,312,003**;

    iii. Past loss of function of **$50,000**;

    iv. Future loss of function of **$200,000**;

    v. Past pain and suffering of **$50,000**;

    vi. Future pain and suffering of **$200,000**.

m. Hudson was entitled to the following damages:

    i. Past loss of consortium of **$150,000**;

    ii. Future loss of consortium of **$200,000**.

20.     The Court entered judgment against Weller and in favor of Kruse in the total of

**$2,647,100**.

21.     On May 5, 2015, Judge DeGeest filed a Corrected Judgment to correct a

mathematical error in the computation of the total sum of damages awarded, to provide for

interest as provided for in Iowa Code Section 668.13, and to read as follows:

> IT IS THEREFORE ORDERED that Judgment be entered against
> the Defendant and for the Plaintiffs in the total sum of $2,557,100,
> allocated as set forth above, with interest awarded for the future
> damages in the amount of $1,912,003 at the rate of 2.25% per
> annum from the date of entry of the judgment herein, May 1, 2015,
> and with interest awarded on the balance of the judgment of
> $645,097 from the date of the commencement of the action,
> January 10, 2014, at the rate of 2.25% per annum, all to be
> computed in accordance with Iowa Code Section 668.13(5).
>
> IT IS FURTHER ORDERED that all costs are assessed to the
> Defendant.  (Plaintiffs' Exhibit 6 at 2).

The Corrected Judgment also provided, "Other than as expressly amended and corrected herein,

the Ruling and Judgment entered herein on May 1, 2015, is ratified and confirmed in its

entirety." (Plaintiffs' Exhibit 6 at 2).

22.     On May 8, 2015, an attested copy of Kruse's $2.5 million judgment was filed in

the office of the Clerk of the District Court of Mahaska County. The judgment then became a

judgment lien against Weller's real estate in Mahaska County on that date. Iowa Code § 624.24.

**Weller Never Disputed His Fault for the Horrific Collision and Immediately Knew That
Kruse Would Obtain a Substantial Judgment Against Him**

23.     On the morning of January 28, 2012, Weller blew through three sets of rumble

strips, ran the stop sign at the intersection with the highway on which Kruse was driving, and "t-

boned" Kruse's car.

9

24.     At the scene of the collision, Weller immediately acknowledged to law enforcement that he ran the stop sign and claimed he did not see the stop sign.  Despite an unobstructed view, he also said he did not see Kruse's car until immediately before impact. Weller never slowed down or braked.

25.     Weller also witnessed the extensive damage to Kruse's car at the scene of the collision and the resulting catastrophic injuries and incapacitation of Kruse and her passengers. He further witnessed the extensive lifesaving efforts by numerous emergency responders, including the extraction of Kruse from her car by the Jaws of Life.

26.     As an insurance agent, Weller knew he would face a huge claim because of the accident.

27.     Shortly after the accident, Weller told his daughter that the accident could lead to a big lawsuit and that he could lose his farm and other assets.  Weller also told his son, Cody Weller, that he (Weller) was going to face a big lawsuit as a result of the accident.

**Weller's Formal Admissions of Fault for Kruse's Injuries**

28.     In Kruse's personal injury action, Weller responded to Requests for Admission on May 15, 2014, admitting that:

(a) That on January 28, 2012, in Davis County, Iowa, he failed to stop at a stop sign as required by laws of the State of Iowa, which caused his pickup and attached trailer to collide with the car driven by Kruse;

(b) That Weller was 100% at fault for the collision with Kruse that occurred on January 28, 2012; and

(c) That the collision caused serious personal injuries and damage to Kruse.

10

**Exhibit A, Page 10 of 184**

E-FILED 2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

29.     Before Kruse's personal injury action was tried, Weller also stipulated that Kruse's reasonable cost of necessary medical expenses caused by the collision were $395,097.19, as of the date of the stipulation, and that $395,097.19 was the amount paid for those medical services by Medicaid, Medicaid had a lien for that amount, and Kruse was obligated to repay Medicaid that amount.

**Stravers and Weller Orchestrate Initial Fraudulent Transfers**

30.     Shortly after Weller's accident with Kruse on January 28, 2012, Weller's auto liability insurer told Weller that he needed to get his own attorney to represent him in the personal injury case because his exposure exceeded his coverage limits.

31.     Weller, accordingly, consulted with Randy Stravers, an "estate planning" attorney, within a month and a half after the accident. Stravers advised Weller to transfer his farms and other real estate into a revocable trust and to make cash gifts to family members.

*Transfers to the Trust*

32..    Pursuant to Stravers' advice, Weller transferred all of his real estate, including all of the real estate legally described in Mortgage A in the pending foreclosure action (Exhibit B to First State's Foreclosure Petition), into the Trust, by quit claim deed dated March 23, 2012. A true and correct copy of the Quit Claim Deed given by Weller to the Trust is attached as Plaintiffs' Exhibit 1.

33.     As a part of the title transaction, Tami L. Weller, Weller's former spouse, also quit claimed her interest in the real estate, including all of the real estate legally described in Mortgage A in the First State's Foreclosure Petition in the pending foreclosure action (Exhibit B to First State's Foreclosure Petition), to Weller to allow Weller to convey his interest to the

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Trust.   A copy of the Quit Claim Deed given by Tami L. Weller to Weller dated March 23, 2012, is attached as Plaintiffs' Exhibit 2.

35.      As Weller would learn later, closer to trial in the personal injury action, Weller's transfer of his real estate into the Trust did not shield him or his farms from Kruse's adverse claims against him.

*"Gifts" to Family Members*

35.      Pursuant to Starvers' advice, Weller also "gifted" $13,000 to each of the following persons: son (Cody Weller), daughter, brother, nephew, niece, girlfriend, girlfriend's daughter, and girlfriend's granddaughter.  Weller's "gifts" totaled $104,000.  Weller also "gifted" cash gifts to his children's 529 college savings plans.

36.      During examinations, Weller has admitted that he made these cash gifts for the purpose of preserving his assets in an effort to place them beyond Kruse's reach.

**Weller "Ungifts" His Family Members**

37.      After Weller made his "gifts" to family members, Nicholson asked Weller if he could contribute money from his own pocket to settle with Kruse and her passengers.

38.      Weller expressed concerns about his ability to make a personal contribution to any settlement given the "gifts" he made pursuant to Starvers' advice.

39.      Nicholson told Weller that the cash "gifts" were unlawful fraudulent transfers. Nicholson advised Weller to undo the "gifts."

**Weller's Attempts to Extract a Settlement Unfavorable to Kruse Fail**

40.      Pursuant to settlement negotiations with Kruse and her counsel, Nicholson sent a letter to Kruse's counsel by U.S. Mail dated November 13, 2013 and enclosed a copy of Weller's

financial statement dated September 9, 2013.  This financial statement was false and misleading because it grossly undervalued Weller's farm property and homestead at $391,000.  The actual value of the property was well over seven figures.

41.     Nicholson's letter also falsely stated (among other things) that the financial statement included personal funds that Weller had already pledged to the settlement with Kruse's passengers.  In fact, Weller financed his settlement with Kruse's passengers by reversing "gifts" to Cody Weller's 529 college savings plan.

42.     In his November 13, 2013 letter, Nicholson offered $250,000 on behalf of Weller to settle Kruse's claims. The settlement offer was predicated on the false and misleading financial statement furnished by Weller to Kruse and other passengers.  The settlement offer made by Nicholson allowed Weller to keep both of his farms.  Kruse did not accept the settlement offer, but Nicholson was able to settle the claims of Kruse's passengers while preserving $215,000 in insurance coverage for Kruse's claims.

43.     Nicholson, on behalf of Weller, continued to provide false and misleading financial statements/information to Kruse in a continued attempt to extract a minimal, negligible, and unfavorable settlement to Kruse and favorable to Weller allowing him to keep both of his farms. On August 15, 2014, Nicholson sent by U.S. Mail to Kruse's counsel a financial statement and affidavit of financial status that restated the same false and misleading property values set forth in the financial statement of September 9, 2013.

44.     As trial was immediately approaching and it became apparent that Kruse would not accept a settlement that allowed Weller to keep both of his farms, Weller became upset with

13

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Stravers for having given him bad advice and for proposing an ineffective way to protect his assets from Kruse's inevitable judgment.

45.     Nicholson continued to tell Weller that he needed to get his own attorney because Kruse's personal injury action would exhaust his coverage and Nicholson would not represent Weller thereafter.

**Weller Seeks Assistance from Repp**

46.     Regardless of the bad advice he received from Stravers, Weller did not abandon his efforts to fraudulently convey his assets beyond Kruse's reach and to extract a minimal, negligible, and unfavorable settlement to Kruse and favorable to Weller allowing him to keep both of his farms.  Weller continued to search for an attorney who was willing and able to aid the evasion of Kruse's inevitable judgment.

47.     Weller thereafter sought out Repp.  In his February 5, 2016 examination, Weller testified:

Q.     Isn't it true that you were advised by Mr. Repp to set up the LLC?  That's what you went to him for; correct?

A.     No.  I went to him because of [Kruse's personal injury] lawsuit.

Q.     … [I]n fact, you went to Mr. Repp at your [personal injury defense] attorney, Bill Nicholson's urging because you knew of the huge judgment that was coming in this case; correct?

A.     That's very true.
...

Q.     You say you went to see Mr. Repp about this lawsuit.  What did you tell him about the lawsuit?

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

A.   I told him that I had been in an auto accident, and Bill Nicholson told me I needed to get ahold of another attorney because he was going to be out of the picture when the insurance was paid.

Q.   And you went to Mr. Repp because you knew he holds himself out as an asset protection attorney; right?

A.   Yes.

...

Q.   That was the reason you went to see him; correct?

A.   Yes.

48.   Weller cannot remember everything he discussed with Repp during their first meeting, but in his examinations, he presumed that:

- They talked about Kruse claiming millions of dollars.

- Weller told Repp that Kruse was in the nursing home and had been life-flighted to the University of Iowa Hospitals and Clinics.

- Weller told Repp that Nicholson was insurance counsel, that he was representing Weller in the personal injury case, and that his insurance coverage would likely be exhausted by Kruse's claims.

- Weller told Repp that the trial in Kruse's personal injury action was coming up in the next two or three months.

- Weller told Repp that Kruse remained in the hospital or the nursing home.

49.   Weller also testified that, at their initial meeting, Repp agreed with Nicholson's assessment that Weller had received bad advice from Stravers and that the cash "gifts" were unlawful and fraudulent transfers.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

50.     Regardless of Stravers' bad advice, however, Repp represented that Weller could protect his assets from Kruse and advised Weller to transfer his farmland and farm assets into a limited liability company (i.e., Weller Farms).

51.     Repp's advice to Weller was motivated by an intent and purpose to hinder, delay, or defraud Kruse in the collection of her foreseeable and inevitable judgment.

**Weller And Repp Orchestrate the Transfer of Weller's Property to Weller Farms**

52.     On March 3, 2015, after Weller's first meeting with Repp and less than two months before Kruse's personal injury trial, Repp filed a Certificate of Organization of Weller Farms with the Iowa Secretary of State.  Repp was identified as organizer of Weller Farms.

53.     On that same day, Weller, as Trustee of the Trust, also signed a Quit Claim Deed that had been prepared by Repp and that conveyed all of Weller's farm real estate to Weller Farms.  The only Trust real estate excluded from the conveyance was: a) forty acres of real estate that Weller apparently planned to claim as his homestead, and b) Weller's insurance office building.  A copy of the Quit Claim Deed given by Weller, as Trustee, to Weller Farms is hereto attached as Plaintiffs' Exhibit 3.

54.     The formation of Weller Farms and all the transfers of assets into it were fraudulent transfers made with the intent to hinder, delay, or defraud Kruse in violation of, *inter alia*, Iowa Code § 684.4(a)(1).

55.     By and before March 3, 2015, Weller and Repp knew that Kruse would obtain a judgment against Weller in excess of his remaining liability insurance coverage ($215,000) and in excess of his entire net worth.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

56.     At the time of the transfers to Weller Farms on March 3, 2015, Kruse's trial was set to begin on April 21, 2015.

57.     In his examination on January 22, 2016, Weller testified:

Q.     … [Y]ou knew at the time that you signed those two documents [Quit Claim Deed from the Trust to Weller Farms and Trustee's Affidavit dated March 3, 2015] that you owed money to … Kruse and … Hudson, correct?

A.     I knew I was going to.

…

Q.     You had admitted liability, correct?

A.     Yes.

Q.     You knew that you had severely injured [Kruse], that she was permanently injured, correct?

A.     Yes.

Q.     That she was in a nursing home, correct?

A.     Yes.

Q.     And that you were going—that you were going to owe her—get a judgment against you in the millions of dollars, correct?

A.     Yes.

58.     In his continued examination on February 5, 2016, Weller further testified:

Q.     At the time you created Weller Farms … , you knew that there was a huge impending judgment coming in this case, didn't you?

A.     Yes.

Q.     You knew at that time that you were not going to be able to pay that judgment; isn't that true?

A.     Yes.

…

17

**Exhibit A, Page 17 of 184**

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Q.      At the time you created [Weller Farms in March 2015], shortly before the trial in this case, you knew that your assets that you had at the time were less than the liabilities you had when taking into account the claims that … Kruse and … Hudson had against you …?

A.       I think so….

Q.      So you knew, at the time you created [Weller Farms], that your assets were not enough to cover your liabilities given the claims of … Kruse and … Hudson in this case?

A.      Yes.

Q.      At that time you knew you were not going to be able to pay the judgments entered against you in favor of … Kruse and … Hudson in this case, true?

A.      True.

59.     Despite Weller's admissions, in Weller's Trial Brief in the fraudulent transfer case, Repp and DMTH falsely state:  "There is no evidence that Plaintiffs can point to at trial which shows that Steven Weller could have reasonably known that judgment would be entered against him in an amount which would render him insolvent."

**Weller Executes the Weller Farms' Operating Agreement Prepared by Repp**

60.     On March 3, 2015, Weller also executed Weller Farms' Operating Agreement in the offices of DMTH.

61.     The Operating Agreement was prepared by Repp and was between Weller and Cody Weller as members.

62.     Paragraph 1.05(f) of Article I of the Operating Agreement states:  "The objectives of the Company are as follows: … (f) provide protection to family assets from the claims of future creditors against family members."

18

63.     Repp prepared the Operating Agreement without having met Cody Weller in person.  Cody Weller also did not sign the Operating Agreement in person.  Rather, Repp transmitted the Operating Agreement to Cody Weller by facsimile for signature.  Repp did not explain the Operating Agreement to Cody Weller, and Cody Weller was not familiar with the Operating Agreement when he signed it.

64.     In a later deposition, in which he was represented by Repp's fellow law partner at DMTH (Ted Craig), Cody Weller testified that, when Weller Farms was formed, he knew Kruse's trial was less than two months away.  At the time, Weller had also acknowledged to Cody Weller that Kruse would obtain a judgment in the millions of dollars against him, and Cody Weller thought that his father had already admitted liability to Kruse when Weller Farms was formed.

65.     Weller Farms contained the typical creditor-thwarting features of an LLC including, but not limited to, the preclusion of execution upon equity interests (thereby preventing a levying creditor from obtaining an ownership interest in Weller Farms absent agreement of all members) and providing only for charging orders against such interests (thereby restricting a levying creditor to only levying on distributions that the judgment debtor/member might be declared to be entitled by the LLC if still a member).  In addition to these typical creditor-thwarting features, Repp's Operating Agreement added special creditor-thwarting provisions that were particularly draconian vis-à-vis Kruse.  For example:

- The Operating Agreement allowed Weller to retain his voting rights in Weller Farms, and thus exercise veto power over the farming operations or any distribution to which a charging order would attach, even if there was execution

19

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

upon or assignment of Weller's membership interest (obviating Weller's membership interest in Weller Farms).

- If Kruse levied on Weller's interest in Weller Farms to get a charging order on the distributions attributable to Weller, the levy of execution would have triggered a buy-out provision in the Operating Agreement, which would have allowed first Weller Farms, and then Cody Weller, to buy Weller's interest in Weller Farms for an amount that Weller and Cody Weller set as being the fair market value of Weller's interest.  As noted above, until the buy-out occurred, and even afterward, Weller retained veto power over any distributions from Weller Farms, over any of its operations, and over the operation of the farms and farm assets transferred into Weller Farms.

- Weller and Cody Weller retained the authority under the Operating Agreement to deplete all of the profits and assets of the farms by paying salaries (set by the Wellers) to Weller and Cody Weller and/or to never make any distributions that Kruse could attach by charging order.

- The Operating Agreement provided Weller and Cody Weller the means to secure fraudulent mortgages, incur fraudulent loans, and otherwise deplete the assets of Weller Farms against which Kruse would have no protection other than through costly litigation to set aside those fraudulent transfers.

66.     The sophistication of the terms and the detailed creditor-thwarting features within the Operating Agreement are beyond the understanding and abilities of laypersons such as

Weller and Cody Weller.  When asked about the creditor-thwarting provisions in the Operating Agreement, Weller admitted that he did not understand them and deferred to Repp.

67.    The Operating Agreement, and Weller Farms generally, was an instrument designed and orchestrated by Repp with the intent to hinder, delay, or defraud Kruse in violation of state and federal law.

68.    The Trial Order and Verdict in Kruse's fraudulent transfer action states:  "The Court finds that Steven Weller's intent was to protect his assets.  Here, the formation of [Weller Farms] was intended to keep certain assets from his creditors…The Operating Agreement lists as one purpose of [Weller Farms] as 'provide protection to family assets from claims of future creditors against family members' [footnote cites to Weller Farms Operating Agreement, Paragraph 1.05(f)].  The future creditors are the Plaintiffs [Kruse and Hudson] in this case."

**Repp Prepares the Individual Trustee's Affidavit and Quit Claim Deed Transferring Real Estate to Weller Farms**

69.    In addition to forming Weller Farms on March 3, 2015, Repp prepared documents to transfer all of Weller's farm real estate to Weller Farms.  Repp prepared the Quit Claim Deed.  Repp also prepared and notarized an Individual Trustee's Affidavit that was signed and sworn to by Weller. A true copy of the Individual Trustee's Affidavit is attached as Plaintiffs' Exhibit 4.

70.    Like the other actions taken by Weller and Repp on March 3, 2015, the Individual Trustee's Affidavit was for the purpose and with the intent to hinder, delay, or defraud Kruse by attempting to clear the title to the farm real estate fraudulently transferred into Weller Farms.

**Exhibit A, Page 21 of 184**

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

71.     The Individual Trustee's Affidavit stated that Weller was conveying the real estate "free and clear of any adverse claim," which was a knowingly false statement sworn to by Weller and notarized by Repp.

72.     In the Quit Claim Deed, Weller Farms (Weller's alter ego created by Repp) falsely acknowledges its "reliance" on the false statement that the real estate was conveyed "free and clear of any adverse claim."

73.     The statements in the Individual Trustee's Affidavit and Quit Claim Deed are false, fraudulent or misleading because Weller and Repp knew of Kruse's impending judgment, which would be an enforceable adverse claim against the Trust and Weller.

74.     Repp caused the Quit Claim Deed and the Individual Trustee's Affidavit to be transmitted by wire to the Mahaska County Recorder for recording and caused the Mahaska County Recorder to return the documents by U.S. mail to Repp after recording.

75.     By this fraud, Repp and Weller were attempting to convert the general five-year statute of limitations (Iowa Code §684.9(1)) for commencing actions to set aside fraudulent transfers to a one-year statute of limitations (Iowa Code §614.14(5)(b)), another potential trap for and means to defraud Kruse.

**Weller Employs False Narratives in an Attempt to Justify the Fraudulent Transfers**

76.     In their ongoing scheme to defraud Kruse, Weller and Repp promoted false narratives for the purpose of thwarting any effort to set aside the fraudulent transfers.  Pursuant to their false narratives, Weller and Repp (among other agents of Weller) claim that Weller Farms was Cody Weller's idea and that they were merely engaged in "estate planning" when they formed Weller Farms and transferred Weller's property.

22

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

77.     Weller and Repp's false narratives are a continuing deceit and a mere façade designed to conceal the fact that the formation of Weller Farms, the related transfers of property, and all associated documents were intended to hinder, delay, and/or defraud Kruse.

78.     By continuing to serve as Weller's attorney, Repp continued to knowingly promote these false narratives to the courts and others and to the detriment of Kruse.

*The Formation of Weller Farms Was Never Cody Weller's Idea*

79.     Despite Cody Weller's testimony elicited by his counsel from DMTH (including Repp) that it was Cody Weller's idea to create Weller Farms, the court in the fraudulent transfer action found that it was ***not*** Cody Weller's idea to create Weller Farms and that Cody Weller did not even know what an LLC was in March 2015 (Plaintiffs' Exhibit 7 at 5, 8).

80.     Repp and Weller have always known that it was never Cody Weller's idea to create Weller Farms.

81.     Repp and DMTH knowingly promote this false narrative.    In Weller's Trial Brief in the fraudulent transfer case, Repp and DMTH falsely state that "[a]fter Cody's graduation from high school, the time was right to formalize the father-son partnership. Therefore, on March 3, 2015, at Cody's urging, Steve and Cody formed Weller Farms LLC."

82.     In truth, Cody Weller was not even in Repp's office when Weller Farms was formed.  Weller enlisted Repp because he was an asset protection attorney, and Weller testified that the idea of Weller Farms came up when he was in Repp's office.  Cody was not there when the idea surfaced.  Cody Weller did not even know what an LLC was at the time.  The creation of Weller Farms was not Cody Weller's idea.

23

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

*Weller and Repp Were Not Merely Engaged in "Estate Planning"*

83.    Repp and Weller also continue to promote the false narrative that Weller Farms was merely an "estate planning" vehicle.

84.    Because Weller did not have the resources to pay a $2.5 million judgment, Weller would have had no estate to distribute if he had intended to pay Kruse's judgment.  Weller and Repp knew that Weller could only preserve his estate by hindering, delaying, and defrauding Kruse from collection of her judgment.

85.    For example, Weller was most likely to preserve from collection a portion of the forty (40) acres on which his homestead is located, but Weller's homestead was not conveyed to Weller Farms.  If the formation of Weller Farms was simply part of a legitimate estate plan, Weller's homestead would have necessarily been conveyed to Weller Farms.

86.    Repp and Weller have always known that Weller Farms was never created for the purposes of advancing any legitimate estate plan.

87.    Repp and Weller have always known that Weller Farms was created and operated as a sham for the purpose of hindering, delaying, and defrauding Kruse from collection of her judgment.  Despite this knowledge, neither Repp nor DMTH has ever withdrawn from representing Weller but, rather, continues to represent Weller and to promote his false narratives.

**Weller's Financial Statements of May 11, 2015 Prepared by Weller and Repp Used in an Attempt to Extract a Minimal, Negligible, and Unfavorable Settlement to Kruse and Favorable to Weller Allowing Him to Keep Both of His Farms**

88.    On May 11, 2015, within ten days of the $2.5 million judgment entered on May 1, 2015 and within a week of the corrected judgment entry of May 5, 2015, Weller and Repp jointly prepared false, misleading, and bogus financial statements for submission to Kruse.  These

24

financial statements were prepared within approximately three months of Repp's organization of Weller Farms on March 3, 2015.

89.     These financial statements, *inter alia*, showed the newly formed LLC (Weller Farms), after the transfer of Weller's valuable farms and farm assets into that LLC, had a negative net equity of $16,506.

90.     These false, misleading, and bogus financial statements were made and given in an attempt to extract a minimal, negligible, and unfavorable settlement to Kruse and favorable to Weller allowing him to keep both of his farms.

**Weller's False Financial Statement of October 9, 2015 Prepared by Weller and First State and the Resulting Refinancing of January 4, 2016**

91.     Without financing, the scheme to defraud Kruse would have collapsed and could not have continued.

92.     Weller secured financing for the fraudulent scheme by preparing a false financial statement for Weller and Weller Farms.

93.     The false financial statement enabled Weller to continue to borrow money with loans secured by his fraudulently transferred assets.

94.      While preparing for Weller's annual financial review in early October 2015, Guinn (a First State loan officer) ran Weller's credit report and learned of Kruse's $2.5 million judgment.

95.     On October 9, 2015, Guinn and Weller jointly prepared Weller's false and fraudulent personal financial statement for First State's loan files and records, knowingly omitting any reference to Kruse's $2.5 million judgment against Weller as a liability.

96.     The financial statement was also false because (among other things) it listed and included the value of the farm real estate as a personal asset of Weller, even though Weller had deeded that real estate seven months earlier to Weller Farms.

97.     The false financial statement that was knowingly prepared by Guinn and Weller was used by First State to extend and by Weller to obtain a refinancing on January 4, 2016.

98.     The refinancing included the grant of the following security interests and the incurrence of the following obligations:

(a)     A new $500,000 second real estate mortgage granted by Weller Farms to First State, in addition to the April 26, 2002 farm mortgage in the open-ended amount of $300,000, on the real estate that Weller had fraudulently conveyed to Weller Farms.  This new $500,000 second mortgage was granted by Weller Farms.  According to a financial statement prepared by Weller and Repp and dated May 11, 2015, Weller Farms had a net equity value of negative $16,506.  A copy of this new $500,000 second real estate mortgage is attached as Plaintiffs' Exhibit 8.

(b)     A Guaranty from Weller Farms to First State guaranteeing all past, present, and future debts of every type and description that Weller had incurred or may incur in the future to First State.  This would include personal, business, or any other type of debt even if completely unrelated to the purported farming purposes of Weller Farms.

(c)     A personal loan to Weller from First State in the principal amount of $296,648.87.  This loan was granted when Kruse's $2.5 million judgment had been entered against Weller, when Weller was massively insolvent, and when Kruse's $2.5 million judgment had been filed as a judgment lien against the Mahaska County real estate.  This personal loan to

26

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Weller was purportedly secured by a future advance clause in the April 26, 2002 farm mortgage in the open-ended amount of $300,000 on the farm real estate, but Weller had conveyed the mortgaged real estate to Weller Farms seven months earlier.

(d)     A personal loan to Weller from First State in the principal amount of $40,357.  This loan was granted when Kruse's $2.5 million judgment had been entered against Weller, when Weller was massively insolvent, and when Kruse's $2.5 million judgment had been filed as a judgment lien against the Mahaska County real estate.  This personal loan to Weller was purportedly secured by a future advance clause in a $50,000 open-ended real estate mortgage on commercial real estate (insurance office), but Weller had previously conveyed the mortgaged real estate to the Trust in 2012, shortly after the accident with Kruse.

99.     In truth, contrary to what was shown in Weller's October 9, 2015 financial statement, Weller was massively insolvent.  A copy of the false and fraudulent financial statement of October 9, 2015 is attached as Plaintiffs' Exhibit 10.

100.     Guinn acknowledges that First State's loans are reviewed by bank examiners, that the examiners expect financial statements in a bank's loan files to be true and accurate, and that a $2.5 million judgment against a customer of the bank would be something that the examiners would certainly want to know about.

101.     Even with the omission of Kruse's judgment and the fraudulent inclusion of Weller Farm assets, Weller's October 9, 2015 personal financial statement indicated that he had a net worth of only $375,871.  Any honest financial statement would have indicated that Weller was insolvent.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

102.    The knowing omission of Kruse's $2.5 million judgment as a liability and the knowing inclusion of Weller Farm real estate as an asset on Weller's personal financial statement, which was jointly prepared by Weller and Guinn, are two prominent instances showing that First State failed to meet the initial, minimal test of "honesty of intention" in order to be a "good faith" participant (transferee or obligee) in the refinancing of January 4, 2016, and the transactions leading up to and following that refinancing.  The financial statements were inaccurate in other ways that will be proven at trial.

103.    At the time of the January 4, 2016 refinance, First State also knew that Weller Farms was formed the month before Kruse's trial began.  Guinn admitted he obtained the Weller Farms formation documents from the Secretary of State's website during Weller's October 2015 financial review.  These documents showed the date of the formation of Weller Farms.  By running Weller's credit report, Guinn also knew that Weller had paid nothing or only minimal payments to Kruse.

104.    First State's knowledge of both of these facts before the refinancing of January 4, 2016, shows its knowledge that Weller's transfers into Weller Farms were fraudulent as to Kruse.

105.    More importantly, at the same time Weller and Guinn jointly prepared Weller's October 9, 2015 personal financial statement, Weller and Guinn also jointly prepared 2016 cash flow projections indicating that Weller had no intention of making any payments to Kruse on their $2.5 million judgment during the coming year.

106.    Based on these facts, among others, the court in the fraudulent transfer action found that "Weller has attempted to go about his life and conduct his business as though he did

28

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

not owe Plaintiff's $2.6 million.  Bluntly, he has not acted like a person who has any intent on satisfying the judgment against him."  (Plaintiffs' Exhibit 7 at 11-12).

107.   The false and fraudulent financial statement jointly prepared by Guinn and Weller evidence First State's knowledge of Weller's fraudulent intent and evidence that First State affirmatively shared Weller's fraudulent intent.

108.   First State's notice and knowledge of the facts rendering the transfers of the assets into Weller Farms voidable are inconsistent with the good faith required of a protected transferee or a protected obligee in the refinancing predicated on these fraudulent transfers.

109.   As a result, the refinancing of January 4, 2016 remains in effect between First State and Weller, but all of the First State's right, title, and interests in the real estate and assets involved in the fraudulent refinancing are subordinated to Kruse and their $2.5 million judgment.

**Some of Weller's Fraudulent "Gifts" Were Not Transferred Back to Weller But to Weller Farms**

110.   The court in the fraudulent transfer case against Weller found that Weller's eight $13,000 "gifts" were "clearly fraudulent" (Plaintiffs' Exhibit 7 at 11).

111.   Nicholson and Repp advised Weller that these eight $13,000 "gifts" were unlawful fraudulent transfers.

112.   At the trial in the fraudulent transfer case against Weller, Weller and Repp represented that the "gifts" were returned because of the appearance of impropriety.

113.   Nonetheless, not all the "gifts" were returned to Weller but some were instead funneled by Weller and Repp to Weller Farms.

29

**Exhibit A, Page 29 of 184**

114.    For example, $39,000 that was fraudulently "gifted" to Weller's brother, nephew, and niece, when "returned", was deposited in the bank account of Weller's daughter, beyond the reach of Weller's creditors.  This $39,000 was then subsequently transferred from the account of Weller's daughter to Weller Farms' account, remaining beyond the reach of Weller's creditors.

115.    The Trial Court in the fraudulent transfer case noted:  "For whatever reason, ultimately transferring the money to [Weller Farms] and away from the creditors did not strike Defendant [Weller] and his counsel [Repp] [DMTH] as just as eyebrow raising."  (Plaintiffs' Exhibit 7 at 11).

116.    In addition, some of the purportedly "returned" fraudulent "gifts" were subsequently used by Weller to satisfy a substantial vehicle loan on a vehicle he had transferred to Weller Farms at the time of its formation.  At the time of its transfer, Weller claimed that the vehicle had "0" value.  In other words, Weller used the proceeds of some of the fraudulent "gifts" to pay debts of Weller Farms when the proceeds were supposed to have been (and Weller and Repp represented that they had been) returned to pay Weller's personal creditors such as Kruse.

117.    Moreover, some of the proceeds of the fraudulent "gifts" were used by Weller to pay attorney fees to Repp and DMTH for work they performed on behalf of Weller in the formation of Weller Farms.

118.    Repp and Weller were actively and knowingly involved and participated in the ongoing scheme to defraud Kruse by attempting to place the fraudulent "gift" proceeds and other assets of Weller beyond Kruse's reach.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

119.    For example, in Weller's Trial Brief in the fraudulent transfer case, Repp and DMTH falsely state that Weller secured the return of the "$13,000 gifts to him, rendering this issue moot," and in the Written Closing Statement, Repp and DMTH falsely state that "Mr. Weller later, of course, reversed each gift taking that money back."

**Kruse's Fraudulent Transfer Case**

120.    On March 3, 2016, Kruse filed the fraudulent transfer action.

121.    On March 13, 2018, Judge Showers entered his Judgment and Decree in the fraudulent transfer action, setting aside and avoiding the transfer of farmland and other assets into Weller Farms as fraudulent transfers as to Kruse, free and clear of any claims of Weller, the Trust, Weller Farms, and Cody Weller.  (Plaintiffs' Exhibit 7).

122.    Specifically, Judge Showers adjudged and decreed as follows:

4.  The March 3, 2015 Quit Claim Deed from Steven J. Weller, Trustee, to Weller Farms LLC is avoided and set aside, declared null and void, with no legal force and effect, along with the Individual Trustee's Affidavit of Steven J. Weller and all other title documents associated with the avoided transfers and all transfers by Steven J. Weller in the Operating Agreement Between and Among the Members of Weller Farms LLC dated March 3, 2015, and all other acts and transactions, including transfers or obligations incurred by Weller Farms LLC, or anyone acting on behalf of Weller Farms LLC be avoided and set aside, free and clear of all claims by Cody Weller, Weller Farms LLC, and Steven J. Weller Revocable Trust.

**Judge Showers' Findings as to First State's Refinancing**

123.    Judge Showers' Judgment and Decree also avoided the entire January 4, 2016 First State refinancing as a fraudulent transfer as to Kruse.

124.    In essence, the Court avoided and set aside all of the security interests granted and loans incurred by Weller in any capacity related to Weller Farms or individually in connection

31

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

with that January 4, 2016 refinancing as fraudulent transfers as to Kruse, which would specifically include:

- Note A in First State's Foreclosure Petition in the pending foreclosure action (a copy of which is attached to the First State's Foreclosure Petition as Exhibit A);

- Note B in First State's Foreclosure Petition in the pending foreclosure action (a copy of which is attached to the Bank's Foreclosure Petition as Exhibit J);

- The Guaranty which is relied upon in First State's Foreclosure Petition in the pending foreclosure action (a copy of which is attached to the Bank's Foreclosure Petition as Exhibit E);

- The purported future advances under Mortgage A in First State's Foreclosure Petition in the pending foreclosure action (a copy of Mortgage A is attached to the Bank's Foreclosure Petition as Exhibit B); and

- The new additional $500,000 second mortgage from Weller Farms to First State dated January 4, 2016 (Plaintiffs' Exhibit 8), which was at the heart of the fraudulent refinancing, but reference to which is conspicuously absent from the body of the First State's Foreclosure Petition in the pending foreclosure action, and which was the only real estate mortgage listed as security in Note C in the First State's Foreclosure Petition (a copy of Note C is attached to the First State's Foreclosure Petition as Exhibit M).

125.    The new $500,000 second mortgage from Weller Farms to First State (Plaintiffs' Exhibit 8), which Judge Showers set aside as a fraudulent transfer as to Kruse, has blocked, frozen, prevented, interfered with, and otherwise hindered, delayed, or defrauded Kruse in execution upon and collection of their $2.5 million judgment, and this additional $500,000

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

second mortgage would remain as an unforeclosed cloud on the real estate and a continued

impediment hindering, delaying, or defrauding Kruse in the execution upon and collection of

their $2.5 million judgment, as a part and parcel of the ongoing scheme to defraud, if First

State's Foreclosure Petition in the pending foreclosure action (Plaintiffs' Exhibit 12) were

granted as requested by First State.

126.    In particular, with regard to the additional $500,000 second mortgage, Judge

Showers ordered and adjudged:

> 8.  The January 4, 2016, Real Estate Mortgage by Weller Farms LLC to First
> State Bank in Lynnville, Iowa, in the principal amount of $500,000, the Guaranty
> from Weller Farms LLC to First State Bank of Lynnville, Iowa, and all loans
> signed by Steven J. Weller in any capacity on January 4, 2016, and all other
> security interests, loans, or documents granted by either Defendant Steven Weller
> in any capacity related to Weller Farms LLC or individually is set aside and
> avoided as fraudulent transfers and declared null and void with no legal force and
> effect.  This voided transfer is free and clear of any claims by Cody Weller,
> Weller Farms LLC, or Steven J. Weller Revocable Trust.

**Judge Showers' Findings as to Weller Farms**

127.    Judge Showers also found that the formation of Weller Farms was intended to

keep certain assets from Weller's creditors and that the Operating Agreement's stated purpose

was to "provide protection to family assets from claims of future creditors against family

members."  The court found that Kruse and Hudson were the future creditors.

128.    Judge Showers determined that Weller's actions in creating Weller Farms and his

subsequent behavior indicated that his goal was and still is to prevent creditors from obtaining

the value of the land.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

129.    Accordingly, the court necessarily found that the formation and operation of Weller Farms was essentially a sham, lacking any economic substance and decreed that all the assets of Weller Farms were owned in substance by Weller:

> 7.  All assets of Weller Farms LLC are owned in substance by Steven J. Weller and remain available to creditors of Steven J. Weller, including Plaintiffs, for levy of execution or other action, process, or proceeding, as the assets of Steven J. Weller, subject to any claim of exemption, which shall be resolved through this matter, the Judgment Debtor case, or the underlying personal injury matter, free and clear any claims by Cody Weller, Weller Farms LLC, or Steven J. Weller Revocable Trust.

130.    And, specifically Judge Showers adjudged and decreed as follows:

> 5.  All transfers made by Steven J. Weller into Weller Farms LLC, or obligations incurred by Defendant Steven J. Weller on behalf of Weller Farms LLC, are avoided and set aside, declared null and void, with no legal force and effect.

131.    The court also enjoined Weller from making further fraudulent transfers or further transfers of avoided real estate transfers:

> 10.  A Permanent Injunction is hereby entered restraining Defendant Steven J. Weller from making any transfer or incurring any obligation with the intent to hinder, delay, or defraud Plaintiffs or from making further disposition of avoided real estate or of any other assets or property determined by this decision to be fraudulently transferred or any other property a constructive trust is imposed.

132.    This permanent injunction was entered by the court to prevent irreparable harm to Kruse.  The permanent injunction was intended to finally put an end to the ongoing scheme to defraud Kruse in the collection of and execution on their $2.5 million judgment.  But, it is not over yet.  Weller is still engaged in efforts to circumvent the permanent injunction, with the aid of First State and the other participants in the ongoing scheme to defraud.

133.    Judge Showers' Trial Order and Verdict and Judgment and Decree entered on March 13, 2018 and the Order Re: Attorney Fees entered on May 18, 2018 are res judicata/issue

preclusive determinations, pursuant to Restatement of Judgments 2d §27 and §39 and other provisions of the Restatement of Judgments 2d and Iowa law on judgments and issue preclusion as to Repp and DMTH.

134.     As to all the named Defendants herein, Plaintiffs' Exhibits 7 and 9 and the adjudications and determinations made therein are operative facts of independent significance to this proceeding.

**First State Knowingly Facilitated the Fraudulent January 4, 2016 Refinance**

135.     First State lacked good faith regarding the fraudulent refinancing of January 4, 2016, and instead joined and participated in the ongoing scheme to hinder, delay, or defraud Kruse in the collection of and execution on their $2.5 million judgment.

136.     The refinancing of January 4, 2016 is full of abnormalities evidencing that First State knew that the transfer of the farm real estate into Weller Farms was fraudulent and likely to be set aside as fraudulent to Kruse and their $2.5 million judgment. The abnormalities include but are not limited to:

- First State ignored the existence of the Quit Claim Deed to Weller Farms in refinancing the $296,648.87 personal note to Weller on the farm real estate (Exhibit A in the Foreclosure Petition in the pending foreclosure action).

- Given that Weller Farms had been the record titleholder to the farm real estate for seven months, normal business practices and common sense would dictate that the current owner of the real estate, Weller Farms, should execute a new note and give a new mortgage.

35

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

- If First State wanted security from Weller personally, First State could have required Weller to sign a personal guaranty.

- The farm real estate continued to be listed as a personal asset on the false and fraudulent financial statement jointly prepared by Weller and Guinn on October 9, 2015, which evidences First State's notice and knowledge that the formation of Weller Farms and the transfers of the farm real estate into it were fraudulent and likely to be avoided by Kruse as fraudulent as to her.

137.    All of these acts (among others) evidence First State's notice and knowledge that the transfer of the farm real estate into Weller Farms was fraudulent and likely to be set aside as to Kruse and their $2.5 million judgment.

138.    First State structured the refinancing of January 4, 2016 in a misguided and ineffectual effort to create a second barrier to prevent Kruse from collecting their judgment.  The first barrier was the transfer of the farm real estate and other assets into Weller Farms.

139.    This second barrier included First State's attempt to use the "future advance" clause in the April 26, 2002 farm mortgage in the open-ended amount of $300,000 (Exhibit "B" in the Foreclosure Petition in the pending foreclosure action) as an artifice to further the fraud if and when Weller's fraudulent transfers into Weller Farms were discovered and set aside.  As noted in Paragraph 98 above, the "future advance" clause could not be used by Weller when he had already conveyed his interest in the mortgaged property to Weller Farms.  Moreover, even if Weller could have legally used the "future advance" clause under normal circumstances, he could not use it when he and First State had knowledge and the shared intent to use it to hinder, delay, or defraud Kruse.

E-FILED 2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

140.    The second barrier also included the $500,000 second mortgage which was intended to block, freeze, prevent, interfere with, and otherwise hinder, delay, or defraud Kruse in execution upon and collection of their $2.5 million judgment.  Judge Showers, in his Trial Order and Verdict in the fraudulent transfer action, set aside "[t]he January 4, 2016, Real Estate Mortgage by Weller Farms LLC to First State Bank in Lynnville, Iowa, in the principal amount of $500,000…"  (Plaintiffs' Exhibit 7 at 14).

141.    When the fraudulent transfer of the farm real estate to Weller Farms was set aside by Judge Showers as fraudulent as to Kruse, free and clear of any claims of Weller Farms, this subjected and subordinated any new mortgage that First State took from Weller Farms to Kruse's $2.5 million judgment lien, and First State knew it likely would.

142.    Weller and First State's attempt to use the refinancing of January 4, 2016 as a barrier to Kruse's collection efforts is fraudulent, ineffective, unconscionable, and cannot be sanctioned by this court.

143.    The March 3, 2015 formation of Weller Farms, Weller's transfers of his farm real estate and other farm assets into Weller Farms, the January 4, 2016 refinancing, and all of the acts in furtherance or cover-up of these fraudulent transfers were all a part of the ongoing fraudulent scheme intended to hinder, delay or defraud Kruse in the collection of their $2.5 million judgment and to interfere with Kruse's collection of their claim and judgment.  This ongoing fraudulent scheme constituted a violation of Kruse's rights since March 3, 2015 and is still continuing.

144.    Van Vark was Guinn's senior loan officer, mentor, and advisor.  Van Vark and Guinn communicated regarding the accident between Weller and Kruse.  They communicated

regarding Weller's plans to form Weller Farms as an LLC.  They communicated regarding Kruse's $2.5 million judgment when it appeared on Weller's credit report.  Guinn had taken over the Weller loan account from Van Vark.  On information and belief, Van Vark had notice and knowledge of all the pertinent actions taken by Guinn referred to herein, and that Van Vark approved or authorized those actions from time to time.

**First State Knew that Weller Farms Was a Sham**

145.    First Bank had notice and knowledge that the formation and operation of Weller Farms was a sham, without any economic substance.

146.    This notice and knowledge also negates the good faith necessary for First State to be a bona fide transferee of any of the security interests made or a bona fide obligee of any of the obligations incurred in the January 4, 2016 refinancing, or in connection with it.

147.    Judge Showers essentially adjudged and decreed that the formation and operation of Weller Farms, in fact, was a sham, without economic substance, in Paragraph 7 of his Judgment and Decree when he ordered and adjudged:

> All assets of Weller Farms LLC are owned in substance by Steven J. Weller and remain available to creditors of Steven J. Weller, including Plaintiffs, for levy of execution or other action, process or proceeding as the assets of Steven J. Weller, subject to any claim of exemption which shall be resolved through this matter, the Judgment Debtor case, or the underlying personal injury matter, free and clear [of] any claims by Cody Weller, Weller Farms LLC, or Steven Weller Revocable Trust.

(Plaintiffs' Exhibit 7 at 14).

148.    First State had notice and knowledge that Weller Farms was the alter ego of Weller because First State knew that: (1) Weller influenced and governed Weller Farms; (2) a unity of interest and ownership existed such that Weller and Weller Farms could not be

38

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

separated; and (3) giving effect to the fictional separation between Weller Farms and Weller would "sanction a fraud or promote injustice."

*Weller Influenced and Governed Weller Farms*

149.    First State's entire refinancing of January 4, 2016 was completed with only Weller's signature.

150.    Weller signed all the documents involved in the refinancing in his individual capacity or as a director or member of Weller Farms.  This included the Guaranty by which Weller Farms guaranteed and pledged all of its assets to secure all of Weller's personal debts to First State.  (Exhibit E attached to Foreclosure Petition in the pending foreclosure action).

151.    By its terms, the Guaranty was secured by the Security Agreement dated November 5, 2015, which was a blanket security interest covering all of Weller Farms' tangible and intangible personal property, and a new $500,000 second real estate mortgage from Weller Farms to First State as part of the January 4, 2016 refinancing.

152.    This new $500,000 second mortgage from Weller Farms to First State was signed only by Weller on behalf of Weller Farms.  (Plaintiffs' Exhibit 8).

153.    According to First State, the Guaranty guaranteed and secured (among other debts) the alleged "future advance" to Weller of $296,648.87 on January 4, 2016, a note Weller signed in his individual name, as well as Weller's debts on his insurance building.  This insurance building was never conveyed to Weller Farms and the debt on the insurance building was totally unrelated to the operation of the family farm, which was Weller Farms' purported purpose.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

154.    In essence, the Guaranty was a blank check for Weller to incur personal loans from First State and charge them to Weller Farms.

*Unity of Interest and Ownership Between Weller and Weller Farms*

155.    The entire January 4, 2016 refinancing evidences a unity of interest and ownership such that Weller Farms and Weller could not be separated, but the Guaranty alone clearly evidences this relationship.

*Recognizing the Fictional Separation Between Weller and Weller Farms Would "Sanction a Fraud or Promote Injustice."*

156.    Judge Showers has already determined that giving effect to the fictional separation between Weller Farms and Weller would "sanction a fraud or promote injustice." (See Plaintiffs' Exhibit 7 at 13-15).

157.    First State was also blindly indifferent to the existence of the six factors that justify piercing the corporate veil between Weller Farms and Weller.

- Weller Farms was undercapitalized.  Financial statements for Weller and Weller Farms dated January 20, 2016 (fifteen days after First State's refinancing of January 4, 2016) shows $0.01 in Weller's personal checking account at First State, $12.30 in Weller's personal checking account at Midwestone Bank, and no balance in Weller's personal savings account at Midwestone Bank.  In terms of Weller Farms' liquidity, the financial statement shows no checking or savings accounts and a negative net equity of $19,312.95.

- The Weller Farms' participants did not follow corporate formalities.  There were no corporate records or documents other than the Certificate of Organization and

40

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

the Operating Agreement.  There were no minutes of any corporate meetings.
First State knew this or was blindly indifferent to the lack of corporate formalities.
First State simply downloaded the bare bones documents from the Secretary of
State's website and looked at two banking resolutions signed at First State.

- Weller Farms did not keep separate books.  Weller Farms maintained only a
  checking account ledger at First State.

- The checking account ledger indicated that Weller Farms' finances were
  comingled with Weller's personal finances.  Weller Farms paid Weller's
  individual obligations.  The Guaranty (Exhibit E attached to the Foreclosure
  Petition in the pending foreclosure action) evidences that First Bank knew there
  was no separation between the finances of Weller Farms and Weller.

- As determined by Judge Showers, Weller Farms was used to promote fraud.
  (Plaintiffs' Exhibit 7 at 8, 12).

- Judge Showers also determined that the formation and operation of Weller Farms
  was essentially a sham and an instrument used to promote fraud and illegality.

  (*Id.*)

158.    Due to First State's notice and knowledge of the Weller Farms sham and the
fraud, its active participation and involvement in the sham and the ongoing fraud, and its use and
attempt to use the sham and the ongoing fraud, First State has unclean hands, is "in pari delicto"
with Weller and the other participants in the ongoing scheme to defraud, and is estopped from
denying the ongoing fraud in which it has countenanced, assisted, participated, furthered, and
encouraged.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

159.     As a result, all of First State's right, title, and interests in the real estate and secured assets in that fraudulent refinancing, and following, are subordinated to Kruse and their $2.5 million judgment.

**Mail & Wire Fraud**

160.     Weller, Repp, DMTH, Guinn, Van Vark, and First State engaged in a scheme to defraud Kruse by means of fraudulently conveying and transferring Weller's assets for the purpose of thwarting Kruse's ability to collect their $2.5 million judgment. Weller, Repp, DMTH, Guinn, Van Vark, and First State knowingly devised or knowingly participated in a scheme or artifice to defraud Kruse or to obtain the money or property of Kruse by means of false or fraudulent pretenses, representations, or promises.

161.     Weller, Repp, DMTH, Guinn, Van Vark, and First State could foresee that the U.S. Postal Service and interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341 and 1343.

162.     In particular, Weller, Repp, DMTH, Guinn, Van Vark, and First State knew or could foresee that the U.S. Postal Service and interstate wires would be used to receive and/or deliver, *inter alia*, communications for the purpose of forming and operating Weller Farms; for the purpose of transferring Weller's money and assets to Weller Farms; for the purpose of facilitating all transactions with First State; and for the purpose of coordinating, planning, financing and facilitating the activities of Weller, Repp, DMTH, Guinn, Van Vark, and First State pursuant to the scheme to defraud Kruse.

42

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

163.    Weller, Repp, DMTH, Guinn, Van Vark, and First State acting singly and in concert, personally or through their agents, used the U.S. Postal Service and interstate wires or caused the U.S. Postal Service or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to defraud Kruse, within the meaning of 18 U.S.C. §§ 1341 and 1343.

164.    It is not possible for Kruse to plead with particularity all instances of mail and wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Weller, Repp, DMTH, Guinn, Van Vark, and First State, and other presently unknown individuals. By way of example, however, Weller, Repp, DMTH, Guinn, Van Vark, and First State specifically used the U.S. Postal Service or interstate wires or caused the U.S. Postal Service or interstate wires to deliver each and every email, electronic transfer, letter, mailing, and other uses of the mail and wire described in the above paragraphs, and including but not limited to those further described below, for the purpose of advancing, furthering, executing, and concealing the scheme to defraud Kruse:

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

| Type | Date | From | To | Description |
|---|---|---|---|---|
| Interstate Wire | 3/3/15 | David Repp in Des Moines, IA or Steven Weller in Rose Hill, IA | IRS in Cincinnati, OH | Application for EIN for Weller Farms LLC |
| U.S. Mail | 3/5/15 | Mahaska County Recorder in Oskaloosa, IA | David Repp in Des Moines, IA | Quit Claim Deed from Steven J. Weller, Trustee of the Steven J. Weller Revocable Trust to Weller Farms, LLC |
| U.S. Mail | 3/5/15 | Mahaska County Recorder in Oskaloosa, IA | David Repp in Des Moines, IA | Individual Trustee's Affidavit of Steven J. Weller |
| Interstate Wire | 10/9/15 | First State Bank in Lynnville, IA | Credit Report | Credit Report pulled for Weller's annual review |
| Interstate Wire | 12/22/15 | First State Bank in Lynnville, IA | Charlotte, NC | ACH Debit from Weller Farms LLC to Capital One for Check Payment of Check No. 1122 |
| U.S. Mail | 1/5/16 | Mahaska County Recorder in Oskaloosa, IA | First State Bank in Lynnville, IA | Real Estate Mortgage from Weller Farms, LLC to First State Bank of Lynnville, Iowa |
| Interstate Wire | 1/5/16 | First State Bank in Lynnville, IA | Memphis, MO | Check No. 1131 from Weller Farms LLC to Scottland Co. |
| Interstate Wire | 1/5/16 | First State Bank in Lynnville, IA | Memphis, MO | Check No. 1132 from Weller Farms LLC to Scottland Co. |
| Interstate Wire | 1/12/16 | First State Bank in Lynnville, IA | Memphis, MO | Check No. 1142 from Weller Farms LLC to Scottland Co. Livestock |
| Interstate Wire | 1/25/16 | First State Bank in Lynnville, IA | Charlotte, NC | ACH Debit from Weller Farms LLC to Capital One for Check Payment of Check No. 1161 |

**Exhibit A, Page 44 of 184**

| | | | | |
|---|---|---|---|---|
| Interstate Wire | 2/22/16 | First State Bank in Lynnville, IA | Charlotte, NC | ACH Debit from Weller Farms LLC to Capital One for Check Payment of Check No. 1193 |
| Interstate Wire | 4/14/16 | Kirksville, MO | First State Bank in Lynnville, IA | Deposit of Check from Kirksville to Weller Farms LLC account at First State Bank of Lynnville, Iowa |
| Interstate Wire | 4/17/16 | Hunt & Associates PC in Oskaloosa, IA | IRS in Cincinnati, OH | E-filing of 2015 Form 1040, U.S. Individual Income Tax Return for Steven J. Weller |
| Mail | 4/17/16 | Steven Weller in Oskaloosa or Rose Hill IA | IRS in Cincinnati, OH | Payment of balance due on Steven Weller's 2015 individual income tax return |
| Interstate Wire | 4/17/16 | Hunt & Associates PC in Oskaloosa, IA | IRS in Ogden, UT | E-filing of 2015 Form 1065, U.S. Return of Partnership for Weller Farms LLC |
| U.S. Mail and/or Interstate Wire | 4/21/16 and/or 5/3/2016 | Rose Hill, IA and/or First State Bank in Lynnville, IA | Charlotte, NC | Check No. 1250 from Weller Farms LLC to Capital One |
| Interstate Wire | 5/16/16 | First State Bank in Lynnville, IA | Greentop, MO | Check No. 1260 from Weller Farms LLC to Harry Durflinger |
| Interstate Wire | 8/1/16 | First State Bank in Lynnville, IA | Carol Stream, IL or Wilmington, DE | ACH Debit from Weller Farms LLC to Chase for Check Payment of Check No. 1290 |
| Interstate Wire | 8/22/16 | First State Bank in Lynnville, IA | Carol Stream, IL or Wilmington, DE | ACH Debit from Weller Farms LLC to Chase for Check Payment of Check No. 1299 |
| Interstate Wire | 11/21/16 | First State Bank in Lynnville, IA | Carol Stream, IL or Wilmington, DE | ACH Debit from Weller Farms LLC to Chase for Check Payment of Check No. 1329 |

**Exhibit A, Page 45 of 184**

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

| Interstate Wire | 1/18/17 | First State Bank in Lynnville, IA | Greentop, MO | Check No. 1344 from Weller Farms LLC to Harry Durflinger |
|---|---|---|---|---|
| Interstate Wire | 2/16/17 | Kirksville, MO | First State Bank in Lynnville, IA | Deposit of Check from Kirksville Livestock to Weller Farms LLC account at First State Bank of Lynnville, Iowa |
| Interstate Wire | 3/6/17 | Hunt & Associates PC in Oskaloosa, IA | IRS in Fresno, CA | E-filing of 2016 Form 1040, U.S. Individual Income Tax Return for Steven J. Weller |
| Interstate Wire | 3/6/17 | IRS | First State Bank in Lynnville, IA | Direct deposit of federal income tax refund from Steven Weller's 2016 individual income tax return |
| Interstate Wire | 3/6/17 | Hunt & Associates PC in Oskaloosa, IA | IRS in Ogden, UT | E-filing of 2016 Form 1065, U.S. Return of Partnership for Weller Farms LLC |
| Interstate Wire | 3/23/17 | First State Bank in Lynnville, IA | Credit Report | Credit Report pulled for Weller's annual review |
| Interstate Wire | 5/10/17 | First State Bank in Lynnville, IA | Kirksville, MO | Check No. 1377 from Weller Farms LLC to Kirksville Livestock |
| Interstate Wire | 5/11/17 | Kirksville, MO | First State Bank in Lynnville, IA | Deposit of Check No. 1377 to Kirksville Livestock |
| Interstate Wire | 5/17/17 | Kirksville, MO | First State Bank in Lynnville, IA | Deposit of Check from Kirksville to Weller Farms LLC account at First State Bank of Lynnville, Iowa |
| Interstate Wire | 6/19/17 | First State Bank in Lynnville, IA | Kirksville, MO | Check No. 1380 from Weller Farms LLC to Kirksville Livestock |
| Mail | 6/14/18 | First State Bank in Lynnville, IA | Steven Weller in Rose Hill, IA | Notice of Right to Cure Default |

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

| Mail | 6/14/18 | First State Bank in Lynnville, IA | Weller Farms LLC in Rose Hill, IA | Notice of Right to Cure Default |
|---|---|---|---|---|
| Mail | 8/7/18 | Iowa Mediation Service in West Des Moines, IA | Steven Weller and Weller Farms LLC in Rose Hill, IA | Mandatory Mediation Release |
| Mail | 11/2/18 | Davis Brown Law Firm in Des Moines, IA | Steven Weller in Rose Hill, IA | Letter re First State Bank foreclosure on loan no. 64723 |
| Mail | 11/2/18 | Davis Brown Law Firm in Des Moines, IA | Weller Farms LLC in Rose Hill, IA | Letter re First State Bank foreclosure on loan no. 64723 |
| Mail | 11/2/18 | Davis Brown Law Firm in Des Moines, IA | Steven Weller in Rose Hill, IA | Letter re First State Bank foreclosure on loan no. 64722 |
| Mail | 11/2/18 | Davis Brown Law Firm in Des Moines, IA | Weller Farms LLC in Rose Hill, IA | Letter re First State Bank foreclosure on loan no. 64722 |
| Mail | 11/2/18 | Davis Brown Law Firm in Des Moines, IA | Steven Weller in Rose Hill, IA | Letter re First State Bank foreclosure on loan no. 66473 |
| Mail | 11/2/18 | Davis Brown Law Firm in Des Moines, IA | Weller Farms LLC in Rose Hill, IA | Letter re First State Bank foreclosure on loan no. 66473 |
| Interstate Wire | TBD | TBD | TBD | Clearing of check payments in connection with the fraudulent scheme (Additional details TBD in discovery) |

**Exhibit A, Page 47 of 184**

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

165.     Upon information and belief, some of the wire communications described above occurred between persons in the same state but crossed interstate borders by reason of the technology and other mechanisms used to transmit the communication.

166.     Each and every use of the U.S. Postal Service or interstate wires described above was committed by Weller, Repp, DMTH, Guinn, Van Vark, and First State with the specific intent to defraud Kruse or Hudson or for obtaining the money or property of Kruse or Hudson by means of false or fraudulent pretenses, representations, or promises.  Weller's, Repp's, DMTH's, Guinn's, Van Vark's, and First State's acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

167.     Plaintiffs suffered, continue to suffer, and will suffer substantial injures by reason of Weller's, Repp's, DMTH's, Guinn's, Van Vark's, and First State's acts of racketeering.

## COUNT I

### (FIRST STATE'S TRANSFEREE AND OBLIGEE LIABILITY FOR FRAUDULENT TRANSFERS UNDER IOWA'S UNIFORM FRAUDULENT TRANSFER ACT)

168.     Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-167 above as if fully pled herein.

169.     The January 4, 2016, Real Estate Mortgage by Weller Farms to First State in the principal amount of $500,000, the Guaranty from Weller Farms to First State, and all loans signed Weller in any capacity on January 4, 2016, and all other security interests, loans, or documents granted by either Weller in any capacity related to Weller Farms or individually are fraudulent transfers and avoided as to Kruse under Iowa's Uniform Fraudulent Transfer Act.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

170.     All other acts and transactions, including transfers or obligations incurred by Weller Farms or anyone acting on behalf of Weller Farms, are fraudulent transfers and avoided as to Kruse under Iowa's Uniform Fraudulent Transfer Act.

171.     All transfers made by Weller into Weller Farms, or obligations incurred by Weller on behalf of Weller Farms are fraudulent transfers and avoided as to Kruse under Iowa's Uniform Fraudulent Transfer Act.

172.     While these fraudulent transfers and transactions are avoidable as to Kruse, they are nevertheless valid as between First State, Weller, and Weller Farms under Iowa's Uniform Fraudulent Transfer Act.

173.     First State bears the burden to prove protected status as a good faith transferee or obligee to be entitled to protection under Iowa's Uniform Fraudulent Transfer Act, which First State cannot do because First State had notice and knowledge that negated its status as a good faith transferee or obligee.

174.     Kruse were damaged and are entitled to all the statutory, legal, and equitable remedies allowed by Iowa's Uniform Fraudulent Transfer Act including but limited to the following:

  a.     Subordination of all the obligations and security interests referred to above to Kruse and their $2.5 million judgment;

  b.     Disgorgement and payment by First State of any payments received or receivable on the obligation to Kruse;

  c.     The option for entry of judgment against First State for the value of the assets fraudulently transferred;

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

     d.     All other statutory, legal, and equitable remedies available to Kruse allowed under Iowa's Uniform Fraudulent Transfer Act.

175.     First State's actions were willful, wanton, and in reckless disregard for the rights of Kruse entitling them to an award of punitive damages.

176.     First State's actions were conniving and wrongfully interfered with the rights of Kruse entitling them to an award of common law attorney fees.

WHEREFORE Plaintiffs request judgment against First State for declaratory relief declaring and decreeing that all of the First State's interests are subordinated to the interests of Kruse, and judgment for compensatory damages, restitution, and disgorgement by First State of any payments received or receivable on the obligations set aside under Iowa's Uniform Fraudulent Transfer Act, and all other statutory, legal, and equitable elections for relief and relief to which Plaintiffs are entitled under Iowa's Uniform Fraudulent Transfer Act, including but not limited to punitive damages, common law attorney fees, and all other relief to which they are entitled and for the costs of this action.

## COUNT II

### (AIDING AND ABETTING STEVEN WELLER'S FRAUDULENT TRANSFERS IN THE ONGOING SCHEME TO DEFRAUD AS TO ALL DEFENDANTS)

177.     Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-176 above as if fully pled herein.

178.     The March 3, 2015 Quit Claim Deed from Weller, as trustee, to Weller Farms, along with Weller's Individual Trustee's Affidavit and all other title documents and transfers by

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Weller in the Operating Agreement Between and Among the Members of Weller Farms dated March 3, 2015, and all other acts and transactions, including transfers or obligations incurred by Weller Farms, or anyone acting on behalf of Weller Farms are fraudulent transfers and avoided as to Kruse under Iowa's Uniform Fraudulent Transfer Act.

179.   Weller committed the fraudulent transfers referred to above.

180.   Repp, Guinn, Van Vark, DMTH, and First State knew of the fraudulent transfers by Weller.

181.   These fraudulent transfers were part and parcel of an ongoing scheme to defraud, including fraudulent transfers of assets, security interests and other interests in assets, and fraudulent incurrence of obligations; false financial statements and other false and misleading statements; misrepresentations and omissions; shams; false or misleading statements under oath and/or perjury; and other false, fraudulent, dishonest, and/or misleading acts or other artifices and means to defraud; all intended to hinder, delay, or defraud Kruse from collecting their claim and executing on their $2.5 million judgment and instead to extort and extract a minimal, negligible, and unfavorable settlement to Kruse in compromise of their $2.5 million judgment.

182.   Repp, Guinn, Van Vark, DMTH, and First State also knew of the ongoing scheme to defraud.

183.   Repp, Guinn, Van Vark, DMTH, and First State gave substantial assistance or encouragement to Weller in the commission of the fraudulent transfers.

184.   Repp, Guinn, Van Vark, DMTH, and First State gave substantial assistance or encouragement to Weller in the commission of the ongoing scheme to defraud.

185.    Kruse were damaged and are entitled to all the statutory, legal, and equitable remedies allowed by Iowa's Uniform Fraudulent Transfer Act including, but limited to, the following:

a.      Subordination of all the obligations and security interests referred to above to Kruse and their $2.5 million judgment;

b.      Disgorgement and payment to Kruse of any payments received or receivable by First State on the obligations fraudulently incurred and disgorgement and payment to Kruse of any attorney fees received by Repp and DMTH;

c.      The option for entry of judgment against Repp, Guinn, Van Vark, DMTH, and First State for the value of the assets fraudulently transferred;

d.      All other statutory, legal, and equitable remedies available to Kruse allowed under Iowa's Uniform Fraudulent Transfer Act.

186.    Repp's, Guinn's, Van Vark's, DMTH's, and First State's actions and the actions of those whom they aided and abetted (for which Repp, Guinn, Van Vark, DMTH, and First State are liable) were willful, wanton, and in reckless disregard for the rights of Kruse entitling them to an award of punitive damages.

187.    Repp's, Guinn's, Van Vark's, DMTH's, and First State's actions and the actions of those whom they aided and abetted (for which Repp, Guinn, Van Vark, DMTH, and First State are liable) were conniving and wrongfully interfered with the rights of Kruse entitling them to an award of common law attorney fees.

WHEREFORE Plaintiffs request judgment against Repp, Guinn, Van Vark, DMTH, and First State, jointly and severally, for declaratory relief declaring and decreeing that all of Repp's,

Guinn's, Van Vark's, DMTH's, and First State's interests are subordinated to the interests of Plaintiffs, and judgment for compensatory damages, restitution, and disgorgement by Repp, Guinn, Van Vark, DMTH, and First State of any payments received or receivable on the obligations set aside under Iowa's Uniform Fraudulent Transfer Act, and disgorgement by Repp and DMTH of any attorney fees received, and all other statutory, legal, and equitable elections for relief and relief to which Plaintiffs are entitled under Iowa's Uniform Fraudulent Transfer Act, including but not limited to punitive damages, common law attorney fees, and all other relief to which they are entitled and for the costs of this action.

## COUNT III

### (DEFENDANTS' TORTIOUS AND INTENTIONAL INTERFERENCE WITH PLAINTIFFS' COLLECTION OF AND EXECUTION ON THEIR CLAIM AND $2.5 MILLION JUDGMENT AND/OR LIABILITY FOR AIDING AND ABETTING WELLER IN THE TORTIOUS AND INTENTIONAL INTERFERENCE IN THE ONGOING SCHEME TO DEFRAUD)

188.    Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-187 above as if fully pled herein.

189.    Kruse had a prospective economic relationship with Weller, since Weller owed Kruse for the damages he caused in the January 28, 2012 collision.

190.    Kruse's creditor/debtor relationship with Weller arose at the time their claims accrued at the time of the collision on January 28, 2012.

191.    These claims became liquidated in amount when the $2.5 million judgment was entered against Weller on May 1, 2015.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

192.    Repp, Guinn, Van Vark, DMTH, and First State knew of the creditor/debtor relationship between Kruse and Weller arising from the collision of January 28, 2012 and the resulting $2.5 million judgment on May 1, 2015.

193.    Repp, Guinn, Van Vark, DMTH, and First State intentionally and improperly interfered with the relationship by blocking, freezing, preventing, hampering, and otherwise interfering with Kruse in the collection of their claims and enforcement of and execution on their $2.5 million judgment and judgment lien and/or by giving substantial assistance or encouragement to Weller in blocking, freezing, preventing, hampering, and otherwise interfering with Kruse in the collection of their claims and enforcement of and execution on their $2.5 million judgment and judgment lien.

194.    The creditor/debtor relationship was disrupted because Kruse were blocked, frozen, prevented, hampered, and otherwise interfered from levying execution directly on Weller's assets as they could have done if it were not for the interference caused by Repp, Guinn, Van Vark, DMTH, and First State and/or Repp's, Guinn's, Van Vark's, DMTH's, and First State's actions giving substantial assistance or encouragement to Weller in the commission of the interference.

195.    This tortious and intentional interference was part and parcel of an ongoing scheme to defraud, including fraudulent transfers of assets, security interests and other interests in assets, and fraudulent incurrence of obligations; false financial statements and other false and misleading statements; misrepresentations and omissions; shams; false or misleading statements under oath and/or perjury; and other false, fraudulent, dishonest, and/or misleading acts or other artifices and means to defraud; all intended to hinder, delay, or defraud Kruse from collecting

54

their claim and executing on their $2.5 million judgment and instead to extort and extract a minimal, negligible, and unfavorable settlement to Kruse in compromise of their $2.5 million judgment.

196.    Kruse were harmed as a result of the interference, and the actions of Repp, Guinn, Van Vark, DMTH, and First State caused the harm to Kruse.

197.    Kruse were damaged and are entitled to all compensatory damages including, but not limited to, decreased value of the assets to be levied upon caused by the delay and interference; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on and recover against the property fraudulently transferred and/or encumbered resulting from the delay and interference; damage caused by waste, loss, plunder, and devaluation of the assets committed by Weller during the delay and interference; attorney fees and costs resulting from the interference, including attorney fees and costs incurred in setting aside the fraudulent transfers as well as attorney fees paid by Weller to his attorneys; all payments to First State made by Weller or Weller Farms at the time of or after the refinancing of January 4, 2016; interference with family relationships and economic benefits of family; and all other damages, injuries, and harms caused by the interference.

198.    Repp's, Guinn's, Van Vark's, DMTH's, and First State's actions and the actions of those whom they aided and abetted (for which Repp, Guinn, Van Vark, DMTH, and First State are liable) were severe, extreme, and done with reckless disregard for the rights of Kruse, and Kruse have incurred mental anguish as a result of the direct tortious and intentional interference of Repp, Guinn, Van Vark, DMTH, and First State and/or the tortious and

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

intentional interference of Weller in which Repp, Guinn, Van Vark, DMTH, and First State gave substantial assistance or encouragement, and damages for that mental anguish are justified and appropriate.

199.    Repp's, Guinn's, Van Vark's, DMTH's, and First State's actions and the actions of those whom they aided and abetted (for which Repp, Guinn, Van Vark, DMTH, and First State are liable) were willful, wanton, and in reckless disregard for the rights of Kruse entitling them to an award of punitive damages.

200.    Repp's, Guinn's, Van Vark's, DMTH's, and First State's actions and the actions of those whom they aided and abetted (for which Repp, Guinn, Van Vark, DMTH, and First State are liable) were conniving and wrongfully interfered with the rights of Kruse entitling them to an award of common law attorney fees.

WHEREFORE Plaintiffs request judgment against Repp, Guinn, Van Vark, DMTH, and First State, jointly and severally, for compensatory damages, punitive damages, attorney fees, and costs.

## COUNT IV

### (CONSPIRACY AS A CO-CONSPIRATOR IN WELLER'S FRAUDULENT TRANSFERS AND IN THE ONGOING SCHEME TO DEFRAUD AS TO ALL DEFENDANTS)

201.    Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-200 above as if fully pled herein.

202.    Weller committed the fraudulent transfers referred to above.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

203.    Repp, Guinn, Van Vark, DMTH, and First State participated with Weller and others in the fraudulent transfers referred to above.

204.    These fraudulent transfers were part and parcel of an ongoing scheme to defraud, including fraudulent transfers of assets, security interests and other interests in assets, and fraudulent incurrence of obligations; false financial statements and other false and misleading statements; misrepresentations and omissions; shams; false or misleading statements under oath and/or perjury; and other false, fraudulent, dishonest, and/or misleading acts or other artifices and means to defraud; all intended to hinder, delay, or defraud Kruse from collecting their claim and executing on their $2.5 million judgment and instead to extort and extract a minimal, negligible, and unfavorable settlement to Kruse in compromise of their $2.5 million judgment.

205.    Repp, Guinn, Van Vark, DMTH, and First State participated with Weller and others in the ongoing scheme to defraud referred to above.

206.    The agreement between the Repp / DMTH and Weller to commit the fraudulent transfers and the ongoing scheme to defraud included the attorney fee agreement; the Operating Agreement and other LLC formation documents; jointly prepared false financial statements; and other oral or written, informal or formal, express or implied agreements in furtherance of the fraudulent transfers and the ongoing scheme to defraud.

207.    The agreement among Guinn, Van Vark, First State and Weller to commit the fraudulent transfers and the ongoing scheme to defraud included the jointly prepared false financial statements; all of the new notes, mortgages, the Guaranty, and other documents executed or entered into as part of the refinancing of January 4, 2016; and other oral or written,

informal or formal, express or implied agreements in furtherance of the fraudulent transfers and the ongoing scheme to defraud.

208.    Kruse were damaged and are entitled to all the statutory, legal, and equitable remedies allowed by Iowa's Uniform Fraudulent Transfer Act including, but limited to, the following:

a.    Subordination of all the obligations and security interests referred to above to Kruse and their $2.5 million judgment;

b.    Disgorgement and payment to Kruse of any payments received or receivable by First State on the obligations fraudulently incurred and disgorgement and payment to Kruse of any attorney fees received by Repp and DMTH;

c.    The option for entry of judgment against Repp, Guinn, Van Vark, DMTH, and First State for the value of the assets fraudulently transferred;

d.    All other statutory, legal, and equitable remedies available to Kruse allowed under Iowa's Uniform Fraudulent Transfer Act.

209.    Repp's, Guinn's, Van Vark's, DMTH's and First State's actions and the actions of its co-conspirators (for which Repp, Guinn, Van Vark, DMTH, and First State are liable as co-conspirators) were willful, wanton, and in reckless disregard for the rights of Kruse entitling them to an award of punitive damages.

210.    Repp's, Guinn's, Van Vark's, DMTH's and First State's actions and the actions of its co-conspirators (for which Repp, Guinn, Van Vark, DMTH, and First State are liable as co-conspirators) were conniving and wrongfully interfered with the rights of Kruse entitling them to an award of common law attorney fees.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

WHEREFORE Plaintiffs request judgment against Repp, Guinn, Van Vark, DMTH, and First State, jointly and severally, for declaratory relief declaring and decreeing that all of the their interests are subordinated to the interests of Plaintiffs, and judgment for compensatory damages, restitution, and disgorgement by Repp, Guinn, Van Vark, DMTH, and First State of any payments received or receivable on the obligations set aside under Iowa's Uniform Fraudulent Transfer Act, and disgorgement by Repp and DMTH of any attorney fees received, and all other statutory, legal, and equitable elections for relief and relief to which Plaintiffs are entitled under Iowa's Uniform Fraudulent Transfer Act, including but not limited to punitive damages, common law attorney fees, and all other relief to which they are entitled and for the costs of this action.

## COUNT V

### (CONSPIRACY AS A CO-CONSPIRATOR IN THE TORTIOUS AND INTENTIONAL INTERFERENCE WITH PLAINTIFFS' COLLECTION OF AND EXECUTION ON THEIR CLAIM AND $2.5 MILLION JUDGMENT AS PART OF THE ONGOING SCHEME TO DEFRAUD AS TO ALL DEFENDANTS)

211.    Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-210 above as if fully pled herein.

212.    Weller committed the tortious and intentional interference with Kruse in the collection of their claims and enforcement of and execution on their $2.5 million judgment and judgment lien.

59

213.    Repp, Guinn, Van Vark, DMTH, and First State participated with Weller and others in the tortious and intentional interference with Kruse in the collection of their claims and enforcement of and execution on their $2.5 million judgment and judgment lien.

214.    The tortious and intentional interference was part and parcel of an ongoing scheme to defraud, including fraudulent transfers of assets, security interests and other interests in assets, and fraudulent incurrence of obligations; false financial statements and other false and misleading statements; misrepresentations and omissions; shams; false or misleading statements under oath and/or perjury; and other false, fraudulent, dishonest, and/or misleading acts or other artifices and means to defraud; all intended to hinder, delay, or defraud Kruse from collecting their claim and executing on their $2.5 million judgment and instead to extort and extract a minimal, negligible, and unfavorable settlement to Kruse in compromise of their $2.5 million judgment.

215.    Repp, Guinn, Van Vark, DMTH, and First State participated with Weller and others in the ongoing scheme to defraud referred to above.

216.    The agreement between the Repp / DMTH and Weller to commit the tortious and intentional interference and the ongoing scheme to defraud included the attorney fee agreement; the Operating Agreement and other LLC formation documents; jointly prepared false financial statements; and other oral or written, informal or formal, express or implied agreements in furtherance of the interference and the ongoing scheme to defraud.

217.    The agreement among Guinn, Van Vark, First State and Weller to commit the tortious and intentional interference and the ongoing scheme to defraud included the jointly prepared false financial statements; all of the new notes, mortgages, the Guaranty, and other

60

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

documents executed or entered into as part of the refinancing of January 4, 2016; and other oral or written, informal or formal, express or implied agreements in furtherance of the interference and the ongoing scheme to defraud.

218.    Kruse were harmed as a result of the interference, and the actions of Repp, Guinn, Van Vark, DMTH, and First State caused harm to Kruse.

219.    Kruse were damaged and are entitled to all compensatory damages including, but not limited to, decreased value of the assets to be levied upon caused by the delay and interference; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on and recover against the property fraudulently transferred and/or encumbered resulting from the delay and interference; damage caused by waste, loss, plunder, and devaluation of the assets committed by Weller during the delay and interference; attorney fees and costs resulting from the interference, including attorney fees and costs incurred in setting aside the fraudulent transfers as well as attorney fees paid by Weller to his attorneys; all payments to First State made by Weller or Weller Farms at the time of or after the refinancing of January 4, 2016; interference with family relationships and economic benefits of family; and all other damages, injuries, and harms caused by the interference.

220.    Repp's, Guinn's, Van Vark's, DMTH's and First State's actions and the actions of their co-conspirators (for which Repp, Guinn, Van Vark, DMTH, and First State are liable as co-conspirators) were severe, extreme, and done with reckless disregard for the rights of the Kruse, and Kruse have incurred mental anguish as a result of the direct tortious and intentional interference of Repp, Guinn, Van Vark, DMTH, and First State and/or the tortious and

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

intentional interference of Weller in which Repp, Guinn, Van Vark, DMTH, and First State conspired, and damages for that mental anguish are justified and appropriate.

221.    Repp's, Guinn's, Van Vark's, DMTH's and First State's actions and the actions of their co-conspirators (for which Repp, Guinn, Van Vark, DMTH, and First State are liable as co-conspirators) were willful, wanton, and in reckless disregard for the rights of Kruse entitling them to an award of punitive damages.

222.    Repp's, Guinn's, Van Vark's, DMTH's and First State's actions and the actions of their co-conspirators (for which Repp, Guinn, Van Vark, DMTH, and First State are liable as co-conspirators) were conniving and wrongfully interfered with the rights of Kruse entitling them to an award of common law attorney fees.

WHEREFORE Plaintiffs request judgment against Repp, Guinn, Van Vark, DMTH, and First State, jointly and severally for compensatory damages, punitive damages, attorney fees, and costs.

## COUNT VI

## (CIVIL RICO —18 U.S.C. § 1962(c) — REPP AND DMTH)

223.    Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-222 above as if fully pled herein.

224.    Although Weller is not a party to this action, Count VI pleads that he violated 18 U.S.C. § 1962(c) for purposes of Count VII.

225.    Weller Farms, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).  Weller, Repp, and DMTH are each a "person", within the meaning

of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed (directly or indirectly) the affairs of Weller Farms, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of mail/wire fraud as set forth in Paragraphs 19-167 (above).

226.    In the alternative to Paragraph 225 above, Weller, Repp, DMTH, and Cody Weller (or any subset thereof) constituted an "enterprise," within the meaning of 18 U.S.C. §§1961(4) & 1962(c), in that they were "a group of individuals associated in fact" (the "Weller Law Enterprise").

a.      Weller, Repp, DMTH, and Cody Weller shared the common purpose(s) of (among other things) defrauding Kruse of money or property and/or placing Weller's assets beyond the reach of Kruse;

b.      Weller, Repp, DMTH, and Cody Weller were related in that they were all agents involved in the formation of Weller Farms and/or were agents of Weller;

c.      The Weller Law Enterprise possessed sufficient longevity for the members to carry out their purpose(s) in that the Weller Law Enterprise has existed from March 3, 2015 through the present.

Weller, Repp, and DMTH are each a "person" within the meaning of 18 U.S.C. §§1961(3) & 1962(c), who conducted, participated in, engaged in, and operated and managed the affairs of the Weller Law Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) & 1962(c).  This pattern of racketeering activity

63

**Exhibit A, Page 63 of 184**

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

consisted of, but was not limited to, acts of mail and wire fraud as set forth in Paragraphs 19-167 (above).

227.    In the alternative to Paragraphs 225 and 226 above, Weller constituted an "enterprise," within the meaning of 18 U.S.C. §§1961(4) & 1962(c), in that he is an "individual." Repp or DMTH are each a "person", within the meaning of 18 U.S.C. §§1961(3) & 1962(c), who conducted, participated in, engaged in, and operated and managed the affairs of Weller through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) & 1962(c). This pattern of racketeering activity consisted of, but was not limited to, acts of mail and wire fraud as set forth in Paragraphs 19-167 (above).

228.    At all relevant times, the enterprises alleged in Paragraphs 225-227 above were engaged in, and their activities affected, interstate commerce.

229.    All of the acts of racketeering described in Paragraphs 19-167 (above) were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. §1962(c), in that their common purpose was to defraud Kruse of money and property and/or to place Weller's assets beyond the reach of Kruse; their common result was to defraud Kruse of money and property and/or to place Weller's assets beyond the reach of Kruse; Weller, Repp, and DMTH, through their employees, members, or agents, directly or indirectly, participated in the acts and employed the same or similar methods of commission; Kruse were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

230.    All of the acts of racketeering described in Paragraphs 19-167 (above) were continuous so as to form a pattern of racketeering activity in that Weller, Repp and/or DMTH

64

engaged in the predicate acts over a substantial period (March 3, 2015 – the present) or in that acts of racketeering are ongoing and threaten to continue indefinitely.

231.    To the extent Weller, Repp, and DMTH have suspended their acts of racketeering against Kruse, Weller, Repp, and DMTH have only done so because of legal action taken by Kruse and the Court's permanent injunction entered against Weller. The ongoing nature of Defendants' pattern of racketeering is not obviated by this fortuitous interruption.

232.    As a direct and proximate result of, and by reason of, the activities of Weller, Repp and/or DMTH and their conduct in violation of 18 U.S.C. §1962(c), Kruse were injured in their business or property, within the meaning of 18 U.S.C. §1964(c). Among other things, Kruse suffered damages, i.e., damages for the fraudulent transfers; decreased value of the assets to be levied upon caused by the delay and interference; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on and recover against the property fraudulently transferred and/or encumbered resulting from the delay and interference; damage caused by waste, loss, plunder, and devaluation of the assets committed by Weller during the delay and interference; attorney fees and costs resulting from the interference, including attorney fees and costs incurred in setting aside the fraudulent transfers as well as attorney fees paid by Weller to his attorney; all payments to First State made by Weller or Weller Farms at the time of or after the refinancing of January 4, 2016; interference with family relationships and economic benefits of family; and all other damages, injuries, and harms caused by the fraudulent transfers and interference. Kruse are, therefore, entitled to recover threefold the damages they sustained together with the cost of the suit, reasonable attorneys' fees and reasonable experts' fees.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

WHEREFORE Plaintiffs demand judgment against Repp and DMTH, jointly and severally, for the following:  Treble damages pursuant to 18 U.S.C. §1964(c); Attorney fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper.

## COUNT VII

## (CIVIL RICO CONSPIRACY—18 U.S.C. § 1962(d) — ALL DEFENDANTS)

233.    Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-232 above as if fully pled herein.

234.    As alleged in Count VI, one or more of the following individuals violated 18 U.S.C. § 1962(c): Weller, Repp, and/or DMTH.  Any person(s) who is found to have violated 18 U.S.C. § 1962(c) is hereafter referred to as the "Operator / Manager" for the remainder of this Count.

235.    Repp, DMTH, Guinn, Van Vark, and/or First State conspired with the Operator / Manager(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises (*see* ¶¶ 225-227) through a pattern of racketeering activity (*see* ¶¶ 19-167, 229-231) in violation of 18 U.S.C. § 1962(d). In particular, Repp, DMTH, Guinn, Van Vark, and/or First State intended to or agreed to further an endeavor of the Operator / Manager(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

236.    Kruse were injured by Weller's, Repp's, DMTH's, Guinn's, Van Vark's, and/or First State's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute,

which included (among other acts) acts of mail and wire fraud (as described in Paragraphs 19-167 (above)) committed through the enterprises alleged in Count VI.

237.    As a direct and proximate result of, and by reason of, the activities of Repp, DMTH, Guinn, Van Vark, and/or First State and their conduct in violation of 18 U.S.C. §1962(d), Kruse were injured in their business or property, within the meaning of 18 U.S.C. §1964(c).  Among other things, Kruse suffered damages, i.e., damages for the fraudulent transfers; decreased value of the assets to be levied upon caused by the delay and interference; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on and recover against the property fraudulently transferred and/or encumbered resulting from the delay and interference; damage caused by waste, loss, plunder, and devaluation of the assets committed by Weller during the delay and interference; attorney fees and costs resulting from the interference, including attorney fees and costs incurred in setting aside the fraudulent transfers as well as attorney fees paid by Weller to his attorney; all payments to First State made by Weller or Weller Farms at the time of or after the refinancing of January 4, 2016; interference with family relationships and economic benefits of family; and all other damages, injuries, and harms caused by the fraudulent transfers and interference.  Kruse are, therefore, entitled to recover threefold the damages they sustained together with the cost of the suit, reasonable attorneys' fees and reasonable experts' fees.

WHEREFORE Plaintiffs demand judgment against Repp, DMTH, Guinn, Van Vark, and First State, jointly and severally, for the following:  Treble damages pursuant to 18 U.S.C. §1964(c); Attorney fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

## COUNT VIII

## (OUTRAGEOUS CONDUCT WITH RECKLESS DISREGARD OF THE PROBABILITY OF CAUSING EMOTIONAL DISTRESS AS TO ALL DEFENDANTS)

238.    Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-237 above as if fully pled herein.

239.    The conduct of all Defendants, or one or more of them, and/or the conduct of those with whom they aided and abetted or conspired (for which they are liable) constituted outrageous conduct.

240.    Defendants, or one or more of them, and/or those with whom they aided and abetted or conspired (for which they are liable) acted with reckless disregard of the probability of causing emotional distress.

241.    Kruse and Hudson suffered severe or extreme emotional distress.

242.    The outrageous conduct of all Defendants, or one or more of them, and/or those with whom they aided and abetted or conspired (for which they are liable) was a cause of the emotional distress.

243.    Plaintiffs request and are entitled to compensatory damages for the severe or extreme emotional distress to Kruse and Hudson.

244.    Defendants' conduct and/or the conduct of those with whom they aided and abetted or conspired  (for which they are liable) was willful, wanton, and in reckless disregard for the rights of Kruse and Hudson entitling them to an award of punitive damages.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

245.     Defendants' conduct and/or the conduct of those with whom they aided and abetted or conspired  (for which they are liable) was conniving and wrongfully interfered with the rights of Kruse and Hudson entitling them to an award of common law attorney fees.

246.     The amount of damages attributable to any emotional distress suffered by Kruse and Hudson is expressly excluded from any damages claimed under Counts VI-VII herein.

WHEREFORE Plaintiffs request judgment against Repp, DMTH, Guinn, Van Vark, and First State, or one or more of them, jointly and severally, for compensatory damages for the severe or extreme emotional distress to Kruse and Hudson, punitive damages, common law attorney fees and costs, and for the costs of this action.

### COUNT IX

### (REQUEST FOR FURTHER EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF)

247.     Plaintiffs reallege and incorporate by reference their allegations pled in Paragraphs 1-246 above as if fully pled herein.

248.     First State has a pending foreclosure action.  (Plaintiffs' Exhibit 12).

249.     Plaintiffs have filed Answer, Affirmative Defenses, and Counterclaims in that foreclosure action, which involve disputed issues of law and fact common to this Petition at Law.

250.     There are disputed issues among First State and Kruse as they relate to the subordination of First State's interest in the Mahaska County real estate under the provisions of the Iowa Uniform Fraudulent Transfer Act as set forth in the paragraphs above.

251.     Moreover, Kruse claim that their $2.5 million judgment is legally superior to any of First State's alleged right, title, and interests in the Mahaska County real estate legally

69

described in the Foreclosure Petition because the mortgagors, on all of the mortgages and security agreements on which Counts I, II, and III of the Foreclosure Petition are based, no longer owned the collateral covered by the mortgage.

252.    Accordingly, there was no mortgagor to which secured debts could be extended under the terms of the original mortgage and security agreement that would constitute a legal and valid future advance secured under the terms of the original mortgage and security agreement.

253.    As a result, Kruse and their $2.5 million judgment are legally superior to any of First State's alleged right, title, and interests in the real estate and secured assets involved in the Foreclosure Petition.

254.    Alternatively, even if Weller Farms could be substituted as a new mortgagor under the terms of those mortgages for purposes of issuing secured debt, the Guaranty of January 4, 2016, by which the substitution was made and obligations incurred, would constitute a novation of the original mortgages.

255.    This novation of January 4, 2016 was subsequent to the recording of Kruse's $2.5 million judgment lien against the real estate filed in Mahaska County, Iowa, on May 8, 2015.

256.    First State had actual, constructive, and inquiry notice of Kruse's $2.5 million judgment prior to the novation of the original mortgages; and Kruse's $2.5 million judgment is legally superior to any of the First State's alleged right, title, and interests in the real estate and secured assets involved in the Foreclosure Petition.

257.    And, First State engaged in fraudulent or other inequitable conduct as set forth above.

258.    The conduct resulted in injury and prejudice to Kruse.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

259.     Under the equitable doctrine of equitable subordination, and in the interests of equity and justice, all of First State's right, title, and interests in the real estate and secured assets involved in the Foreclosure Petition are subordinated to Kruse and their $2.5 million judgment.

260.     There are disputed issues between Kruse and First State, which are triable to a jury.

261.     Following the jury's determination of the legal issues submissible to it, there will remain equitable issues for the Court to decide.

262.     Kruse are entitled to further appropriate equitable and declaratory relief to protect Kruse and to avoid further injury being perpetrated on them and to afford them full equitable relief.

263.     To the extent necessary to avoid irreparable harm, Kruse are entitled and request appropriate injunctive relief.

WHEREFORE Plaintiffs request judgment against First State for full equitable, declaratory, and injunctive relief as necessary to provide Plaintiffs full equity and justice and for the costs of this action.


## JURY DEMAND

Plaintiffs request jury trial of all issues in the Petition at Law and Jury Demand and this First Amended Petition at Law and Jury Demand submissible to a jury.

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Respectfully submitted,

Dated:  March 15, 2019

CHRISTINA L. KRUSE, individually; THE
GUARDIANSHIP AND
CONSERVATORSHIP OF CHRISTINA
KRUSE, by and through VERDA KRUSE,
as guardian and conservator of CHRISTINA
L. KRUSE; and HARLEY HUDSON,

       Plaintiffs

SWAIM LAW FIRM, P.L.L.C.

By:     /s/ Justin K. Swaim
       Justin K. Swaim     AT0007788
       701 13th Street, Suite 2
       West Des Moines, IA 50265
       Telephone: (515) 305-1412
       Facsimile:  (515) 777-1127
       E-mail: justin@swaimlawfirm.com

ATTORNEY FOR PLAINTIFFS
CHRISTINA L. KRUSE, individually; THE
GUARDIANSHIP AND
CONSERVATORSHIP OF CHRISTINA
KRUSE, by and through VERDA KRUSE
as guardian and conservator of CHRISTINA
L. KRUSE; and HARLEY HUDSON

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Document 2012- 1114   Stamp #: — 0 —
Book 2012   Page 1114
Fee: 127   Real Estate Transfer Tax — 0 —
Auditors Fee: 15
Date: April 16 , 2012   Time: 1.48 pm

*Diane Upton Crookham - Mahaska County Recorder*
106 S. 1st Street, Oskaloosa, Iowa 52577



# QUIT CLAIM DEED
### THE IOWA STATE BAR ASSOCIATION
Official Form #106
**Recorder's Cover Sheet**

**Preparer Information:** (Name, address and phone number)
RANDALL C. STRAVERS , 110 NORTH MARKET STREET , OSKALOOSA , IA  52577
, Phone: (641) 673-9451

**Taxpayer Information:** (Name and complete address)
STEVEN J. WELLER, 3133 195TH STREET, ROSE HILL IA  52586

**Return Document To:** (Name and complete address)
RANDALL C. STRAVERS , 110 NORTH MARKET STREET , OSKALOOSA , IA
52577 , Phone: (641) 673-9451

**Grantors:**
STEVEN J. WELLER

**Grantees:**
STEVEN J. WELLER REVOCABLE TRUST

**Legal description:** See Page 2
**Document or instrument number of previously recorded documents:**

© The Iowa State Bar Association 2005
IOWADOCS®





Plaintiffs' Exhibit "1"

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

| THE IOWA STATE BAR ASSOCIATION<br>Official Form No. 188 | RANDALL C. STRAVERS | FOR THE LEGAL EFFECT OF THE USE OF<br>THIS FORM, CONSULT YOUR LAWYER |
|---|---|---|

## QUIT CLAIM DEED

For the consideration of **ONE** _____ Dollar(s) and other valuable consideration,
**STEVEN J. WELLER, SINGLE** _____

Quit Claim to **STEVEN J. WELLER REVOCABLE TRUST** _____ do hereby

claim and demand in the following described real estate in _____ **MAHASKA** _____ County, Iowa:

all our right, title, interest, estate,

1. THE SOUTH HALF OF THE NORTHWEST QUARTER, THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER, AND THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER ALL IN SECTION 36, TOWNSHIP 75, RANGE 14

2. THE EAST HALF OF THE NORTHWEST QUARTER AND THE WEST HALF OF THE NORTHEAST QUARTER OF SECTION TWENTY-TWO, TOWNSHIP SEVENTY-SIX, RANGE FOURTEEN, CONSISTING OF 150 ACRES, MORE OR LESS, SUBJECT TO ALL EASEMENTS AND RESTRICTIONS OF RECORD.

3. COMMENCING ONE HUNDRED FIFTY FEET SOUTH OF THE NORTHEAST CORNER OF LOT THREE OF THE SUBDIVISION OF OUT LOT FOURTEEN OF THE ORIGINAL PLAT OF THE CITY OF OSKALOOSA, IOWA, RUNNING THENCE WEST ONE HUNDRED TWENTY FEET, THENCE SOUTH TO THE SOUTH LINE OF SAID LOT THREE, THENCE EAST OT THE SOUTHEAST CORNER OF SAID LOT THREE, THENCE NORTH TO THE PLACE OF BEGINNING, TOGETHER WITH AND SUBJECT TO ANY AND ALL EASEMENTS AND RESTRICTIONS OF RECORD.

THIS IS AN EXEMPT TRANSACTION.  THIS IS A CONVEYANCE WITH CONSIDERATION OF LESS THAN $500.00.

Each of the undersigned hereby relinquishes all rights of dower, homestead and distributive share in and to the real estate.  Words and phrases herein, including acknowledgment hereof, shall be construed as in the singular or plural number, and as masculine or feminine gender, according to the context.

Dated: **3-23-2012**

_____  (Grantor)        _____  (Grantor)
**STEVEN J. WELLER**

_____  (Grantor)        _____  (Grantor)

_____  (Grantor)        _____  (Grantor)

STATE OF _____ **IOWA** _____ , COUNTY OF _____ **MAHASKA** _____
This instrument was acknowledged before me on **March 23, 2012** , by **STEVEN J. WELLER**

_____ , Notary Public

**ANDREA VAN WAARDHUIZEN**
Commission Number 137752
My Commission Expires
_____

| © The Iowa State Bar Association 2007 | | Quit Claim Deed |
|---|---|---|
| IOWADOCS® | | Revised January 2007 |

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Document 2012- 1064   Stamp #: ~ -
Book 2012   Page 1064
Fee: 12.00   Real Estate Transfer Tax ~ -
Auditors Fee: 15.00
Date: April 10 , 2012   Time: 1:44 pm

*Diane Upton Crookham - Mahaska County Recorder*
106 S. 1st Street, Oskaloosa, Iowa 52577



# QUIT CLAIM DEED
## THE IOWA STATE BAR ASSOCIATION
### Official Form #106
### Recorder's Cover Sheet

**Preparer Information:  (Name, address and phone number)**
RANDALL C. STRAVERS , 110 NORTH MARKET STREET , OSKALOOSA , IA  52577
, Phone: (641) 673-9451

**Taxpayer Information: (Name and complete address)**
STEVEN J. WELLER, 3133 195TH STREET, ROSE HILL IA  52586

**Return Document To: (Name and complete address)**
RANDALL C. STRAVERS , 110 NORTH MARKET STREET , OSKALOOSA , IA
52577 , Phone: (641) 673-9451

**Grantors:**
TAMI L. WELLER

**Grantees:**
STEVEN J. WELLER

**Legal description:**See Page 2
**Document or instrument number of previously recorded documents:**

© The Iowa State Bar Association 2008
IOWADOCS®

Plaintiffs' Exhibit "2"

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

| THE IOWA STATE BAR ASSOCIATION<br>Official Form No. 198 | RANDALL C. STRAVERS | FOR THE LEGAL EFFECT OF THE USE OF<br>THIS FORM, CONSULT YOUR LAWYER |
| --- | --- | --- |

## QUIT CLAIM DEED

For the consideration of ONE _____ Dollar(s) and other valuable consideration,

TAMI L. WELLER, SINGLE

_____ do hereby

Quit Claim to STEVEN J. WELLER, SINGLE _____

all our right, title, interest, estate,

claim and demand in the following described real estate in          MAHASKA          County, Iowa:

THE SOUTH HALF OF THE NORTHWEST QUARTER, THE NORTHWEST QUARTER OF THE NORTHWEST
QUARTER, AND THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER
ALL IN SECTION 36, TOWNSHIP 75, RANGE 14

THE EAST HALF OF THE NORTHWEST QUARTER AND THE WEST HALF OF THE NORTHEAST QUARTER OF
SECTION TWENTY-TWO, TOWNSHIP SEVENTY-SIX, RANGE FOURTEEN, CONSISTING OF 150 ACRES, MORE OR
LESS, SUBJECT TO ALL EASEMENTS AND RESTRICTIONS OF RECORD.

COMMENCING ONE HUNDRED FIFTY FEET SOUTH OF THE NORTHEAST CORNER OF LOT THREE OF THE
SUBDIVISION OF OUT LOT FOURTEEN OF THE ORIGINAL PLAT OF THE CITY OF OSKALOOSA, IOWA, RUNNING
THENCE WEST ONE HUNDRED TWENTY FEET, THENCE SOUTH TO THE SOUTH LINE OF SAID LOT THREE,
THENCE EAST TO THE SOUTHEAST CORNER OF SAID LOT THREE, THENCE NORTH TO THE PLACE OF
BEGINNING, TOGETHER WITH AND SUBJECT TO ANY AND ALL EASEMENTS AND RESTRICTIONS OF RECORD.

This deed is exempt according to Iowa Code 428A.2(16).

Each of the undersigned hereby relinquishes all rights of dower, homestead and distributive share in and
to the real estate.  Words and phrases herein, including acknowledgment hereof, shall be construed as in the
singular or plural number, and as masculine or feminine gender, according to the context.

Dated: 3-23-12

_____ (Grantor)          _____ (Grantor)
TAMI L. WELLER

_____ (Grantor)          _____ (Grantor)

_____ (Grantor)          _____ (Grantor)

STATE OF _____IOWA_____ , COUNTY OF ___MAHASKA___
This instrument was acknowledged before me on _____3-23-12_____ , by TAMI L.
WELLER, SINGLE

BRIAN HAWK
Commission Number 707021
My Commission Expires
11-30-12

_____, Notary Public

© The Iowa State Bar Association 2007
IOWADOCS®

Quit Claim Deed
Revised January 2008

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

```
Instr. Number:    598
BK:  2015 PG:  598
Recorded: 3/5/2015 at 8:57:17.0 AM
Fee Amount: $22.00
Revenue Tax: $0.00
Diane Upton Crookham RECORDER
Mahaska County, Iowa
Unique Doc ID: 2015_0305__598
```

## QUIT CLAIM DEED
### THE IOWA STATE BAR ASSOCIATION
Official Form No. 106
**Recorder's Cover Sheet**

**Preparer Information:**
David M. Repp
699 Walnut Street, Suite 1600
Des Moines, IA  50309, Phone: (515) 244-2600

**Taxpayer Information:**
Weller Farms, LLC
3133 195th Street
Rose Hill, IA  52586

**Return Document To:**
David M. Repp
699 Walnut Street, Suite 1600
Des Moines, IA  50309

**Grantors:**
Steven J. Weller, Trustee of the Steven J. Weller Revocable Trust

**Grantees:**
Weller Farms, LLC

**Legal Description:**  See Page 2

**Document or instrument number of previously recorded documents:**  N/A



Plaintiffs' Exhibit "3"

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

## QUIT CLAIM DEED

For the consideration of One Dollar ($1.00) and other valuable consideration, Steven J. Weller, as Trustee of the Steven J. Weller Revocable Trust, does hereby quit claim to Weller Farms, LLC all its right, title, interest, estate, claim and demand in the following described real estate in Mahaska County, Iowa:

The South Half of the Northwest Quarter, the Northwest Quarter of the Northwest Quarter and the Northwest Quarter of the Northeast Quarter of the Northwest Quarter all in Section 36, Township 75, Range 14, Mahaska County, Iowa.
AND
The Northeast Quarter of the Northwest Quarter, and the West Half of the Northeast Quarter of Section 22, Township 76, Range 14, Mahaska County, Iowa.

**This deed is exempt according to Iowa Code 428A.2(21).**

Iowa Land Title Standard 4.7 Purchaser's Showing by Deed Poll.  The affirmative act of accepting and recording this deed by Grantee represents its reliance upon the affidavit recorded contemporaneously herewith.  The Grantee affirmatively represents that it has no knowledge of any adverse claim against the Trustee or the Trust.

Each of the undersigned hereby relinquishes all rights of dower, homestead and distributive share in and to the real estate.

Words and phrases herein, including acknowledgment hereof, shall be construed as in the singular or plural number, and as masculine or feminine gender, according to the context.

Dated: March 3, 2015                    STEVEN J. WELLER REVOCABLE TRUST



By: _____
       Steven J. Weller, Trustee

STATE OF IOWA, COUNTY OF POLK

This record was acknowledged before me this 3rd day of March, 2015, by Steven J. Weller, Trustee of the Steven J. Weller Revocable Trust.

_____
Signature of Notary Public

00519007-1

DAVID M. REPP
Commission Number 166672
My Commission Expires
9-21-16

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

ENTERED INTO
TAXATION

MAR 2 5 2015

SUSAN L. BROWN
MAHASKA COUNTY AUDITOR

Instr. Number:    598
BK:  2015 PG:   598
Recorded: 3/5/2015 at 8:57:17.0 AM
Fee Amount: $22.00
Revenue Tax: $0.00
Diane Upton Crookham RECORDER
Mahaska County, Iowa
Unique Doc ID: 2015_0305_598

**QUIT CLAIM DEED**
**THE IOWA STATE BAR ASSOCIATION**
Official Form No. 106
**Recorder's Cover Sheet**

**Preparer Information:**     David M. Repp
699 Walnut Street, Suite 1600
Des Moines, IA  50309, Phone: (515) 244-2600

**Taxpayer Information:**     Weller Farms, LLC
3133 195th Street
Rose Hill, IA  52586

**Return Document To:**     David M. Repp
699 Walnut Street, Suite 1600
Des Moines, IA  50309

**Grantors:**
Steven J. Weller, Trustee of the Steven J. Weller Revocable Trust

**Grantees:**
Weller Farms, LLC

**Legal Description:**  See Page 2

**Document or instrument number of previously recorded documents:**   N/A

EXHIBIT
#27
SJJ 1/22/16

### QUIT CLAIM DEED

For the consideration of One Dollar ($1.00) and other valuable consideration, Steven J. Weller, as Trustee of the Steven J. Weller Revocable Trust, does hereby quit claim to Weller Farms, LLC all its right, title, interest, estate, claim and demand in the following described real estate in Mahaska County, Iowa:

The South Half of the Northwest Quarter, the Northwest Quarter of the Northwest Quarter and the Northwest Quarter of the Northeast Quarter of the Northwest Quarter all in Section 36, Township 75, Range 14, Mahaska County, Iowa.
AND
The Northeast Quarter of the Northwest Quarter, and the West Half of the Northeast Quarter of Section 22, Township 76, Range 14, Mahaska County, Iowa.

This deed is exempt according to Iowa Code 428A.2(21).

Iowa Land Title Standard 4.7 Purchaser's Showing by Deed Poll. The affirmative act of accepting and recording this deed by Grantee represents its reliance upon the affidavit recorded contemporaneously herewith. The Grantee affirmatively represents that it has no knowledge of any adverse claim against the Trustee or the Trust.

Each of the undersigned hereby relinquishes all rights of dower, homestead and distributive share in and to the real estate.

Words and phrases herein, including acknowledgment hereof, shall be construed as in the singular or plural number, and as masculine or feminine gender, according to the context.

Dated: March 3, 2015                                  STEVEN J. WELLER REVOCABLE TRUST



By: _____
Steven J. Weller, Trustee


STATE OF IOWA, COUNTY OF POLK

This record was acknowledged before me this 3rd day of March, 2015, by Steven J. Weller, Trustee of the Steven J. Weller Revocable Trust.

_____
Signature of Notary Public

00519007-1

DAVID M. REPP
Commission Number 166672
My Commission Expires
9-23-16

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Instr. Number:    597
BK:   2015 PG:   597
Recorded: 3/5/2015 at 8:57:16.0 AM
Fee Amount: $12.00
Revenue Tax:
Diane Upton Crookham RECORDER
Mahaska County, Iowa
Unique Doc ID: 2015_0305__597

## INDIVIDUAL TRUSTEE'S AFFIDAVIT
### THE IOWA STATE BAR ASSOCIATION
Official Form No. 113
**Recorder's Cover Sheet**

**Preparer Information:**    David M. Repp
699 Walnut Street, Suite 1600
Des Moines, IA  50309
Phone: (515) 244-2600

**Taxpayer Information**    N/A

**Return Document To:**    David M. Repp
699 Walnut Street, Suite 1600
Des Moines, IA  50309

**Grantors:**
Steven J. Weller

**Grantees:**
Weller Farms, LLC

**Legal Description:**  See Page 2

**Document or instrument number of previously recorded documents:**  N/A



PLAINTIFF'S
EXHIBIT
23

EXHIBIT
#30
SJS 1/22/16

Plaintiffs' Exhibit "4"

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

### INDIVIDUAL TRUSTEE'S AFFIDAVIT

**RE:** The South Half of the Northwest Quarter, the Northwest Quarter of the Northwest Quarter and the Northwest Quarter of the Northeast Quarter of the Northwest Quarter all in Section 36, Township 75, Range 14, Mahaska County, Iowa. **AND** The Northeast Quarter of the Northwest Quarter, and the West Half of the Northeast Quarter of Section 22, Township 76, Range 14, Mahaska County, Iowa.

STATE OF IOWA, COUNTY OF POLK, ss:

I, Steven J. Weller, being first duly sworn (or affirmed) under oath, state of my personal knowledge that:

1. I am the trustee under the Steven J. Weller Revocable Trust dated _March 23, 2012_, to which the above-described real estate was conveyed to the trustee by Steven J. Weller, as Trustee of the Steven J. Weller Revocable Trust, pursuant to an instrument recorded the 16th day of April, 2012, in the office of the Mahaska County Recorder in Book 2012 at Page 1114.

2. I am the presently existing trustee under the Trust and I am authorized to transfer and convey the above-described real property without any limitation or qualification whatsoever.

3. The Trust is in existence and I, as trustee, am authorized to transfer the interest in the real estate as described in paragraph 2, free and clear of any adverse claims.

4. The grantor of the trust is alive.

5. The trust is revocable or, if the trust is irrevocable, none of the beneficiaries of the trust are deceased.

Steven J. Weller

Signed and sworn to (or affirmed) before me this 3rd day of March, 2015, by Steven J. Weller.

Signature of Notary Public

DAVID M. REPP
Commission Number 166672
My Commission Expires
9-23-16

E-FILED  2015 MAY 01 1:31 PM DAVIS - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT IN AND FOR  DAVIS COUNTY

| | |
|---|---|
| CHRISTINA L KRUSE<br>HARLEY HUDSON<br>GUAR/CONS OF CHRISTINA KRUSE<br>GUAR/CONS OF HARLEY J HUDSON<br>CHARLES RICHARD KRUSE<br>VERDA KRUSE,<br><br>      Plaintiffs,<br>Vs.<br><br>STEVEN JAMES WELLER, an individual,<br><br>      Defendant. | NO. LALA012548<br><br><br>RULING AND JUDGMENT |

Trial was held in this matter on April 21, 22 and 23, 2015.  The Plaintiffs appeared by Verda Kruse and Charles Kruse with Attorney Justin K. Swaim.  The Defendant, Steven Weller, was present with Attorney William Nicholson.

The Court heard the testimony of many witnesses and has considered extensive exhibits, along with the arguments of counsel.  The Court finds as follows:

On January 28, 2012, the life of Christina Kruse was tragically altered by a horrific motor vehicle collision at the intersection of Troy Road and Timber Avenue in rural Davis County, Iowa.  As Christina was driving her Ford Taurus through the intersection, a Ford pickup pulling a livestock trailer ran a stop sign and hit her broadside. The driver of the pickup truck stated he did not see the stop sign and has admitted he was totally at fault.

Christina now lives in the Bloomfield Nursing and Rehab Center in Bloomfield, Iowa.  She is alert and can communicate verbally.  She is wheel-chair-bound and requires 24-hour care.  Christina has very little ability to use her right arm and leg.  She cannot

1

E-FILED  2015 MAY 01 1:31 PM DAVIS - CLERK OF DISTRICT COURT

walk and needs the help of two people to get in and out of bed, to dress and go to the bathroom.  She is incontinent approximately three times per week.  Christina can use her left hand and arm to eat and help dress herself.  She is often in pain and suffers from depression.  She does participate in activities offered at the nursing home and enjoys bingo.  She is frustrated by her limitations and she wants to go home.

Christina was diagnosed with diabetes at age six, and eventually went on dialysis. In 2008 she received a kidney and pancreas transplant.  After the surgery she had a seizure but recovered, and her diabetes abated due to the new organs.  At the time of the collision, Christina was leading a normal life.

Christina has one son, Harley Hudson, who is now 16 years of age.  Harley is a sophomore at Davis County High School and is active in sports, particularly baseball, which he loves.  Harley is a fine young man.  Christina and Harley were and are close. They have a very loving and supportive relationship.  Christina's parents and Harley's grandparents are Verda and Charles Kruse.  Verda and Charles have been wonderful support to Christina and Harley both before and after the collision.  Prior to the collision, Christina and Harley lived with them off and on due to Christina's diabetes and her inability to keep steady work.  After the transplant surgery Christina and Harley lived with Verda and Charles until she recovered and could live on her own.  Since the collision Harley has lived with Verda and Charles as his co-guardians.  Verda and Charles are wonderful grandparents and parents.

It has been clearly established that Christina will require 24-hour care for the rest of her life.  She has suffered extreme pain and suffering as a result of the accident, and the pain and suffering will continue to a lesser degree for the rest of her life.  Christina

E-FILED  2015 MAY 01 1:31 PM DAVIS - CLERK OF DISTRICT COURT

has lost the function of her right arm and leg, and her closed brain injury affects how her entire body functions.  Christina suffered from depression before the collision, but it was well controlled.  After the collision her depression has increased and may likely continue for the rest of her life.

Harley has not totally lost his mother, as he visits her regularly; however, she is not the mother he had before the collision.  Harley is suffering from the loss of his mother.

The life expectancy of Christina is less than that of a typical person of her age due to several factors.  As a diabetic she was on dialysis and near death just prior to her kidney and pancreas transplant.  Christina takes anti-rejection drugs which inhibit her immune system, making her more susceptible to infection, disease and related conditions. She had a seizure after her transplant surgery and is on anti-seizure medication.  In addition, Christina's sedentary lifestyle due to being wheel-chair-bound can lead to life-shortening conditions, such as pulmonary thrombosis and cardio vascular issues. Christina has been hospitalized post-collision for a stomach bleed.

Christina's general-practice physician, Dr. Brodale, testified he believes her life expectancy is 25 years.  At one point during his testimony, Dr. Brodale became emotional, teared up and had to take a few moments to compose himself.  The Court has reservations about Dr. Rodale's life expectancy estimate due to his emotional attachment to Christina.  The Court finds that Christina's life expectancy is between 10 and 15 years, and the Court will use 12.5 years relating to future damages.

E-FILED  2015 MAY 01 1:31 PM DAVIS - CLERK OF DISTRICT COURT

The Court finds that Christina is entitled to the following damages:

1. Past medical costs in the sum of **$395,097**, as set forth on Plaintiffs' Exhibit No. 3.

2. Future medical costs, including nursing home care for the rest of her life, in the sum of **$1,312,003**.

3. Past loss of function in the sum of **$50,000.**

4. Future loss of function in the sum of **$200,000.**

5. Past pain and suffering in the sum of **$50,000**.

6. Future pain and suffering in the sum of **$200,000**.


The Court finds that Harley Hudson is entitled to the following damages:

1. Past loss of consortium of **$150,000.**

2. Future loss of consortium of **$200,000**.


IT IS THEREFORE ORDERED that Judgment be entered against the Defendant and for the Plaintiffs in the total sum of **$2,647,100**, allocated as set forth above.

IT IS FURTHER ORDERED that all costs are assessed to the Defendant.

E-FILED  2015 MAY 01 1:31 PM DAVIS - CLERK OF DISTRICT COURT



State of Iowa Courts

**Type:**          OTHER ORDER

**Case Number**   **Case Title**
LALA012548        KRUSE, CHRISTINA ETAL VS STEVEN JAMES WELLER

So Ordered

*Randy S De Geest*

Randy S. DeGeest, District Court Judge,
Eighth Judicial District of Iowa

Electronically signed on 2015-05-01 13:31:52    page 5 of 5

**Exhibit A, Page 87 of 184**

E-FILED 2015 MAY 05 3:00 PM DAVIS - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR DAVIS COUNTY

| | |
|---|---|
| **CHRISTINA L. KRUSE**, individually and as mother and next friend of **HARLEY J. HUDSON**, a minor; **THE GUARDIANSHIP AND CONSERVATORSHIP OF CHRISTINA KRUSE**, by and through **CHARLES KRUSE** and **VERDA KRUSE**, as co-guardians and co-conservators of **CHRISTINA KRUSE**, on behalf of **CHRISTINA L. KRUSE**, individually and as mother and next friend of **HARLEY J. HUDSON**, a minor; and **THE GUARDIANSHIP AND CONSERVATORSHIP OF HARLEY HUDSON**, by and through **CHARLES KRUSE** and **VERDA KRUSE**, as co-guardians and co-conservators of **HARLEY HUDSON**, on behalf of **HARLEY J. HUDSON**, a minor,<br>　　　　　　　Plaintiffs,<br><br>v.<br><br>**STEVEN JAMES WELLER**, an individual,<br><br>　　　　　　　Defendant. | Case No. LALA012548<br><br><br><br><br><br>**CORRECTED JUDGMENT ENTRY NUNC PRO TUNC** |

On May 1, 2015, Ruling and Judgment was filed herein. That Ruling and Judgment inadvertently failed to include interest as provided for in Iowa Code Section 668.13, and contained a mathematical error in the computation of the total sum of damages awarded.

By agreement of attorney for Plaintiffs, Justin K. Swaim, and attorney for Defendant, William Nicholson, the Court now enters this Corrected Judgment Entry Nunc Pro Tunc to conform the Ruling and Judgment to the Court's intent at the time of

E-FILED  2015 MAY 05 3:00 PM DAVIS - CLERK OF DISTRICT COURT

the original entry thereof and specifically amends and corrects the final two paragraphs of said Ruling and Judgment, nunc pro tunc, to state as follows:

IT IS THEREFORE ORDERED that Judgment be entered against the Defendant and for the Plaintiffs in the total sum of $2,557,100, allocated as set forth above, with interest awarded for the future damages in the amount of $1,912,003 at the rate of 2.25% per annum from the date of entry of the judgment herein, May 1, 2015, and with interest awarded on the balance of the judgment of $645,097 from the date of the commencement of the action, January 10, 2014, at the rate of 2.25% per annum, all to be computed in accordance with Iowa Code Section 668.13(5).

IT IS FURTHER ORDERED that all costs are assessed to the Defendant.

Other than as expressly amended and corrected herein, the Ruling and Judgment entered herein on May 1, 2015, is ratified and confirmed in its entirety.

IT IS SO ORDERED AND ADJUDGED.

E-FILED  2015 MAY 05 3:00 PM DAVIS - CLERK OF DISTRICT COURT



State of Iowa Courts

**Type:**            OTHER ORDER

**Case Number**      **Case Title**
LALA012548           KRUSE, CHRISTINA ETAL VS STEVEN JAMES WELLER

So Ordered

Randy S. DeGeest, District Court Judge,
Eighth Judicial District of Iowa

Electronically signed on 2015-05-05 15:00:55     page 3 of 3

E-FILED 2019 MAR 15 10:52 PM MAHASKA - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR MAHASKA COUNTY

| | |
|---|---|
| CHRISTINA L. KRUSE, individually and as mother and next friend of HARLEY J. HUDSON; THE GUARDIANSHIP AND CONSERVATORSHIP OF CHRISTINA KRUSE, by and through CHARLES KRUSE and VERDA KRUSE, as co-guardians and co-conservators of CHRISTINA KRUSE, on behalf of CHRISTINA L. KRUSE, individually and as mother and next friend of HARLEY J. HUDSON; and THE GUARDIANSHIP AND CONSERVATORSHIP OF HARLEY HUDSON, by and through CHARLES KRUSE and VERDA KRUSE, as co-guardians and co-conservators of HARLEY HUDSON, | CASE NO. EQEQ088047 |
| Plaintiffs | |
| v. | |
| STEVEN JAMES WELLER, individually and in his capacity as trustee of the STEVEN J. WELLER REVOCABLE TRUST; the STEVEN J. WELLER REVOCABLE TRUST; WELLER FARMS, LLC, an Iowa Limited Liability Company; and CODY ALLEN WELLER, an individual, | **TRIAL ORDER AND VERDICT** |
| Defendants. | |

Trial to the Court in this matter commenced on February 6, 2018, and concluded on

February 9, 2018, after four (4) days of trial.  Present for trial was Charles and Verda Kruse,

represented by attorney Justin K. Swaim.

E-FILED 2019 MAR 15 10:52 PM WAPELLO – CLERK OF DISTRICT COURT

Christina L. Kruse was not in able to attend due to the severe injuries she suffered in the January 28, 2012 crash that the Defendant caused.  Harley Hudson also did not appear. Defendants, Steven Weller and Cody Weller, were personally present represented by attorneys Theodore W. Craig, William M. Reasoner, and David M. Repp.  The Court informed the parties that, based the lack of evidence presented at trial, the Court was going to release Cody Weller as a Defendant.

At the request of Plaintiff's attorney, the Court reserved officially dismissing Cody Weller until after the parties filed their final briefs and the Court reviewed the evidence and exhibits again.  The Court allowed the parties three weeks to file written closing arguments or requested relief briefs.

The briefs and final review of the exhibits did not change that Court's conclusion that Cody Weller should be dismissed as a Defendant for the reasons stated on the record and this decision.  The Court has considered the evidence, exhibits, arguments of counsel, oral and written, and considers the matter submitted.

### *BACKGROUND AND PROCEDURAL HISTORY*

1. On January 28, 2012, Plaintiff, Christina Kruse, was severely injured in a car crash when her Ford Taurus was hit by Defendant, Steven Weller's, Ford pickup hit Ms. Kruse vehicle after running a stop sign in Davis County, Iowa.

**Exhibit A, Page 92 of 184**

E-FILED 2019 MAR 15 10:52 PM IOWA - CLERK OF DISTRICT COURT

2. A civil action was filed by Plaintiffs in Davis County LALA012548.  Trial to the Court began April 21, 2015 and concluded April 23, 2015.  Judge Randy S. DeGeest entered a judgment against Steven J. Weller in the amount of $2,647,100.

3. One month before trial, on March 3, 2015, Steven Weller and Cody Weller entered into a business partnership and formed Weller Farms, LLC.

4. Steven Weller's insurance paid Christina Kruse $215,000 on May 12, 2015.  On February 15, 2016, Steven Weller paid Christina Kruse $25,500, after Judge Daniel P. Wilson ordered him to, following a Judgment Debtor Examination.

5. Plaintiffs filed Petition in Equity alleging Fraudulent Transfer on March 3, 2016.  Defendants filed an Answer on April 21, 2016.  Plaintiffs filed their Amended Petition on January 7, 2018.  Defendants filed their Amended Answer on January 26, 2018.

6. Plaintiffs allege several actions taken by Defendant Steven Weller were done to protect his assets from Plaintiffs' substantial judgment.  A majority of the trial evidence focused on the formation and operation of Weller Farms LLC.  Plaintiffs also presented evidence on Defendant's insurance business operations, various gifts, and the formation of the Steven J. Weller revocable trust, which was created on March 23, 2012, shortly after the car accident.

7. Plaintiff's claim these operations are a sham and the main purpose is to evade Plaintiffs judgment.  Defense's position is that the formation of the LLC was Cody Weller's idea and that his love of farming is the reason Weller Farms LLC exits.  Defendant's claim the LLC, along with the Steven J. Weller Revocable Trust, is simply smart estate planning.

3

**Exhibit A, Page 93 of 184**

E-FILED 2019 MAR 15 10:52 PM WAHASKA - CLERK OF DISTRICT COURT

### CONCLUSIONS OF LAW

8.   There are four alternatives which a present creditor may void certain transfers made by a debtor under Iowa Code Chapter 684.

9.   A creditor can attempt to prove that the debtor actually intended to hinder, delay, or defraud the creditor. Iowa Code § 684.4(1)(a).

10.   Alternatively, the creditor can attempt to prove that the debtor did not receive reasonably equivalent value in a transaction and that one of the following is true: (1) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) the debtor intended to incur or should have reasonably believed that the debtor would incur debts beyond the debtor's ability to pay as they became due. Iowa Code § 684.4(1)(b).

11.   Additionally, a creditor can prove to void transaction is the debtor did not receive reasonably equivalent value in exchange for a transfer and one of the following is true: (1) the debtor was insolvent at the time of the transfer; or (2) the debtor became insolvent as a result of the transfer.  Iowa Code § 684.5(1).

12.   The final avenue the creditor can attempt to prove under Chapter 684 is that the debtor made a transfer to an insider for an antecedent debt, that the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.  Iowa Code § 684.5(2).

13.   Iowa Code § 684.5(3) established the burden of proof by a preponderance of the evidence.  On July 1, 2016, Iowa adopted the revised Uniform Voidable Transfer Act.  However, this action commenced prior to that 2016 amendment and the common law standard is by clear

4

E-FILED 2019 MAR 15 10:52 PM IOWA – CLERK OF DISTRICT COURT

and convincing evidence.  Clear and convincing evidence is the standard the Court used in deciding this case.

14.  Under the Uniform Fraudulent Transfer Act (UFTA), a "plaintiff must prove each of the elements of fraudulent transfer by clear and convincing evidence."  *Benson v. Richardson*, 537 N.W.2d 748, 756 (Iowa 1995).  Clear and convincing evidence means there "are no serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Smith v. State*, 845 N.W.2d 51, 56 (Iowa 2014).

## *ANALYSIS AND VERDICT*

### A.  PLAINTIFFS HAVE NOT PROVED BY CLEAR AND CONVICING EVIDENCE THAT CODY WELLER CONSPIRED TO HINDER, DELAY, OR DEFRAUD PLAINTIFFS

Plaintiffs presented scant evidence that Cody Weller conspired with his father to hinder, delay, or defraud Plaintiffs in this case.  Cody wanted to farm with his dad using his dad's resources.  It was not Cody's idea to create Weller Farm's LLC and his actions in the formation of the LLC do not rise to the level of conspiracy to defraud.  There was no evidence presented of a meeting of the minds or an agreed common plan or scheme that indicated Cody possessed the requisite intent to be found liable for conspiracy.  At the end of trial, the Court indicated this to counsel.  Nothing contained in the exhibits or in counsel's closing trial briefs changes the Court's opinion on this matter.

For these reasons and the reasons the Court stated to counsel on the record at the conclusion of the Defense's case, this action as it relates to Cody Weller is **DISMISSED** with costs assessed to the Plaintiffs.

5

E-FILED 2019 MAR 15 10:52 PM WAPELLO - CLERK OF DISTRICT COURT

## B.  CLAIMS AGAINST STEVEN WELLER

### 1.  *GARY VAN ZETTEN'S BOOK OF BUSINESS (SGI Insurance Services, LLC)*

Steven Weller and Gary Van Zetten formed SGI Insurance Services, LLC on October 1, 2008.  It was subsequently dissolved on August 6, 2010, before being reinstated on January 20, 2016.  Mr. Van Zetten passed away on February 9, 2016.  The insurance products that SGI sold were through Insurance Station based in Altoona, Iowa.  The SGI LLC does not own land or buildings.

Plaintiffs' allege that Steven Weller transferred Mr. Van Zetten's LLC interest to Van Zetten's daughter Holland Taylor as a way to defraud Plaintiffs.  Ms. Taylor's deposition was taken and offered at trial as Defendant's Exhibit Q2.  SGI Insurance Services, LLC, Operating Agreement was admitted at trial as Defendant's Exhibit Z.  There is no clause in the SGI LLC Operating Agreement that dictates that Gary Van Zetten's share of the LLC would transfer to Holland Taylor upon death.

Holland Taylor testified that it was her request that the LLC interest be transferred to her.  Ms. Taylor and her aunt Carolyn Schaeffer drafted and filed the necessary documents with the Iowa Secretary of State.  The Defense argues that this demonstrates a lack of intent on the part of Steven Weller to defraud Plaintiff.  The amendment to the SGI LLC operating agreement added language that gave Holland Taylor a 50 percent ownership in SGI Insurance Services, LLC.[1]  This amendment was filed on December 30, 2016.  Since 2016, Ms. Taylor has received over $60,000 from SGI.

---

[1] *Defendant's Exhibit A1*

E-FILED  2019 MAR 15 16:52 PM  WAPELLO - CLERK OF DISTRICT COURT

In analyzing the evidence and arguments of counsel regarding the transfer of Gary Van Zetten's share in the LLC to Holland Taylor, the Court finds that both Plaintiffs and Defendants have reasonable theories for the reason of the relevant parties' actions.

The Court is not persuaded by clear and convincing evidence that Steven Weller's actions regarding this transfer was effectuated to hinder, delay, or defraud his current or future creditors. Plaintiffs have failed to meet their burden on this claim.

### 2.  *STEVEN J. WELLER REVOCABLE TRUST*

Plaintiffs alleged that Defendant Steven Weller created this trust to hinder, delay, or defraud present or future creditors.  There was very little evidence presented at trial regarding this transaction, but Plaintiffs point to the judgment debtor exam as proof by clear and convincing evidence that the Revocable Trust was created fraudulently.

Steven Weller testified at his judgment debtor exam that the trust was created to ensure the property, which includes his homestead, passes to his children.  Defense correctly asserts that under Iowa Code Chapter 633A, revocable trusts are estate planning tools that do not protect assets from creditors.  The revocable trust was created on the advice of prior counsel.  Weller's homestead was placed in the Revocable Trust, which is likely a creditor's biggest obstacle to assets based on the homestead exemption.

In the final analysis, the Court is underwhelmed by the evidence of fraudulent transfer on the creation of the Steven J. Weller Revocable Trust.  Plaintiffs have not proved, under any legal standard, that the creation of this revocable trust was fraudulent.

**Exhibit A, Page 97 of 184**

At the time of formation, Steven Weller would not have fully understood the potential judgment against him.  There is not sufficient evidence of intent to hinder, delay, or defraud.  The lack of a "pour over" will does not equal proof by clear and convincing evidence.

### 3.  WELLER FARMS LLC (FORMATION, IMPROPER GIFTS, and COMMINGLING)

A couple of factors weigh heavily in Plaintiffs' favor.  First, Weller Farms, LLC was created in March 2015, one month before the car accident trial commenced.  Second, since the 2.6 million dollar verdict was entered against the Defendant, he has only voluntarily paid $27,000 to the Plaintiffs which was not through insurance proceeds or court-ordered after a judgment creditor exam in February 2016.  Apparently, the $27,000 was paid only on advice of attorney Craig.  (*Plaintiff's Exhibit 72*)

Steven Weller is an intelligent man who worked in the insurance industry.  He spoke with attorneys during the pendency of the personal injury lawsuits filed against him.  Defendant knew that he was facing a "huge"[2] judgment that could erase much of his assets.  Mr. Weller no doubt wanted to maintain his assets to pass along to his children and for his retirement.  This is a smart and common desire.  However, avoiding paying Christina Kruse and her family the necessary money for Ms. Kruse to live is not an honorable venture.  In fact, it is fraud and it is not allowed by Iowa law.

Cody Weller testified that is what his idea to form the LLC.  Cody wanted to farm and his dad had the land and resources Cody needed to farm.  However, the Court finds that Cody did not know what an LLC was in March 2015.  He was a 20 year old young adult who liked

---

[2] *See Plaintiff's Exhibit 43 & 44*

E-FILED 2019 MAR 15 10:52 PM WAPELLO - CLERK OF DISTRICT COURT

farming, but it was his dad who saw this as a way to protect his assets against the Plaintiffs in the Davis County case. Steven Weller testified that Cody had always wanted to farm and that the reason the LLC was formed on March 3, 2015 was because Cody had just graduated high school. Cody testified at trial that he graduated high school in 2012.

Plaintiffs presented a voluminous amount of evidence that Steven Weller did not receive reasonable equivalent value from the LLC for the assets he placed in Weller Farms, LLC.  The Court does not believe that Plaintiffs have proved by clear and convincing evidence that Steven Weller did not receive reasonable equivalent value for the assets he put into the LLC.

The Court is not convinced that Steven Weller's assets were devalued to the point of fraud based on the information presented at trial, via testimony or exhibits.  Family businesses involving parents and children often are financially slanted in favor of the children.  The Court's issue with the LLC is the reason for the formation and not the insignificant value of assets Steven Weller may have lost.

Defense Expert Jason Stone testified regarding the Weller Farms LLC Operating Agreement.  Stone testified that the LLC formation agreement was typical.  The Court finds his testimony persuasive and that the specifics of the LLC are not a sham.  The Court also found much of the testimony of Plaintiff's expert witnesses compelling regarding some of the critiques regarding the terms of the Operating Agreement.  A majority of the critical testimony was extremely pedantic, inside baseball jargon irrelevant to the fighting issue in this case.

Was the LLC formed with the intent to hinder, delay, or defraud Plaintiffs?  That is the deciding issue in this case.   The formation of the LLC and Steven Weller's actions as a member

E-FILED   2019 MAR 15 10:52 PM   WAPELLO - CLERK OF DISTRICT COURT

of the LLC is suspicious and troubling.  It is clear that Steven Weller commingled the LLC's assets with his personal and insurance accounts.

Mr. Weller claims that in 2016 he had to pay his insurance bills and personal bills out of the LLC account because Plaintiffs' attorney froze assets in a Midwest One Bank account. Steven Weller testified that the levy on his accounts lasted for 24-48 hours, yet he continued to pay bills to his insurance employee, Connie Van Klootwyk.  The evidence showed that Steven Weller continued to deposit his SGI Insurance wages and commission into Weller Farms LLC into 2017.  The reasonable explanation for why Steven Weller did this is to prevent Plaintiffs from gaining access to these funds. (*Plaintiff's Exhibits 85 and 86*)  Defendant's health insurance premiums from his insurance business were also deducted from the Weller Farms LLC account.

The Court finds that Steven Weller's intent was to protect his assets.  Under normal circumstances, this is a rationale and smart strategy.  Here, the formation of the LLC was intended to keep certain assets from his creditors.  The Defendant had seriously injured individuals in the car he struck.  The Jaws of Life came to retrieve the occupants of the vehicle. Plaintiff Christina Kruse was life-flighted to the University of Iowa Hospitals and Clinics.  A T.I. Report was prepared by the Iowa State Patrol.  The Operating Agreement lists as one purpose of the LLC as "[P]rovide protection to family assets from claims of future creditors against family members."[3]  The future creditors are the Plaintiffs in this case.

The cattle that Weller Farms LLC has purchased are not in Steven Weller or Cody Weller's name.  The value of cattle can be difficult to establish and, for creditors, if the cattle are not listed in the debtor's name, impossible to access.  Steven Weller has attempted to go about

---

[3] *Plaintiff's Exhibit 24 (Weller Farms, LLC Operating Agreement 1.05(f))*

E-FILED 2019 MAR 15 10:52 PM IOWA - CLERK OF DISTRICT COURT

his life and conduct business as though he did not owe Plaintiffs $2.6 million.  Bluntly, he has not acted like a person who has any intent on satisfying the judgment against him.

Defendant Steven Weller's behavior since the rendering of the verdict on May 1, 2015, is telling as to what his intent was when the LLC was formed.  Defendant has paid very little of the judgment and practiced financial maneuvers which have kept his personal assets out of reach of Plaintiffs.

Steven Weller also testified that he is an auctioneer and evidence presented demonstrated that he paid his girlfriend, Leigh Christenson, from the Weller Farms LLC account for proceeds from an auction he had conducted.  Defense counsel presented evidence of how a creditor could obtain a "charging order" in order to get access to LLC assets.  At the time of trial, the Court is unaware of any steps taken by Steven Weller or his legal counsel to facilitate this with Plaintiffs and/or Plaintiffs' counsel.

There was a great deal of evidence presented at trial regarding various $13,000 checks that Steven Weller gifted in 2013.  Five of those eight checks eventually went back into Steven Weller's personal bank account.  Defendant claims that attorney Randy Stravers gave him the advice to write these eight $13,000 checks totaling $104,000.   It is undisputed that three, $13,000 gifts were deposited into Madison Weller's bank account before being transferred to Weller Farms LLC.

The defense stated that the gifts were returned based on an appearance of impropriety.  For whatever reason, ultimately transferring the money to the LLC and away from creditors did not strike Defendant or his counsel as just as eyebrow-raising.  The Court finds the cash gifts were clearly fraudulent.  The eight cash gifts are avoidable as fraudulent transfers.

11

**Exhibit A, Page 101 of 184**

E-FILED 2019 MAR 15 10:52 PM IOWA - CLERK OF DISTRICT COURT

Steven Weller argues the farm will become very profitable.  It operated at a loss in 2015 and 2016.  The LLC did lose less in 2016 than it did in 2015 and it is common for businesses to operate at a loss for the first several years.  The reality is that the value in the farming operation is almost entirely the land.  Defendant Steven Weller's actions in creating the LLC and subsequent behavior indicate his goal was and still is to prevent creditors from obtaining the value of this land.  Plaintiffs' have proved by clear and convincing evidence that Steven Weller fraudulently transferred these assets when Weller Farms LLC was formed.

### 4.  529 COLLEGE SAVINGS ACCOUNTS

Plaintiffs claim that the $10,000 Steven Weller deposited into a 529 college savings account for Cody Weller and the $15,000 Steven Weller deposited in his daughter's college savings account was done with the purpose to hinder, delay, or defraud Plaintiffs.  The transactions were completed in the spring of 2012 and Steven Weller added $13,000 to Cody Weller's 529 account and $12,000 to Madison Weller's account in January 2013.

While the Court is not persuaded that the Plaintiffs have met their burden of proof that the initial deposits were done fraudulently, the Court does find that the January 2013 transfers were fraudulent.  At that point, the Court finds Steven Weller knew a significant judgment was a distinct possibility.  Cody Weller was not attending college.  Steven Weller testified at trial that he thought he had liquidated the entirety of the college savings plans and paid those to Plaintiffs.  The Plaintiff is entitled to those funds.

12

E-FILED 2019 MAR 15 10:52 PM IOWA - CLERK OF DISTRICT COURT

## JUDGMENT AND DECREE

IT IS HEREBY ORDERED AS FOLLOWS:

1. The eight cash gifts are avoided and set aside, declared null and void, with no legal force and effect.

2. The 2013 gifts via 529 college savings plan deposits are avoided set aside, declared null and void, with no legal force and effect with remaining assets in those accounts to be paid to Plaintiffs immediately.

3. All assets and all proceeds from gifts that have been voided are imposed with a constructive trust and equitable lien in favor of Plaintiffs, Christina Kruse and Harley Hudson.

4. The March 3, 2015 Quit Claim Deed from Steven J. Weller, Trustee, to Weller Farms LLC is avoided and set aside, declared null and void, with no legal force and effect, along with the Individual Trustee's Affidavit of Steven J. Weller and all other title documents associated with the avoided transfers and all transfers by Steven J. Weller in the Operating Agreement Between and Among the Members of Weller Farms LLC dated March 3, 2015, and all other acts and transactions, including transfers or obligations incurred by Weller Farms LLC, or anyone acting on behalf of Weller Farms LLC be avoided and set aside, free and clear of all claims by Cody Weller, Weller Farms LLC, and Steven J. Weller Revocable Trust.

5. All transfers made by Steven J. Weller into Weller Farms LLC, or obligations incurred by Defendant Steven J. Weller on behalf of Weller Farms LLC, are avoided and set aside, declared null and void, with no legal force and effect.

13

**Exhibit A, Page 103 of 184**

E-FILED  2019 MAR 15 10:52 PM IOWA – CLERK OF DISTRICT COURT

6.  Plaintiffs may levy execution on and recover against any and all of the assets recovered as a result of such voided transfers and without regard to any such voided obligations, free and clear of any claims by Cody Weller, Weller Farms LLC, or Steven J. Weller Revocable Trust.

7.  All assets of Weller Farms LLC are owned in substance by Steven J. Weller and remain available to creditors of Steven J. Weller, including Plaintiffs, for levy of execution or other action, process, or proceeding, as the assets of Steven J. Weller, subject to any claim of exemption, which shall be resolved through this matter, the Judgment Debtor case, or the underlying personal injury matter, free and clear any claims by Cody Weller, Weller Farms LLC, or Steven J. Weller Revocable Trust.

8.  The January 4, 2016, Real Estate Mortgage by Weller Farms LLC to First State Bank in Lynnville, Iowa, in the principal amount of $500,000, the Guaranty from Weller Farms LLC to First State Bank of Lynnville, Iowa, and all loans signed by Steven J. Weller in any capacity on January 4, 2016, and all other security interests, loans, or documents granted by either Defendant Steven Weller in any capacity related to Weller Farms LLC or individually is set aside and avoided as fraudulent transfers and declared null and void with no legal force and effect.  This voided transfer is free and clear of any claims by Cody Weller, Weller Farms LLC, or Steven J. Weller Revocable Trust.

9.  All assets and proceeds from voided transactions and transfers are available for levy of execution imposed by constructive trust and equitable lien in favor of Plaintiffs, Christina Kruse and Harley Hudson.

E-FILED 2019 MAR 15 10:52 PM IOWA - CLERK OF DISTRICT COURT

10. A Permanent Injunction is hereby entered restraining Defendant Steven J. Weller from making any transfer or incurring any obligation with the intent to hinder, delay, or defraud Plaintiffs or from making further disposition of avoided real estate or of any other assets or property determined by this decision to be fraudulently transferred or any other property a constructive trust is imposed.

11. Defendant Steven J. Weller is further barred from any financial action as it relates to Weller Farms LLC, along with the avoided gifts and 529 plans.  Such attempts will be subject to contempt of court.  Defendant shall not pay any of his attorney fees through the property for which a constructive trust has been imposed.

12. This Court retains jurisdiction over supplemental equitable proceedings related to the consequences of this ruling.

13. The Defendant, Steven J. Weller, shall pay Plaintiffs' attorney fees in full, as well as the costs of this action.  Plaintiff's attorney shall submit an affidavit on attorney fees within 30 days.

IT IS SO ORDERED.

Clerk to Notify

**Exhibit A, Page 105 of 184**

E-FILED  2018 MAR 13 10:52 AM WAPELLO - CLERK OF DISTRICT COURT



State of Iowa Courts

**Type:**          OTHER ORDER

**Case Number**     **Case Title**
EQEQ088047          KRUSE, CHRISTINA L, ETAL VS WELLER, STEVEN J, ETAL

So Ordered

Shawn Showers
Judge

Electronically signed on 2018-03-13 10:52:15     page 16 of 16

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

**COPY**

Instr. Number:   21
BK:  2016 PG:   21
Recorded: 1/5/2016 at 1:35:27.0 PM
Fee Amount: $52.00
Revenue Tax:
Diane Upton Crookham RECORDER
Mahaska County, Iowa
Unique Doc ID: 2016_0105_21

——————— State of Iowa ———————     ——————— Space Above This Line For Recording Data ———————

**Prepared By:** ZACHARY GUINN
FIRST STATE BANK OF
LYNNVILLE, IOWA
413 EAST STREET, LYNNVILLE, IA 50153  (641) 527-2535

**Return To:** FIRST STATE BANK OF
LYNNVILLE, IOWA
413 EAST STREET
P.O. BOX #187  LYNNVILLE, IA  50153

## OPEN-END REAL ESTATE MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage is 01-04-2016_____ and the parties and their addresses are as follows:

   **MORTGAGOR:** WELLER FARMS, LLC
   3133 195TH STREET
   ROSE HILL, IA  52586

   

   ☐ Refer to the Addendum which is attached and incor
   additional Mortgagors. The Addendum is located on
   _____.

   **LENDER:** FIRST STATE BANK OF LYNNVILLE, IOWA
   ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF
   IOWA
   413 EAST STREET
   P.O. BOX #187  LYNNVILLE, IA  50153

2. **MORTGAGE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (hereafter defined), Mortgagor grants, bargains, warrants, conveys and mortgages to Lender the following described property: (If the legal description of the property is not on page one of this Mortgage, it is located on PAGE 10_____.)

IOWA - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT
[NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)
Expere ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IA 10/24/2005

(page 1 of 9)

**EXHIBIT**

Plaintiffs' Exhibit "8"

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

——————— State of Iowa ———————         ———— Space Above This Line For Recording Data ————

**Prepared By:** ZACHARY GUINN
FIRST STATE BANK OF
LYNNVILLE, IOWA
413 EAST STREET, LYNNVILLE, IA 50153  (641) 527-2535

**Return To:** FIRST STATE BANK OF
LYNNVILLE, IOWA
413 EAST STREET
P.O. BOX #187  LYNNVILLE, IA  50153

# OPEN-END REAL ESTATE MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage is <u>01-04-2016</u>         and the parties
   and their addresses are as follows:

   **MORTGAGOR:** WELLER FARMS, LLC
   3133 195TH STREET
   ROSE HILL, IA  52586

   ☐ Refer to the Addendum which is attached and incorporated herein for
   additional Mortgagors. The Addendum is located on _____.

   **LENDER:** FIRST STATE BANK OF LYNNVILLE, IOWA
   ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF
   IOWA
   413 EAST STREET
   P.O. BOX #187  LYNNVILLE, IA  50153

2. **MORTGAGE.** For good and valuable consideration, the receipt and sufficiency of which is
   acknowledged, and to secure the Secured Debt (hereafter defined), Mortgagor grants, bargains,
   warrants, conveys and mortgages to Lender the following described property: (if the legal description
   of the property is not on page one of this Mortgage, it is located on <u>PAGE 10</u>            .)

IOWA - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT
(NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)
ExperP ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA  10/24/2005
*(page 1 of 9)*

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

The property is located in **MAHASKA**_____ at _____
(County)

_____ , _____ , Iowa _____
(Address)                (City)                (Zip Code)

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property"). The term Property also includes, but is not limited to, any and all water wells, water, ditches, reservoirs, reservoir sites and dams located on the real estate and all riparian and water rights associated with the Property, however established.

NOTICE: THIS MORTGAGE SECURES CREDIT IN THE AMOUNT OF $ 500,000.00 LOANS AND ADVANCES UP TO THIS AMOUNT, TOGETHER WITH INTEREST, ARE SENIOR TO INDEBTEDNESS TO OTHER CREDITORS UNDER SUBSEQUENTLY RECORDED OR FILED MORTGAGES AND LIENS.

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount of the Secured Debt (hereafter defined) secured by this Mortgage at any one time shall not exceed the amount stated above. This limitation of amount does not include interest, loan charges, commitment fees, brokerage commissions, attorneys' fees and other charges validly made pursuant to this Mortgage and does not apply to advances (or interest accrued on such advances) made under the terms of this Mortgage to protect Lender's security and to perform any of the covenants contained in this Mortgage. Future advances are contemplated and, along with other future obligations, are secured by this Mortgage even though all or part may not yet be advanced. Nothing in this Mortgage, however, shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment would need to be agreed to in a separate writing.

4. **SECURED DEBT DEFINED.** The term "Secured Debt" includes, but is not limited to, the following:

A. The promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all extensions, renewals, modifications or substitutions (Evidence of Debt) *(e.g., borrower's name, note amount, interest rate, maturity date):*

B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Mortgage whether or not this Mortgage is specifically referred to in the evidence of debt and whether or not such future advances or obligations are incurred for any purpose that was related or unrelated to the purpose of the Evidence of Debt.

C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Mortgage, plus interest at the highest rate in effect, from time to time, as provided in the Evidence of Debt.

E. Mortgagor's performance under the terms of any instrument evidencing a debt by Mortgagor to Lender and any Mortgage securing, guarantying, or otherwise relating to the debt.

If more than one person signs this Mortgage as Mortgagor, each Mortgagor agrees that this Mortgage will secure all future advances and future obligations described above that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. This Mortgage will not secure any other debt if Lender fails, with respect to such other debt, to make any required disclosure about this Mortgage or if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Mortgagor agrees to make all payments on the Secured Debt when due and in accordance with the terms of the Evidence of Debt or this Mortgage.

6. **WARRANTY OF TITLE.** Mortgagor covenants that Mortgagor is lawfully seized of the estate conveyed by this Mortgage and has the right to grant, bargain, warrant, convey, sell, and mortgage the Property and warrants that the Property is unencumbered, except for encumbrances of record.

7. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the

*(page 2 of 9)*

Exserp ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IA 10/24/2006

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Mortgage. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses which Mortgagor may have against parties who supply labor or materials to improve or maintain the Property.

8.  **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property and that may have priority over this Mortgage, Mortgagor agrees:
    A. To make all payments when due and to perform or comply with all covenants.
    B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
    C. Not to make or permit any modification or extension of, and not to request or accept any future advances under any note or agreement secured by, the other mortgage, deed of trust or security agreement unless Lender consents in writing.

9.  **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of any lien, encumbrance, transfer, or sale, or contract for any of these on the Property. However, if the Property includes Mortgagor's residence, this section shall be subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. For the purposes of this section, the term "Property" also includes any interest to all or any part of the Property. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Mortgage is released.

10. **TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if (1) a beneficial interest in Mortgagor is sold or transferred; (2) there is a change in either the identity or number of members of a partnership or similar entity; or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity. However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Mortgage.

11. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall be continuing as long as the Secured Debt remains outstanding:
    A. Mortgagor is an entity which is duly organized and validly existing in the Mortgagor's state of incorporation (or organization). Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.
    B. The execution, delivery and performance of this Mortgage by Mortgagor and the obligation evidenced by the Evidence of Debt are within the power of Mortgagor, have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.
    C. Other than disclosed in writing Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Secured Debt is satisfied.

12. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will give Lender prompt notice of any loss or damage to the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor will not initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restriction limiting or defining the uses which may be made of the Property or any part of the Property, without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor or any other owner made under law or regulation regarding use, ownership and occupancy of the Property. Mortgagor will comply with all legal requirements and restrictions, whether public or private, with respect to the use of the Property. Mortgagor also agrees that the nature of the occupancy and use will not change without Lender's prior written consent.
    No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Mortgage. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent. Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

13. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any of Mortgagor's duties under this Mortgage, or any other mortgage, deed of trust, security agreement or other lien document that has priority over this Mortgage, Lender may, without notice, perform the duties or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any

Exper9 ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA 10/24/2005

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

amount necessary for performance. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may do whatever is necessary to protect Lender's security interest in the Property. This may include completing the construction.

Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Mortgage. Any amounts paid by Lender for insuring, preserving or otherwise protecting the Property and Lender's security interest will be due on demand and will bear interest from the date of the payment until paid in full at the interest rate in effect from time to time according to the terms of the Evidence of Debt.

14. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, warrants, conveys and mortgages to Lender as additional security all the right, title and interest in the following (Property).

   A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to, any extensions, renewals, modifications or replacements (Leases).

   B. Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

   In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

   Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security Instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment. This Security Instrument will remain effective during any statutory redemption period until the Secured Debts are satisfied.

   As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance.

   Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

15. **CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

16. **DEFAULT.** Mortgagor will be in default if any of the following occur:

   A. Any party obligated on the Secured Debt fails to make payment when due;

   B. A breach of any term or covenant in this Mortgage, any prior mortgage or any construction loan agreement, security agreement or any other document evidencing, guarantying, securing or otherwise relating to the Secured Debt;

   C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;

   D. The death, dissolution, or insolvency of, appointment of a receiver for, or application of any debtor relief law to, Mortgagor or any person or entity obligated on the Secured Debt;

_____  _____  _____  _____  _____  (page 4 of 9)

Experts ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA  10/24/2005

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the value of the Property is impaired;

F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or

G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

17. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure, mediation notices or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Mortgage in a manner provided by law if this Mortgagor is in default. Upon a default by the Mortgagor, the Lender may take possession of the Property itself or through a court appointed receiver, without regard to the solvency or insolvency of the Mortgagor, the value of the Property, the adequacy of the Lender's security, or the existence of any deficiency judgment, and may operate the Property and collect the rents and apply them to the costs of operating the Property and/or to the unpaid debt.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the Evidence of Debt, other evidences of debt, this Mortgage and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether expressly set forth or not. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

18. **REDEMPTION.** Mortgagor agrees that in the event of foreclosure of this Mortgage, at the sole discretion of Lender, Lender may elect to reduce or extend the period of redemption for the sale of the Property to a period of time as may then be authorized under the circumstances and under any section of Iowa Code Chapter 628, or any other Iowa Code section, now in effect or as may be in effect at the time of foreclosure.

19. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Mortgage. Mortgagor will also pay on demand all of Lender's expenses incurred in collecting, insuring, preserving or protecting the Property or in any inventories, audits, inspections or other examination by Lender in respect to the Property. Mortgagor agrees to pay all costs and expenses incurred by Lender in enforcing or protecting Lender's rights and remedies under this Mortgage, including, but not limited to, attorneys' fees, court costs, and other legal expenses. Once the Secured Debt is fully and finally paid, Lender agrees to release this Mortgage and Mortgagor agrees to pay for any recordation costs. All such amounts are due on demand and will bear interest from the time of the advance at the highest rate in effect, from time to time, as provided in the Evidence of Debt and as permitted by law.

20. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) "Environmental Law" means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) "Hazardous Substance" means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law. Mortgagor represents, warrants and agrees that, except as previously disclosed and acknowledged in writing:

A. No Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

_SW_

_____  _____  _____  _____ (page 6 of 9)

Expere ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IA 10/24/2006

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

D. Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law.

F. There are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Mortgage and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Mortgage without prejudice to any of Lender's rights under this Mortgage.

L. Notwithstanding any of the language contained in this Mortgage to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Mortgage regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

21. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any action, real or threatened, by private or public entities to purchase or take any or all of the Property, including any easements, through condemnation, eminent domain, or any other means. Mortgagor further agrees to notify Lender of any proceedings instituted for the establishment of any sewer, water, conservation, ditch, drainage, or other district relating to or binding upon the Property or any part of it. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims and to collect and receive all sums resulting from the action or claim. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Mortgage. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

22. **INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the improvements now existing or hereafter built on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Mortgage.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "lender loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.                                         *(page 6 of 9)*

Express  ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA 10/24/2005

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

Unless Lender and Mortgagor otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Debt, whether or not then due, with any excess paid to Mortgagor. If Mortgagor abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Secured Debt whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of scheduled payments or change the amount of the payments. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

   B.  Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

   C.  Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

23. **NO ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

24. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem necessary. Mortgagor warrants that all financial statements and information Mortgagor provides to Lender are, or will be, accurate, correct, and complete. Mortgagor agrees to sign, deliver, and file as Lender may reasonably request any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Mortgage and Lender's lien status on the Property. If Mortgagor fails to do so, Lender may sign, deliver, and file such documents or certificates in Mortgagor's name and Mortgagor hereby irrevocably appoints Lender or Lender's agent as attorney in fact to do the things necessary to comply with this section.

25. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Mortgage are joint and individual. If Mortgagor signs this Mortgage but does not sign the Evidence of Debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. Mortgagor agrees that Lender and any party to this Mortgage may extend, modify or make any change in the terms of this Mortgage or the Evidence of Debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Mortgage. The duties and benefits of this Mortgage shall bind and benefit the successors and assigns of Mortgagor and Lender.

If this Mortgage secures a guaranty between Lender and Mortgagor and does not directly secure the obligation which is guaranteed, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation including, but not limited to, anti-deficiency or one-action laws.

26. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Mortgage is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Mortgage is complete and fully integrated. This Mortgage may not be amended or modified by oral agreement. Any section or clause in this Mortgage, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section or clause of this Mortgage cannot be enforced according to its terms, that section or clause will be severed and will not affect the enforceability of the remainder of this Mortgage. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Mortgage are for convenience only and are not to be used to interpret or define the terms of this Mortgage. Time is of the essence in this Mortgage.

27. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Mortgage, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

28. **WAIVERS.** Except to the extent prohibited by law, Mortgagor waives any rights relating to reinstatement, the marshaling of liens and assets, all rights of dower and distributive share and all homestead exemption rights relating to the Property.

29. **U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Mortgage:

   ☐  **Construction Loan.** This Mortgage secures an obligation incurred for the construction of an improvement on the Property.

   ☐  **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

*(page 7 of 9)*

Exempt ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IA 10/24/2005

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

☐ **Crops; Timber; Minerals; Rents, Issues and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property").

☐ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property. This security interest includes all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property. The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

☐ **Filing As Financing Statement.** Mortgagor agrees and acknowledges that this Mortgage also suffices as a financing statement and as such, may be filed of record as a financing statement for purposes of Article 9 of the Uniform Commercial Code. A carbon, photographic, image or other reproduction of this Mortgage is sufficient as a financing statement.

**30. OTHER TERMS.** If checked, the following are applicable to this Mortgage:

☐ **Purchase Money Mortgage.** This is a purchase money mortgage as defined by Iowa law.

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Mortgage will remain in effect until released.

☒ **Agricultural Property.** Mortgagor covenants and warrants that the Property will be used principally for agricultural or farming purposes and that Mortgagor is an individual or entity allowed to own agricultural land as specified by law.

☐ **Separate Assignment.** The Mortgagor has executed or will execute a separate assignment of leases and rents. If the separate assignment of leases and rents is properly executed and recorded, then the separate assignment will supersede this Security Instrument's "Assignment of Leases and Rents" section.

☐ **Additional Terms.**

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Mortgage and in any attachments. Mortgagor also acknowledges receipt of a copy of this Mortgage on the date stated above on Page 1.

☐ Actual authority was granted to the parties signing below by resolution signed and dated
_____ .

Entity Name: **WELLER FARMS, LLC**

(Signature) **STEVEN J. WELLER, DIRECTOR**                     1 - 4 - 16 (Date)

_____          _____
(Signature)                                                      (Date)

_____          _____
(Signature)                                                      (Date)

_____          _____
(Signature)                                                      (Date)

*(page 8 of 9)*

ExpereⓇ ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA  10/24/2005

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

**ACKNOWLEDGMENT:**

(Individual)

STATE OF _____, COUNTY OF _____ } ss.
On this _____day of _____ before me, a Notary Public in the
state of Iowa, personally appeared _____

to me known to be the person(s) named in and who executed the foregoing instrument, and
acknowledged that _____
executed the same as _____ voluntary act and deed.
My commission expires:

_____
(Notary Public)

(Business
or Entity
Acknowl-
edgment)

STATE OF IOWA_____, COUNTY OF JASPER_____ } ss.
On this 4TH_____day of JANUARY, 2016_____ before me, a Notary Public in the
state of Iowa, personally appeared STEVEN J. WELLER_____
to me personally known, who being by me duly sworn or affirmed did say that that person is
DIRECTOR
of said entity, that (the seal affixed to said instrument is the seal of said entity or no seal has
been procured by said entity) and that said instrument was signed and sealed, if applicable, on
behalf of the said entity by authority of its board of directors/partners/members and the said
DIRECTOR
acknowledged the execution of said instrument to be the voluntary act and deed of said entity
by it voluntarily executed.
My commission expires: 01-27-2018

_____
(Notary Public)
ZACHARY ISAAC GUINN

ZACHARY ISAAC GUINN
Commission Number 768101
My Commission Expires
January 27, 2018

(In the following statement "I" means the Mortgagor.) I understand that homestead property is in
many cases protected from the claims of creditors and exempt from judicial sale; and that
by signing this contract, I voluntarily give up my rights to this protection for this property
with respect to claims based upon this contract.

_____                                                    _____
(Signature) WELLER FARMS, LLC                                              (Date)

_____                                                    _____
(Signature)                                                                (Date)

_____  _____  _____  _____  (page 9 of 9)
Expera ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA 10/24/2006

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

## PAGE 10

The Northeast Quarter of the Northwest Quarter and the West Half of the Northeast Quarter of Section Twenty-two, Township Seventy-six North, Range Fourteen West.

### AND

The South Half of the Northwest Quarter, the Northwest Quarter of the Northwest Quarter and the Northwest Quarter of the Northeast Quarter of the Northwest Quarter, all in Section Thirty-six, township Seventy-five North, Range Fourteen West, all located in Mahaska County, Iowa.

E-FILED 2018 MAR 18 8:07 PM MAHASKA - CLERK OF DISTRICT COURT

8CVCAP

## IN THE IOWA DISTRICT COURT IN AND FOR MAHASKA COUNTY

| | |
|---|---|
| GUAR/CONS OF CHRISTINA KRUSE<br>CHRISTINA L KRUSE<br>HARLEY J HUDSON<br>, <br><br><br>Plaintiff<br><br><br>STEVEN J WELLER REVOC TRUST<br>STEVEN JAMES WELLER<br>CODY ALLEN WELLER<br>WELLER FARMS, LLC<br><br><br>Defendant | 08621  EQEQ088047<br><br><br><br>**ORDER RE: ATTORNEY FEES** |

Appearances: Plaintiff's attorney Justin K. Swaim
                        Defendant's attorney David M. Repp

Hearing date: May 18, 2018

## I. PLAINTIFF'S REQUESTED AMOUNT FOR ATTORNEY FEES

   The Court ordered that Defendant Steven Weller pay Plaintiff's attorney fees in full in its March 13, 2018 Trial Order and Verdict. The Court believes it has that authority under common law. See Hockenberg Equip. Co v. Hockenberg Equipment & Supply Company of Des Moines Inc., 510 N.W.2d 153, 159 (Iowa 1993).  The Court finds that the Defendant was conniving in his actions to prevent Plaintiff from gaining access to the assets in Weller Farms L.L.C. Furthermore, the time to enlarge or appeal the Court's verdict has passed. Plaintiff's attorney is entitled to reasonable attorney fees.

   The Court reviewed the Plaintiff's affidavit regarding his fees. The Court has reviewed both Plaintiff's and Defendant's briefs on this issue and affidavits from other attorneys regarding Mr. Swaim's fees. There are fees included that the Court finds should not be included in the award of attorney fees. The Court specifically excludes work done prior to the March 3, 2016 filing of the

Plaintiffs' Exhibit "9"

E-FILED   2018 MAR 18 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

Petition. Additionally, the Court finds expenses were not explicitly authorized in the Court's March 13, 2018 ruling.

Mr. Swaim argued the Court should not consider Mr. Weller's financial situation in assessing fees because Mr. Weller is responsible for this situation. Mr. Repp insisted that the Court should consider Steven Weller's current financial situation. Because this award of attorney fees is within the equitable powers of the Court, the Court is considering Mr. Weller's financial situation. However, deterring this type of behavior is a main factor for the Court. Plaintiff's attorney exerted a great amount of work in filing this claim, researching the legal issues, and preparing for depositions and trial.

Plaintiff requests $158,690 is attorney's fees. Defendant's attorney argued $20,000 is appropriate. After careful consideration of the Defendant's conduct and Defendant's and Plaintiff's current financial situation, the Court hereby orders Defendant Steven Weller pay Plaintiff's attorney fees in the amount of $100,000.

IT IS THEREFORE ORDERED:

1. Defendant Steven Weller shall pay $100,000 in attorney fees with interest accruing at the current rate to be imposed by the Clerk of Court.

2. This award shall be a judgment and lien against Steven Weller and all entities he is affiliated with.

**Exhibit A, Page 119 of 184**

E-FILED  2018 MAR 18 8:07 PM MAHASKA - CLERK OF DISTRICT COURT



State of Iowa Courts

| | |
|---|---|
| **Case Number** | **Case Title** |
| EQEQ088047 | KRUSE, CHRISTINA L, ETAL VS WELLER, STEVEN J, ETAL |
| **Type:** | OTHER ORDER |

So Ordered

_____

Shawn Showers
Judge

Electronically signed on 2018-05-18 15:47:47

E-FILED  2019 MAR 15 8:05 PM MAHASKA - CLERK OF DISTRICT COURT

## AGRICULTURAL FINANCIAL STATEMENT

FROM: Steven Weller
3133 195th Street
Rose Hill, IA 52586

TO: First State Bank
413 East Street
Lynnville, IA 50153

DATE: 10/9/15



### ASSETS

**CURRENT ASSETS**

| | | | |
|---|---|---|---|
| Checking Account | First State Bank-Farm Acct | | $111 |
| | MidWestOne Bank-Personal | | $400 |
| Cash | In Lock Box | | $15,000 |
| Savings Account | MidWestOne Bank | | $50 |
| Accounts Receivable | Cash Rent-DeGroot | | $8,700 |
| | CRP | | $9,607 |
| | | | $0 |
| | Mike Weller | | $2,500 |
| Bonds & Investments | Edward Jones-Trust Acct | | $28,880 |
| Prepaid Expenses | | | $0 |
| Other Current Assets | | | $0 |
| | | | $0 |
| | **TOTAL QUICK ASSETS:** | | $65,228 |

**LIVESTOCK HELD FOR SALE**

| Description | Number | Avg. Wt. | $/CWT | |
|---|---|---|---|---|
| | 0 | 0 | $0.00 | $0 |
| | 0 | 0 | $0.00 | $0 |
| | 0 | 0 | $0.00 | $0 |
| | 0 | 0 | $0.00 | $0 |
| | 0 | 0 | $0.00 | $0 |
| **TOTAL LIVESTOCK HELD FOR SALE:** | | | | $0 |

**FARM PRODUCTS & FEED**

| Description | Number | Unit | $/Unit | |
|---|---|---|---|---|
| | 0 | @ | $0.00 | $0 |
| | 0 | @ | $0.00 | $0 |
| | 0 | @ | $0.00 | $0 |
| | 0 | @ | $0.00 | $0 |
| | 0 | @ | $0.00 | $0 |
| | 0 | @ | $0.00 | $0 |
| **TOTAL FARM PRODUCTS & FEED:** | | | | $0 |

**TOTAL CURRENT ASSETS** — $65,228

**LONG TERM ASSETS**

| | | |
|---|---|---|
| Car(s) & Pickup(s) | 2006 Chrysler Sebring | $1,500 |
| | 2003 Ford Ranger | $700 |
| | | $0 |
| | | $0 |
| Cash Value/Life Ins. | Farm Bureau | $9,700 |
| IRA/Retirement | American National Annuity | $7,000 |
| | Edward Jones Roth IRA | $62,570 |
| | Edward Jones IRA | $48,480 |
| Machinery & Equip. | | $0 |

**BREEDING LIVESTOCK**

| Description | Number | Avg. Wt. | $/Head | |
|---|---|---|---|---|
| Horses | 3 | | $300 | $900 |
| | 0 | | $0 | $0 |
| | 0 | | $0 | $0 |
| **TOTAL BREEDING LIVESTOCK:** | | | | $900 |

| | | |
|---|---|---|
| 160A with 13A Acreage | Acres Owned in Mahaska County | $298,000 |
| 130 | Acres Owned in Mahaska County | $95,000 |
| Osky Rental/Office Bldg | Acres Owned in Mahaska County | $80,000 |
| | Acres Owned in | $0 |
| | Acres Owned in | $0 |
| | Acres Owned in | $0 |
| Other Long Term | Weller Farms LLC (50% share) | $49,782 |
| | | $0 |

**TOTAL LONG TERM ASSETS** — $653,612

**TOTAL ASSETS** — $718,840

### LIABILITIES & EQUITY

**CURRENT LIABILITIES**

| | | |
|---|---|---|
| Operating | FSB-LOC | $46,374 |
| | FSB-LOC Interest | $2,938 |
| | | $0 |
| | MidWestOne | $500 |
| | | $0 |
| | | $0 |
| Sealed Grain Debt | | $0 |
| | | $0 |
| | | $0 |
| Term Payments Due | FSB-Ag RE | $15,340 |
| | | $0 |
| | | $0 |
| Due Relatives | | $0 |
| | | $0 |
| | | $0 |
| **Accounts Payable** | | |
| | Fertilizer | $0 |
| | Chemicals | $0 |
| | Seed | $0 |
| | Repairs | $0 |
| | Doctor/Hospital | $0 |
| | Feed | $0 |
| | Fuel | $0 |
| Income Taxes | | $0 |
| | RE Taxes | $0 |
| | Cash Rent | $0 |
| Other Current Debts | | $0 |
| | | $0 |
| | | $0 |
| **TOTAL CURRENT LIABILITIES** | | $65,152 |

**LONG TERM LIABILITIES (List non-current portion)**

| | | |
|---|---|---|
| Car(s) & Pickup(s) | | $0 |
| | | $0 |
| | | $0 |
| Credit Card(s) | | $0 |
| Life Insurance | | $0 |
| | | $0 |
| Machinery & Equip. | | $0 |
| | | $0 |
| | | $0 |
| Breeding Livestock | | $0 |
| | | $0 |
| Other Long Term | | $0 |
| | | $0 |
| | | $0 |
| | | $0 |
| Real Estate | FSB-Rental Bldg | $26,933 |
| | FSB-Ag RE | $250,884 |
| | | $0 |
| | | $0 |
| **TOTAL LONG TERM LIABILITIES** | | $277,817 |
| **TOTAL LIABILITIES** | | $342,969 |
| **TOTAL OWNER'S EQUITY** | | $375,871 |
| **TOTAL LIABILITIES & EQUITY** | | $718,840 |

Personal Information    Age: 53          Dependents: 1

Phone: 641-632-8231 (home)
641-660-1198 (cell)

For the purpose of obtaining credit from the above bank, (I) (We), the undersigned, make the above statement of all assets and liabilities. Dated this   9-Oct-15 , (I) (We) certify the above statement is correct to the best of (my) (our) knowledge. By signing below, (I) (We) authorize you to check (my) (our) employment and credit history and to answer questions others may ask about (my) (our) credit record.

X _____    X _____
Signature of Applicant                Signature of Applicant

EXHIBIT
23

Plaintiffs' Exhibit "10"

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR MAHASKA COUNTY

| | | |
|---|---|---|
| FIRST STATE BANK, | ) | EQUITY NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| STEVEN J. WELLER REVOCABLE TRUST; | ) | |
| STEVEN J. WELLER; SPOUSE OF STEVEN J. | ) | |
| WELLER; WELLER FARMS, LLC; TAMI LYNN | ) | FORECLOSURE PETITION |
| WELLER; STATE OF IOWA; CHRISTINA L. | ) | |
| KRUSE, INDIVIDUALLY AND AS MOTHER | ) | |
| AND NEXT FRIEND OF HARLEY J. HUDSON; | ) | |
| THE GUARDIANSHIP AND | ) | |
| CONSERVATORSHIP OF CHRISTINA KRUSE | ) | |
| BY AND THROUGH CHARLES KRUSE AND | ) | |
| VERDA KRUSE, AS CO-GUARDIANS AND | ) | |
| CO-CONSERVATORS OF CHRISTINA L. | ) | |
| KRUSE, ON BEHALF OF CHRISTINA L. | ) | |
| KRUSE, INDIVIDUALLY AND AS MOTHER | ) | |
| AND NEXT FRIEND OF HARLEY J. HUDSON; | ) | |
| AND THE GUARDIANSHIP AND | ) | |
| CONSERVATATORSHIP OF HARLEY | ) | |
| HUDSON, BY AND THROUGH CHARLES | ) | |
| KRUSE AND VERDA KRUSE, AS CO- | ) | |
| GUARDIANS AND CO-CONSERVATORS OF | ) | |
| HARLEY J. HUDSON, | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the Plaintiff, First State Bank, and respectfully states to the Court the following as its cause of action against the Defendants:

### FACTS COMMON TO ALL COUNTS

1.      The Plaintiff, First State Bank, elects to foreclose pursuant to Iowa Code Section 654. The mortgaged property which is the subject of this action.

2.      The Plaintiff, First State Bank, is a corporation duly authorized to transact business in the State of Iowa.

#3010271

Plaintiffs' Exhibit "12"

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

3.     The Defendants, Steven J. Weller and Spouse of Steven J. Weller, may be a married couple and are residents of Mahaska County, Iowa.

4.     The Defendant, Spouse of Steven J. Wells, is made a party to this cause of action because they may claim some right, title or interest in the property which is the subject of this action including but not limited to by reason of their appearance in the chain of title to the property which is the subject of this cause of action. The Defendants' rights to the property the subject of this action are junior to the Plaintiff.

5.     The Defendant, State of Iowa is joined as a party to this action because it may claim some right, title or interest in the property which is the subject of this action including but not limited to by virtue of case CDCV011849 and EQEQ088047. The Defendant's rights to the property which is the subject of this action are junior to the Plaintiff.

6.     The Defendant, Christina L. Kruse, Individually and as mother and next friend of Harley J. Hudson is joined as a party to this action because she may claim some right, title or interest in the property which is the subject of this action including but not limited to by virtue of case TJLN100801 and EQEQ088047. The Defendant's rights to the property which is the subject of this action are junior to the Plaintiff.

7.     The Defendant, The Guardianship and Conservatorship of Christina Kruse, by and through Charles Kruse and Verda Kruse, as co-guardians and co-conservators of Christina L. Kruse, individually and as mother and next friend of Harley J. Hudson is joined as a party to this action because they may claim some right, title or interest in the property which is the subject of this action including but not limited to by virtue of case TJLN100801 and EQEQ088047. The Defendant's rights to the property which is the subject of this action are junior to the Plaintiff.

8.     The Defendant, The Guardianship and Conservatorship of Harley J. Hudson, by and through Charles Kruse and Verda Kruse, as co-guardians and co-conservatros of Harley J. Hudson is joined as a party to this action because they may claim some right, title or interest in the property which is the

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

subject of this action including but not limited to by virtue of case TJLN100801 and EQEQ088047.  The

Defendant's rights to the property which is the subject of this action are junior to the Plaintiff.

## COUNT I

### FORECLOSURE OF COLLATERAL SECURING NOTE "A"

9.     The Plaintiff, First State Bank realleges and incorporates by reference its allegations pled in

paragraphs 1-8 as if fully pled herein.

10.    On or about January 4, 2016, the Defendant, Steven J. Weller executed and delivered to

First State Bank a certain promissory Note (Note A) in the principal sum of Two Hundred Ninety-six

Thousand Six Hundred Forty-eight and 87/100 Dollars ($296,648.87).  A copy of Note A is attached hereto

as Exhibit "A" and by this reference incorporated herein.

11.    Note A is secured by a Mortgage (Mortgage A) dated April 26, 2002, executed by Steven J.

Weller and delivered to First State Bank, which Mortgage A was filed on May 3, 2002, in Book 486 58,

records of the Mahaska County Recorder's Office, upon the following-described real estate, to wit:

**THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER AND THE WEST
HALF OF THE NORTHEAST QUARTER OF SECTION TWENTY-TWO, TOWNSHIP
SEVENTY-SIX NORTH, RANGE FOURTEEN WEST.  AND   THE SOUTH HALF OF
THE NORTHWEST QUARTER, THE NORTHWEST QUARTER OF THE NORTHWEST
QUARTER AND THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER, OF
THE NORTHWEST QUARTER, ALL IN SECTION THIRTY-SIX, TOWNSHIP
SEVENTY-FIVE NORTH, RANGE FOURTEEN WEST, ALL LOCATED IN MAHASKA
COUNTY, IOWA.**

12.    A redacted copy of Mortgage A together with the Recorder's Certificate thereon is attached

hereto as Exhibit "B" and by this reference incorporated herein.

13.    The Plaintiff, First State Bank, elects to foreclose Note A with redemption.  The mortgaged

property which is the subject to Count I is used for agricultural purpose as defined within Iowa Code

Section 535.13.

14.    Mortgage A contains a future advance clause with a credit line up to $300,000.00.

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

15.     To further secure payment of Note A, on June 22, 2007 the Defendant, Steven J. Weller, executed and delivered to First State Bank one certain Commercial Security Agreement dated June 22, 2007 (hereinafter the "Security Agreement") and properly perfected by filing a UCC Financing Statement with the Iowa Secretary of State (hereinafter the "Financing Statements").  A copy of the Security Agreement and the Financing Statements are attached hereto as Exhibits "C" and "D" and by this reference incorporated herein.

16.     The Security Agreement and Financing Statement secures all times checked on Exhibits "C" and "D".

17.     To further secure payment of Note A, on January 4, 2016 the Defendant, Weller Farms, LLC, executed by Steven J. Weller, executed a personal guarantee that the Defendant, Weller Farms LLC would make all payments required under the terms of Note A and Mortgage A.  A copy of the Personal Guarantee is attached hereto as Exhibit "E" and incorporated herein by this reference.

18.     The Plaintiff, First State Bank, elects to foreclose Mortgage A with redemption and also foreclose on the Security Agreement.  The mortgaged property which is the subject to Count I is used for agricultural purpose as defined within Iowa Code Section 535.13.

19.     The Plaintiff gave a Notice of Right to Cure and more than forty-five (45) days have elapsed since the notice was given.  A redacted copy of said Notice is attached hereto as Exhibit "F" and incorporated herein by this reference.

20.     Pursuant to the terms and provisions of Iowa Code Section 654.2C, the Plaintiff requested mandatory mediation from the Iowa Mediation Service in order to obtain a mediation release to allow the Plaintiff to proceed with the foreclosure of the real estate subject to this action and to any other agricultural property secured by the Security Agreement.

21.     On August 7, 2018 the Plaintiff obtained a mandatory mediation release as to the Defendants, Steven J. Weller and Weller Farms, LLC from the Iowa Mediation Service.  A true and accurate copy of the release is attached as Exhibit "G" and incorporated herein by this reference.

22.     The Plaintiff gave a Fourteen Day Demand for payment of the accelerated balance pursuant to Iowa Code Section 654.4B and fourteen (14) days have elapsed since the notice was given.  A copy of said Notice is attached hereto as Exhibit "H" and incorporated herein by this reference.

23.     The Mortgage Mediation Notice was mailed to the mortgagors by regular mail pursuant to Iowa Code Section 654.4B(2).

24.     Mortgage A, the Security Agreement and Note A provide that in case of default the holder may declare the entire principal and the interest accrued thereon due and payable and Mortgage A may be foreclosed.

25.     The Defendant, Steven J. Weller, has failed to pay Note A and interest thereon as provided by the terms of Note A.

26.     By reason of the failure to pay Note A and interest thereon, the Plaintiff has elected and does hereby elect in accordance with the terms and conditions of the Note A, the Security Agreement and Mortgage A to declare the whole of Note A due and payable forthwith and to exercise its right to enforce the entire payment of the Note A as provided by Note A and to foreclose Mortgage A given to secure the same.

27.     The unpaid principal balance due on Note "A" after allowing all credits due to the Defendant, Steven J. Weller is the sum of Two Hundred Ninety-two Thousand Three Hundred Fifty-one and 58/100 Dollars ($292,351.58), which is the principal balance, plus interest calculated at the default rate of 6.0% per annum from March 1, 2018 at the rate of $48.06 per day.

28.     In order to commence this foreclosure proceeding the Plaintiff has incurred protective advancements for abstracting, escrow advances, corporate advances, to all of which sums the Plaintiff is entitled to a judgment against the property with interest at the rate of 6.0% per annum for Note "A" from March 1, 2018, costs and accruing costs and other collectible fees, including but not limited to late charges, and all advances made by the Plaintiff for taxes, insurance, property preservation and other costs between the time of the Foreclosure Decree and the time of Sheriff's Sale, including reasonable attorney's fees.

**Exhibit A, Page 126 of 184**

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

29.     Plaintiff has a right to enforce Note A, the Security Agreement and Mortgage A, due demand has been made for payment and payment has been refused.

30.     The Plaintiff hereby seeks a judgment in rem against the property which is the subject of Count I and in personam against the Defendants, Steven J. Weller and Weller Farms, LLC.

31.     Under the terms of Mortgage A, a receiver may be appointed.

32.     Under the terms of said Note A, Security Agreement, Guaranty and Mortgage A, the Defendants, Steven J. Weller and Weller Farms, LLC, agreed to pay attorney's fees and all costs in connection with the proceeding to enforce or foreclose Mortgage A.  Attached hereto as Exhibit "I" and incorporated herein by this reference is an Attestation of Attorney's Fees as required by Iowa Code § 625.24.

WHEREFORE, the Plaintiff, First State Bank, prays for judgment in personam against the Defendants, Steven J. Weller and Weller Farms, LLC and in rem against the real estate described in Mortgage A and against the personal property described in the Security Agreement for the sum of Two Hundred Ninety-two Thousand Three Hundred Fifty-one and 58/100 ($292,351.58), which is the unpaid principal balance, plus interest thereon at the rate of 6.0% per annum for Note "A" from March 1, 2018, such amount equaling $48.06 per day the costs of this action, including protective advancements for abstracting, escrow advances, corporate advances, late charges, reasonable attorney's fees and additional sums for continuing the abstract of title or other purposes authorized by said Note A and Mortgage A and by Iowa law and that said sums be declared a first lien upon the premises and upon the personal property described in the Security Agreement, prior and superior to any right, title, lien or interest of the Defendants or any of them therein; that Plaintiff's Note A, Security Agreement, Mortgage A and Guarantee be foreclosed; that any right, title, lien or interest of the Defendants or any of them in said property be declared junior and inferior to the lien of Plaintiff's Mortgage A; that a special execution be issued for the sale of the mortgaged premises and personal property secured by the Security Agreement, and for the sale of the

6

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

collateral described in this count or so much thereof as may be necessary to satisfy the judgment including interest, costs, and accruing costs including but not limited to any and all advances made by the Plaintiff for taxes, insurance, property preservation and other costs between the time of the Foreclosure Decree and the time of Sheriff's Sale, and that from and after said sale under special execution, the right, title, lien or interest of the Defendants in and to the mortgaged premises be forever cut off, barred and foreclosed, and the purchaser at said sale take free and clear of any right, title, lien or interest of the Defendants or any of them and if any deficiency remains after the sale of the mortgaged property, that a general execution be issued against the Defendants, Steven J. Weller and Weller Farms, LLC.

The Plaintiff further prays for a Writ of Possession to be issued under the seal of this Court, directed to the Sheriff of Mahaska County, Iowa, commanding him to put the purchaser at said sale under special execution or a successor in interest in the possession of the premises; and that a receiver be appointed to take charge of the mortgaged premises during the period of foreclosure for the purpose of preserving the mortgaged premises for the benefit of all concerned.

**COUNT II**

**FORECLOSURE OF COLLATERAL SECURING NOTE B**

**NOTICE**

**THE PLAINTIFF HAS ELECTED FORECLOSURE WITHOUT REDEMPTION. THIS MEANS THAT THE SALE OF THE MORTGAGED PROPERTY WILL OCCUR PROMPTLY AFTER ENTRY OF JUDGMENT UNLESS YOU FILE WITH THE COURT A WRITTEN DEMAND TO DELAY THE SALE. IF YOU FILE A WRITTEN DEMAND, THE SALE WILL BE DELAYED UNTIL TWELVE MONTHS FROM ENTRY OF JUDGMENT IF THE MORTGAGED PROPERTY IS YOUR RESIDENCE AND IS A ONE-FAMILY OR TWO-FAMILY DWELLING OR UNTIL TWO MONTHS FROM ENTRY OF JUDGMENT IF THE MORTGAGED PROPERTY IS NOT YOUR RESIDENCE OR IS YOUR RESIDENCE BUT NOT A ONE-FAMILY OR TWO-FAMILY DWELLING. YOU WILL HAVE NO RIGHT OF REDEMPTION AFTER THE SALE. THE PURCHASER AT THE SALE WILL BE ENTITLED TO IMMEDIATE POSSESSION OF THE MORTGAGED PROPERTY. YOU MAY PURCHASE AT THE SALE.**

**IF YOU DO NOT FILE A WRITTEN DEMAND TO DELAY THE SALE AND IF THE MORTGAGED PROPERTY IS YOUR RESIDENCE AND IS A ONE-FAMILY OR**

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

TWO-FAMILY DWELLING, THEN A DEFICIENCY JUDGMENT WILL NOT BE ENTERED AGAINST YOU. IF YOU DO FILE A WRITTEN DEMAND TO DELAY THE SALE, THEN A DEFICIENCY JUDGMENT MAY BE ENTERED AGAINST YOU IF THE PROCEEDS FROM THE SALE OF THE MORTGAGED PROPERTY ARE INSUFFICIENT TO SATISFY THE AMOUNT OF THE MORTGAGE DEBT AND COSTS.

IF THE MORTGAGED PROPERTY IS NOT YOUR RESIDENCE OR IS NOT A ONE-FAMILY OR TWO-FAMILY DWELLING, THEN A DEFICIENCY JUDGMENT MAY BE ENTERED AGAINST YOU WHETHER OR NOT YOU FILE A WRITTEN DEMAND TO DELAY THE SALE.

33.     The Plaintiff, First State Bank realleges and incorporates by reference its allegations pled in paragraphs 1-32 as if fully pled herein.

34.     The Plaintiff, First State Bank, elects to foreclose Note B without redemption.  The mortgaged property which is the subject to Count II is not used for agricultural purpose as defined within Iowa Code Section 535.13.

35.     On or about January 4, 2016, the Defendant, Steven J. Weller, executed and delivered to First State Bank, one certain Promissory Note (Note "B") in the principal sum of Forty Thousand Three Hundred Fifty-seven and 70/100 and 00/100 Dollars ($40,357.70).  A copy of Note B is attached hereto as Exhibit "J" and by this reference incorporated herein.

36.     To secure payment of Note B, the Defendant, Steven J. Weller, executed and delivered to First State Bank one certain Open Ended Mortgage (Mortgage "B") dated January 5, 2007, which Mortgage was filed on January 10, 2007, Document No. 2007-101, records of the Mahaska County Recorder's Office, upon the following-described real estate, to-wit:

COMMENCING ONE HUNDRED FIFTY FEET SOUTH OF THE NORTHEAST CORNER OF LOT THREE OF THE SUBDIVISION OF OUT LOT FOURTEEN OF THE ORIGINAL PLAT OF THE CITY OF OSKALOOSA, IOWA, RUNNING THENCE WEST ONE HUNDRED TWENTY FEET, THENCE SOUTH TO THE SOUTH LINE OF SAID LOT THREE, THENCE EAST TO THE SOUTHEAST CORNER OF SAID LOT THREE, THENCE NORTH TO THE PLACE OF BEGINNING

**Exhibit A, Page 129 of 184**

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

37.     A redacted copy of Mortgage B together with the Recorder's Certificate thereon is attached hereto as Exhibit "K" and by this reference incorporated herein.

38.     To further secure payment of Note B, on June 22, 2007 the Defendant, Steven J. Weller, executed a Security Agreement and properly perfected by filing a UCC Financing Statement.  A copy of the Security Agreement and the Financing Statements are attached hereto as Exhibits "C" and "D" and by this reference incorporated herein.

39.     To further secure payment of Note B, on January 4, 2016 the Defendant, Weller Farms, LLC, executed by Steven J. Weller, executed a personal guarantee that the Defendant, Weller Farms LLC would make all payments required under the terms of Note A and Mortgage A.  A copy of the Personal Guarantee is attached hereto as Exhibit "E" and incorporated herein by this reference.

40.     The Plaintiff gave a Notice of Right to Cure and more than forty-five (45) days have elapsed since the notice was given.  A redacted copy of said Notice is attached hereto as Exhibit "F" and incorporated herein by this reference.

41.     The Plaintiff gave a Fourteen Day Demand for payment of the accelerated balance pursuant to Iowa Code Section 654.4B and fourteen (14) days have elapsed since the notice was given.  A copy of said Notice is attached hereto as Exhibit "L" and incorporated herein by this reference.

42.     The Mortgage Mediation Notice was mailed to the mortgagors by regular mail pursuant to Iowa Code Section 654.4B(2).

43.     Note B and Mortgage B provide that in case of default the holder may declare the entire principal and the interest accrued thereon due and payable and the Mortgage B may be foreclosed.

44.     The Defendant, Steven J. Weller, has failed to pay Note B and interest thereon as provided by the terms of Note B.

45.     By reason of the failure to pay Note B and interest thereon, the Plaintiff has elected and does hereby elect in accordance with the terms and conditions of the Note B and Mortgage B to declare the

**Exhibit A, Page 130 of 184**

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

whole of Note B due and payable forthwith and to exercise its right to enforce the entire payment of Note A as provided by Note B and to foreclose Mortgage B given to secure the same.

46.     The unpaid principal balance due on Note "B" after allowing all credits due to the Defendants is the sum of Thirty-five Thousand Eighty-four and 94/100 Dollars ($35,084.94), which is the principal balance, plus interest calculated at the rate of 6.0% per annum from March 1, 2018. Interest accrues on the said sum at the rate of $5.77 per day.

47.     In order to commence this foreclosure proceeding the Plaintiff has incurred protective advancements for abstracting, escrow advances, corporate advances, to all of which sums the Plaintiff is entitled to a judgment against the property with interest at the rate of 6.0% per annum for Note B from March 1, 2018, costs and accruing costs and other collectible fees, including but not limited to late charges, and all advances made by the Plaintiff for taxes, insurance, property preservation and other costs between the time of the Foreclosure Decree and the time of Sheriff's Sale, including reasonable attorney's fees.

48.     Plaintiff has a right to enforce the Note B and Mortgage B, due demand has been made for payment and payment has been refused.

49.     Under the terms of Mortgage "B" a receiver may be appointed.

50.     Under the terms of said Note B, Security Agreement and Mortgage B, the Defendants, Steven J. Weller and Weller Farms, LLC, agreed to pay attorney's fees and all costs in connection with the proceeding to enforce or foreclose the Mortgage. Attached hereto as Exhibit "I" and incorporated herein by this reference is an Attestation of Attorney's Fees as required by Iowa Code § 625.24.

WHEREFORE, the Plaintiff, First State Bank, prays for judgment in personam against the Defendants, Steven J. Weller and Weller Farms, LLC and in rem against the real estate described in Mortgage B for the sum of Thirty-five Thousand Eighty-four and 94/100 Dollars ($35,084.94), which is the unpaid principal balance, plus interest thereon at the rate of 6.0% per annum for Note "B" from March 1, 2018, such amount equaling $5.77 per day, plus the costs of this action, including protective advancements for abstracting, escrow advances, corporate advances, late charges, reasonable attorney's fees and additional

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

sums for continuing the abstract of title or other purposes authorized by said Note B and Mortgage B and by Iowa law and that said sums be declared a lien upon the premises above described from January 5, 2007, the date of Plaintiff's Mortgage B, prior and superior to any right, title, lien or interest of the Defendants or any of them therein; that Plaintiff's Note B, Mortgages A and B, Security Agreement and Personal Guarantee be foreclosed; that any right, title, lien or interest of the Defendants or any of them in said property be declared junior and inferior to the lien of Plaintiff's Mortgage B; that a special execution issue for the sale of the mortgaged premises and personal property secured by the Security Agreement or so much thereof as may be necessary to satisfy the judgment including interest, costs, and accruing costs including but not limited to any and all advances made by the Plaintiff for taxes, insurance, property preservation and other costs between the time of the Foreclosure Decree and the time of Sheriff's Sale, and that from and after said sale under special execution, the right, title, lien or interest of the Defendants in and to the mortgaged premises be forever cut off, barred and foreclosed, and the purchaser at said sale take free and clear of any right, title, lien or interest of the Defendants or any of them and if any deficiency remains after the sale of the mortgaged property, that a general execution be issued against the Defendants, Steven J. Weller and Weller Farms, LLC.

The Plaintiff further prays for a Writ of Possession to be issued under the seal of this Court, directed to the Sheriff of Mahaska County, Iowa, commanding him to put the purchaser at said sale under special execution or a successor in interest in the possession of the premises; and that a receiver be appointed to take charge of the mortgaged premises during the period of foreclosure for the purpose of preserving the mortgaged premises for the benefit of all concerned.

### COUNT III

### FORECLOSURE OF COLLATERAL SECURING NOTE C

51.     The Plaintiff, First State Bank realleges and incorporates by reference its allegations pled in paragraphs 1-50 as if fully pled herein.

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

52.     The Plaintiff, First State Bank, elects to foreclose Mortgage A with redemption. The mortgaged property which is the subject to Count II is used for agricultural purpose as defined within Iowa Code Section 535.13.

53.     On or about June 30, 2017, the Defendant, Steven J. Weller, executed and delivered to First State Bank, one certain Promissory Note (Note "C") in the principal sum of Sixty Thousand One Hundred Seventeen and 67/100 and 00/100 Dollars ($60,117.67). A copy of Note C is attached hereto as Exhibit "M" and by this reference incorporated herein.

54.     Note C is secured by a Mortgage (Mortgage A) dated April 26, 2002, executed by Steven J. Weller and delivered to First State Bank, which Mortgage A was filed on May 3, 2002, in Book 486 58, records of the Mahaska County Recorder's Office, upon the following-described real estate, to wit:

> **THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER AND THE WEST HALF OF THE NORTHEAST QUARTER OF SECTION TWENTY-TWO, TOWNSHIP SEVENTY-SIX NORTH, RANGE FOURTEEN WEST. AND THE SOUTH HALF OF THE NORTHWEST QUARTER, THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER AND THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER, OF THE NORTHWEST QUARTER, ALL IN SECTION THIRTY-SIX, TOWNSHIP SEVENTY-FIVE NORTH, RANGE FOURTEEN WEST, ALL LOCATED IN MAHASKA COUNTY, IOWA.**

55.     A redacted copy of Mortgage A together with the Recorder's Certificate thereon is attached hereto as Exhibit "B" and by this reference incorporated herein.

56.     To further secure payment of Note C, on June 22, 2007 the Defendant, Steven J. Weller, executed and delivered to First State Bank a Security Agreement and properly perfected by filing the Financing Statements. A copy of the Security Agreement and the Financing Statements are attached hereto as Exhibits "C" and "D" and by this reference incorporated herein.

57.     The Plaintiff gave a Notice of Right to Cure and more than forty-five (45) days have elapsed since the notice was given. A redacted copy of said Notice is attached hereto as Exhibit "N" and incorporated herein by this reference.

**Exhibit A, Page 133 of 184**

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

58.     The Plaintiff gave a Fourteen Day Demand for payment of the accelerated balance pursuant to Iowa Code Section 654.4B and fourteen (14) days have elapsed since the notice was given.  A copy of said Notice is attached hereto as Exhibit "O" and incorporated herein by this reference.

59.     The Mortgage Mediation Notice was mailed to the mortgagors by regular mail pursuant to Iowa Code Section 654.4B(2).

60.     Note C and Mortgage A provide that in case of default the holder may declare the entire principal and the interest accrued thereon due and payable and the Mortgage A may be foreclosed.

61.     The Defendant, Steven J. Weller, has failed to pay Note C and interest thereon as provided by the terms of Note C.

62.     By reason of the failure to pay Note C and interest thereon, the Plaintiff has elected and does hereby elect in accordance with the terms and conditions of the Note C, the Security Agreement and Mortgage A to declare the whole of Note C due and payable forthwith and to exercise its right to enforce the entire payment of Note C as provided by Note C and to foreclose Mortgage A and the Security Agreement given to secure the same.

63.     The unpaid principal balance due on Note "C" after allowing all credits due to the Defendants is the sum of Nine Thousand Two Hundred Seventy-two and 39/100 Dollars ($9,272.39), which is the principal balance, plus interest calculated at the rate of 6.79% per annum from March 1, 2018. Interest accrues on the said sum at the rate of $1.52 per day.

64.     In order to commence this foreclosure proceeding the Plaintiff has incurred protective advancements for abstracting, escrow advances, corporate advances, to all of which sums the Plaintiff is entitled to a judgment against the property with interest at the rate of 6.79% per annum for Note C from March 1, 2018, costs and accruing costs and other collectible fees, including but not limited to late charges, and all advances made by the Plaintiff for taxes, insurance, property preservation and other costs between the time of the Foreclosure Decree and the time of Sheriff's Sale, including reasonable attorney's fees.

E-FILED 2018 MAR 25 4:03 PM MAHASKA - CLERK OF DISTRICT COURT

65.     Plaintiff has a right to enforce the Note C, Mortgage A and the Security Agreement, due demand has been made for payment and payment has been refused.

66.     Under the terms of Mortgage "A" a receiver may be appointed.

67.     Under the terms of said Note C, Security Agreement and Mortgage A, the Defendants, Steven J. Weller and Weller Farms, LLC, agreed to pay attorney's fees and all costs in connection with the proceeding to enforce or foreclose the Mortgage. Attached hereto as Exhibit "I" and incorporated herein by this reference is an Attestation of Attorney's Fees as required by Iowa Code § 625.24.

WHEREFORE, the Plaintiff, First State Bank, prays for judgment in personam against the Defendants, Steven J. Weller and Weller Farms, LLC and in rem against the real estate described in Mortgage A for the sum of Nine Thousand Two Hundred Seventy-two and 39/100 Dollars ($9,272.39), which is the unpaid principal balance, plus interest thereon at the rate of 6.79% per annum for Note "C" from March 1, 2018, such amount equaling $1.52 per day, plus the costs of this action, including protective advancements for abstracting, escrow advances, corporate advances, late charges, reasonable attorney's fees and additional sums for continuing the abstract of title or other purposes authorized by said Note C and Mortgage A and by Iowa law and that said sums be declared a lien upon the premises above described from April 26, 2002, the date of Plaintiff's Mortgage A, prior and superior to any right, title, lien or interest of the Defendants or any of them therein; that Plaintiff's Note C, Mortgage A and Security Agreement be foreclosed; that any right, title, lien or interest of the Defendants or any of them in said property be declared junior and inferior to the lien of Plaintiff's Mortgage A; that a special execution issue for the sale of the mortgaged premises and personal property secured by the Security Agreement or so much thereof as may be necessary to satisfy the judgment including interest, costs, and accruing costs including but not limited to any and all advances made by the Plaintiff for taxes, insurance, property preservation and other costs between the time of the Foreclosure Decree and the time of Sheriff's Sale, and that from and after said sale under special execution, the right, title, lien or interest of the Defendants in and to the mortgaged premises be forever cut off, barred and foreclosed, and the purchaser at said sale take free and clear of any right, title,

**Exhibit A, Page 135 of 184**

E-FILED  2018 MAR 25 4:03 PM MAHASKA - CLERK OF DISTRICT COURT

lien or interest of the Defendants or any of them and if any deficiency remains after the sale of the

mortgaged property, that a general execution be issued against the Defendants, Steven J. Weller and Weller

Farms, LLC.

The Plaintiff further prays for a Writ of Possession to be issued under the seal of this Court,

directed to the Sheriff of Mahaska County, Iowa, commanding him to put the purchaser at said sale under

special execution or a successor in interest in the possession of the premises; and that a receiver be

appointed to take charge of the mortgaged premises during the period of foreclosure for the purpose of

preserving the mortgaged premises for the benefit of all concerned.

Matthew E. Laughlin  (AT0004515)
The Davis Brown Tower
215 10th Street, Suite 1300
Des Moines, Iowa  50309-3993
Telephone:  (515) 288-2500
Facsimile:  (515) 243-0654
Email:  mattlaughlin@davisbrownlaw.com

ATTORNEY FOR THE PLAINTIFF

**Exhibit A, Page 136 of 184**

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

| STEVEN J. WELLER<br>3313 195TH STREET<br>ROSE HILL, IA 62586<br><br>**BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | FIRST STATE BANK OF LYNNVILLE, IOWA<br>413 EAST STREET<br>P.O. BOX #187<br>LYNNVILLE, IA 50153<br><br>**LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | AG OR COMM  AG<br>Loan Number ████████<br>Date 01-04-2016<br>Maturity Date 11-30-2020<br>Loan Amount $ 296,648.87<br>Renewal Of _____<br>LO INITIALS  ZIG |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of TWO HUNDRED NINETY SIX THOUSAND SIX

HUNDRED FORTY EIGHT AND 87/100 _____ Dollars $ 296,648.87 ____

☒ Single Advance: I will receive all of this principal sum on 01-04-2016 ____. No additional advances are contemplated under this note.

☐ Multiple Advance: The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____

I will receive the amount of $_____ and future principal advances are contemplated.

Conditions: The conditions for future advances are _____

☐ Open End Credit: You and I agree that I may borrow up to the maximum principal sum more than one time. This feature is subject to all
other conditions and expires on _____

☐ Closed End Credit: You and I agree that I may borrow (subject to all other conditions) up to the maximum principal sum only one time.

INTEREST: I agree to pay interest on the outstanding principal balance from 01-04-2016 _____ at the rate of ____ 6.000 %

per year until 11-30-2020 _____.

☐ Variable Rate: This rate may then change as stated below.

☐ Index Rate: The future rate will be _____ the following index rate: _____

_____

_____

☐ No Index: The future rate will not be subject to any internal or external index. It will be entirely in your control.

☐ Frequency and Timing: The rate on this note may change as often as _____

A change in the interest rate will take effect _____

☐ Limitations: During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than
_____ %. The rate may not change more than _____ % each _____.

Effect of Variable Rate: A change in the interest rate will have the following effect on the payments:

☐ The amount of each scheduled payment will change.  ☐ The amount of the final payment will change.

☐ _____

ACCRUAL METHOD: Interest will be calculated on a ACTUAL/365 _____ basis.

POST MATURITY RATE: I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:

☐ on the same fixed or variable rate basis in effect before maturity (as indicated above).

☒ at a rate equal to 12.0%.

☒ LATE CHARGE: If a payment is made more than 10 _____ days after it is due, I agree to pay a late charge of $30.00 _____.

☒ ADDITIONAL CHARGES: In addition to interest, I agree to pay the following charges which  ☒ are  ☐ are not  included in the principal amount
above: _____

PAYMENTS: I agree to pay this note as follows:

4 ANNUAL PAYMENTS OF $25,775.07 BEGINNING 11-30-2016 AND 1 BALLOON PAYMENT OF $275,411.25 ON 11-30-2020. THE ACTUAL AMOUNT OF MY FINAL PAYMENT WILL
DEPEND ON MY PAYMENT RECORD.

☐ Unpaid Interest: Any accrued interest not paid when due (whether due by reason of a schedule of payments or due because of Lender's demand)
will become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided for in this
agreement.

PURPOSE: The purpose of this loan is REFI 244A OF AG RE & OPERATING EXPENSES _____

ADDITIONAL TERMS:

I AGREE THAT THIS PROMISSORY LOAN DATED TODAY IS ALSO SECURED BY A $900,000 REAL ESTATE MORTGAGE DATED 4/25/2002, A SECURITY AGREEMENT DATED
8/22/2007, & A SECURED GUARANTY BY WELLER FARMS, LLC DATED 1/4/2016.

EXHIBIT

A

UNIVERSAL NOTE AND SECURITY AGREEMENT
Express  ©1984, 1991 Bankers Systems, Inc., St. Cloud, MN  Form UN5-LAZ-IA                                    (page 1 of 3)  SJW

E-FILED  2018 MAR 25 3:03 PM MAHASKA - CLERK OF DISTRICT COURT

## SECURITY

SECURITY INTEREST: I give you a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

[X] Accounts and Other Rights to Payment: All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interest (including all liens) which I have by law or agreement against any account debtor or obligor.

[X] Inventory: All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

[X] Equipment: All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule I give to you, but such a list is not necessary to create a valid security interest in all of my equipment.

[X] Instruments and Chattel Paper: All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

[X] General Intangibles: All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use my name.

[X] Documents: All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts.

[X] Farm Products and Supplies: All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

[X] Government Payments and Programs: All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

[X] Investment Property: All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

[X] Deposit Accounts: All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

[ ] Specific Property Description: The Property includes, but is not limited to, the following:

_____

If this agreement covers timber to be cut, enter real estate description and record owner information:

_____
_____

The Property will be used for a  [ ] personal  [ ] business  [X] agricultural  [ ] _____ purpose.
Borrower/Owner State of organization/registration (if applicable) IA

## ADDITIONAL TERMS OF THE SECURITY AGREEMENT

GENERALLY - This agreement secures this note and any other debt I have with you, now or later. However, it will not secure other debts if you fail with respect to such other debts, to make any required disclosure about this security agreement or if you fail to give any required notice of the right of rescission. It property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located.

NAME AND LOCATION - My name indicated on page 1 is my exact legal name. If I am an individual, my address is my principal residence. If I am not an individual, my address is the location of my chief executive offices or sole place of business. If I am an entity organized and registered under state law, my address is located in the state in which I am registered, unless otherwise indicated on page 2. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.

OWNERSHIP AND DUTIES TOWARD PROPERTY - I represent that I own all of the Property, or to the extent this is a purchase money security interest I will acquire ownership of the Property with the proceeds of the loan. I will defend it against any other claim. Your claim to the Property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position. I will not use the Property for a purpose that will violate any laws or subject the Property to forfeiture or seizure.

I will keep books, records and accounts about the Property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the Property.

I will keep the Property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 1 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.

I will keep the Property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the Property is to be used in another state, I will give you a list of those states. I will not try to sell the Property unless it is inventory or I receive your written permission to do so. If I sell the Property I will have the payment made payable to the order of you and me.

You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent: (1) a beneficial interest in the debtor is sold or transferred, or (2) there is a change in either the identity or number of members of a partnership, or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.

I will pay all taxes and charges on the Property as they become due. You have the right of reasonable access in order to inspect the Property. I will immediately inform you of any loss or damage to the Property.

If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law or this security agreement.

PURCHASE MONEY SECURITY INTEREST - For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any nonpurchase money loan also secured by this agreement will not be deemed to apply to the Purchase Money Loan, and (b) payments on the Purchase Money Loan will be deemed to apply first to the nonpurchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase Money Loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancing of such loan.

PAYMENTS BY LENDER - You are authorized to pay, on my behalf, charges I am or may become obligated to pay to preserve or protect the secured property (such as property insurance premiums). You may treat those payments as advances and add them to the unpaid principal under the note secured by this agreement or you may demand immediate payment of the amount advanced.

INSURANCE - I agree to buy insurance on the Property against the risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the Property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the Property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.

WARRANTIES AND REPRESENTATIONS - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so. You may exercise my rights with respect to obligations of any account debtors, or other persons obligated on the Property, to pay or perform, and you may enforce any security interest that secures such obligations.

If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the Property, or at a minimum price established between you and me.

If this agreement covers farm products I will provide you, at your request, a written list of the buyers, commission merchants or selling agents to or through whom I may sell my farm products. You may notify

Any person who signs within this box does so to give you a security interest in the Property described on this page. This person does not promise to pay the note. "I" as used in this security agreement will include the borrower and any person who signs within this box.

Date _____

Signed _____

ExpereE    ©1994, 1991 Bankers Systems, Inc., St. Cloud, MN  Form UN8-LAZ-IA  1/23/2001                                                                 (page 2 of 3)   50

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

additional potential buyers regarding your security interest if you provide me with the name and address of the potential buyers any time prior to such notification. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

If this agreement covers chattel paper or instruments, either as original collateral or proceeds of the Property, I will note your interest on the face of the chattel paper or instruments.

**REMEDIES** - I will be in default on this security agreement if I am in default on any note this agreement secures or if I fail to keep any promise contained in the terms of this agreement. If I default, you have all of the rights and remedies provided in the note and under the Uniform Commercial Code. You may require me to make the secured property available to you at a place which is reasonably convenient. You may take possession of the secured property and sell it as provided by law. The proceeds will be applied first to your expenses and then to the debt. I agree that 10 days written notice sent to my last known address by first class mail will be reasonable notice under the Uniform Commercial Code. My current address is on page 1.

**PERFECTION OF SECURITY INTEREST** - I authorize you to file a financing statement covering the Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining possession of or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code.

## ADDITIONAL TERMS OF THE NOTE

**DEFINITIONS** - As used on pages 1 and 2, "I" means the terms that apply to this loan. "I," "me" or "my" means each borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW** - The law of the state of Iowa will govern this agreement. Any term of this agreement which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**PAYMENTS** - Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe the agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST** - Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal sum outstanding at that time. You and I may provide in this agreement for accrued interest not paid when due to be added to principal. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to in this note (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it. If you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE** - The index will serve only as a device for setting the interest rate on this note. You do not guarantee by selecting this index, or the margin, that the interest rate on this note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers.

**POST MATURITY RATE** - For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS** - If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph on page 2, or if we have agreed that accrued interest not paid when due may be added to principal.

**MULTIPLE ADVANCE LOANS** - If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**SET-OFF** - I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where your rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right to set-off.

**DEFAULT** - I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the Property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES** - Except as provided in the next paragraph, if this note is secured by agricultural land (as defined in Iowa Code § 172C.1) and I am in default on this note, you will give me notice of my right to cure. You may exercise your remedies only if I fail to cure my default within 45 days after you mail the notice (or 45 days after actual delivery if you use a means other than certified mail).

A notice of right to cure is not necessary and you may immediately exercise your remedies if you have: a) given me the notice with respect to two prior defaults; b) you have given me the notice with respect to a default occurring within 12 months before the current default, or I voluntarily surrender the agricultural land and you accept it in full satisfaction of the debt.

Subject to the above limitations and any limitations imposed by Iowa Code Chapter 654A, if I am in default on this note you have, but are not limited to, the following remedies:

(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued unpaid charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "SET-OFF" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.
(6) You may make use of any remedy given to you in any agreement securing this note.

By selecting any one or more of these remedies you do not give up your right to use later any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to consider later the event a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES** - I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER** - I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest); or
(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT** - I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION** - I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

---

NOTICE - Except as limited by the "GENERALLY" section on page two, the security agreement on page two secures all debts I may owe you now or in the future whether or not the debt is secured by any other collateral or indicates that it is secured by this agreement.

SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE INCLUDING THOSE ON PAGES 1, 2 AND 3). I have received a copy on today's date.

STEVEN J. WALLER

SIGNATURE FOR LENDER:
ZACHARY GUINN, LOAN OFFICER

Experts  ©1984, 1991 Bankers Systems, Inc., St. Cloud, MN  Form UN5-LAZ-IA  1/23/2001

(page 3 of 3)

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

| FILE No. 2077 | FILED FOR RECORD THE ____ 3 ND ____ DAY OF | STATE OF IOWA, MAHASKA COUNTY. |
|---|---|---|
| RECORDING FEE $ 3100 | May ____ 2002 at 10.36 | Cindy Drost ____ Recorder |
| TRANSFER $ | O'CLOCK ____ A ____ M, BOOK 446 ____ PAGE ____ 58 | by ____ Deputy |

Prepared by:
Steven L. Russell
First State Bank

Space Above This Line For Recording Data

P.O.Box 187
Lynnville, IA 50153

# MORTGAGE

**DATE AND PARTIES.**  The date of this Mortgage (Security Instrument) is April 26,2002.  The parties and their addresses are:

**MORTGAGOR:**
STEVEN J. WELLER
3133 195th Street
Rose Hill, Iowa 52586

TAMI WELLER
3133 195th Street
Rose Hill, Iowa 52577

FILED NO. 2077
BOOK 446 PAGE 58
DATE 5 32 TIME 1036 am

CINDY DROST
RECORDER
MAHASKA COUNTY, IOWA
$31 —

**LENDER:**
FIRST STATE BANK
Organized and existing under the laws of Iowa
413 East Street
Lynnville, Iowa  50153
42-0263690

**1. CONVEYANCE.**  For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, warrants, conveys and mortgages to Lender, the following described property:

The East Half of the Northwest Quarter and the West Half of the Northeast Quarter of Section Twenty-two, Township Seventy-six, Range Fourteen  AND  The South Half of the Northwest Quarter, the Northwest Quarter of the Northwest Quarter and the Northwest Quarter of the Northeast Quarter of the Northwest Quarter, all in Section Thirty-six, Township Seventy-five, Range Fourteen

The property is located in Mahaska County at 3133 195th Street, Rose Hill, Iowa 52586.

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property).  This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**NOTICE.**  THIS MORTGAGE SECURES CREDIT IN THE AMOUNT OF $300,000.00.  LOANS AND ADVANCES UP TO THIS AMOUNT, TOGETHER WITH INTEREST, ARE SENIOR TO INDEBTEDNESS TO OTHER CREDITORS UNDER SUBSEQUENTLY RECORDED OR FILED MORTGAGES AND LIENS.

**2. MAXIMUM OBLIGATION LIMIT.**  The total principal amount secured by this Security Instrument at any one time will not exceed the amount stated above.  This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument.  Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**3. SECURED DEBTS.**  This Security Instrument will secure the following Secured Debts:

**A. Specific Debts.**  The following debts and all extensions, renewals, refinancings, modifications and replacements.  A promissory note, No. 53781, dated April 19, 2002, from Mortgagor to Lender, with a loan amount of $236,122.00 with an interest rate of 7.75 percent per year and maturing on April 19, 2022.

**B. All Debts.**  All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.  If more than one person signs this Security Instrument, each agrees that it will secure debts incurred either individually or with others who may not sign this Security Instrument.  Nothing in this Security Instrument constitutes a commitment to make additional or future loans or advances.  Any such commitment must be in writing.  In the event that Lender fails to provide notice of the right of rescission, Lender waives any subsequent security

**EXHIBIT**
**B**

©1998 Bankers Systems, Inc., St. Cloud, MN  Experts

Initials S.T.W
Page 1

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

interest in the Mortgagor's principal dwelling that is created by this Security Instrument.  This Security Instrument will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices.  This Security Instrument will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities.

**C. Sums Advanced.**  All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

**4. PAYMENTS.**  Mortgagor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

**5. WARRANTY OF TITLE.**  Mortgagor warrants that Mortgagor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to grant, bargain, convey, sell, mortgage and warrant the Property. Mortgagor also warrants that the Property is unencumbered, except for encumbrances of record.

**6. PRIOR SECURITY INTERESTS.**  With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:

   **A.** To make all payments when due and to perform or comply with all covenants.

   **B.** To promptly deliver to Lender any notices that Mortgagor receives from the holder.

   **C.** Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**7. CLAIMS AGAINST TITLE.**  Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due.  Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument.  Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

**8. DUE ON SALE.**  Lender may, at its option, declare the entire balance of the Secured Debts to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of the Property.  This right is subject to the restrictions imposed by federal law governing the preemption of state due-on-sale laws, as applicable.

**9. WARRANTIES AND REPRESENTATIONS.**  Mortgagor has the right and authority to enter into this Security Instrument.  The execution and delivery of this Security Instrument will not violate any agreement governing Mortgagor or to which Mortgagor is a party.

**10. PROPERTY CONDITION, ALTERATIONS AND INSPECTION.**  Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary.  Mortgagor will not commit or allow any waste, impairment, or deterioration of the Property.  Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent.  Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent.  Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance.  Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument.  Mortgagor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property.  Lender will give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for the inspection.  Any inspection of the Property will be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

**11. AUTHORITY TO PERFORM.**  If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed.  Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance.  Lender's right to perform for Mortgagor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.  If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

**12. ASSIGNMENT OF LEASES AND RENTS.**  Mortgagor grants, bargains, warrants, conveys and mortgages to Lender as additional security all the right, title and interest in and to any and all:

   **A.** Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of any portion of the Property, including any extensions, renewals, modifications or substitutions of such agreements (all referred to as Leases).

   **B.** Rents, issues and profits (all referred to as Rents), including but not limited to security deposits, minimum rent, percentage rent, additional rent, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property.

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

In the event any item listed as Leases or Rents is determined to be personal property, this Security Instrument will also be regarded as a security agreement.

Mortgagor will promptly provide Lender with true and correct copies of all existing and future Leases. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Except for one lease period's rent, Mortgagor will not collect in advance any future Rents without Lender's prior written consent.

Upon default, Mortgagor will receive Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. Amounts collected will be applied at Lender's discretion to payments on the Secured Debts as therein provided, to costs of managing, protecting and preserving the Property and to any other necessary related expenses including Lender's attorneys' fees and court costs.

Mortgagor agrees that this assignment is immediately effective between the parties to this Security Instrument and effective as to third parties on the recording of this Security Instrument.  This assignment will remain effective during any period of redemption until the Secured Debts are satisfied.  Mortgagor agrees that Lender is entitled to notify Mortgagor or Mortgagor's tenants to make payments of Rents due or to become due directly to Lender after such recording, however, Lender agrees not to notify Mortgagor's tenants until Mortgagor defaults and Lender notifies Mortgagor of the default and demands that Mortgagor and Mortgagor's tenants pay all Rents due or to become due directly to Lender.  On receiving the notice of default, Mortgagor will endorse and deliver to Lender any payments of Rents.

Mortgagor warrants that no default exists under the Leases or any applicable landlord law. Mortgagor also agrees to maintain, and to require the tenants to comply with, the Leases and any applicable law.  Mortgagor will promptly notify Lender of any noncompliance.  If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may opt to enforce compliance.  Mortgagor will obtain Lender's written authorization before Mortgagor consents to sublet, modify, cancel, or otherwise alter the Leases, to accept the surrender of the Property covered by such Leases (unless the Leases so require), or to assign, compromise or encumber the Leases or any future Rents.  If Lender acts to manage, protect and preserve the Property, Lender does not assume or become liable for its maintenance, depreciation, or other losses or damages, except those due to Lender's gross negligence or intentional torts.  Otherwise, Mortgagor will hold Lender harmless and indemnify Lender for any and all liability, loss or damage that Lender may incur as a consequence of the assignment under this section.

**13. DEFAULT.**  Mortgagor will be in default if any of the following occur:

**A. Payments.**  Mortgagor fails to make a payment in full when due.

**B. Insolvency.**  Mortgagor makes an assignment for the benefit of creditors or becomes insolvent, either because Mortgagor's liabilities exceed Mortgagor's assets or Mortgagor is unable to pay Mortgagor's debts as they become due.

**C. Death or Incompetency.**  Mortgagor dies or is declared legally incompetent.

**D. Failure to Perform.**  Mortgagor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

**E. Other Documents.**  A default occurs under the terms of any other transaction document.

**F. Other Agreements.**  Mortgagor is in default on any other debt or agreement Mortgagor has with Lender.

**G. Misrepresentation.**  Mortgagor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.**  Mortgagor fails to satisfy or appeal any judgment against Mortgagor.

**I. Forfeiture.**  The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.**  Mortgagor changes Mortgagor's name or assumes an additional name without notifying Lender before making such a change.

**K. Property Transfer.**  Mortgagor transfers all or a substantial part of Mortgagor's money or property.  This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

**L. Property Value.**  The value of the Property declines or is impaired.

**M. Erosion.**  Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained by federal law.

**N. Insecurity.**  Lender reasonably believes that Lender is insecure.

**14. REMEDIES.**  Lender may use any and all remedies Lender has under state or federal law or in any instrument evidencing or pertaining to the Secured Debts.  Any amounts advanced on Mortgagor's behalf will be immediately due and may be added to the balance owing under the Secured Debts.  Lender may make a claim for any and all insurance benefits or refunds that may be available on Mortgagor's default.

Subject to any right to cure, required time schedules or other notice rights Mortgagor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of a default or anytime thereafter.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth.  The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require complete cure of any existing default.  By choosing any one or more of these remedies Lender does not give up Lender's right to use any other remedy.  Lender does not waive a default if Lender chooses not to use a remedy.  By electing not to use any remedy, Lender does not waive Lender's right to later consider the event a default and to use any remedies if the default continues or happens again.

**15. REDEMPTION.**  Mortgagor agrees that in the event of foreclosure of this Security Instrument, at the sole discretion of Lender, Lender may elect to reduce or extend the period of redemption for the sale of the Property to

E-FILED 2018 MAR 15 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

a period of time as may then be authorized under the circumstances and under any section of Iowa Code Chapter 628, or any other Iowa Code section, now in effect or as may be in effect at the time of foreclosure.

**16. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after Default, to the extent permitted by law, Mortgagor agrees to pay all expenses of collection, enforcement or protection of Lender's rights and remedies under this Security Instrument. Mortgagor agrees to pay expenses for Lender to inspect and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. To the extent permitted by the United States Bankruptcy Code, Mortgagor agrees to pay the reasonable attorneys' fees Lender incurs to collect the Secured Debts as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**17. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Security Instrument without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**18. CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**19. INSURANCE.** Mortgagor agrees to keep the Property insured against the risks reasonably associated with the Property. Mortgagor will maintain this insurance in the amounts Lender requires. This insurance will last until the Property is released from this Security Instrument. Mortgagor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

All insurance policies and renewals will include a standard "mortgage clause" and, where applicable, "loss payee clause." If required by Lender, Mortgagor agrees to maintain comprehensive general liability insurance and rental loss or business interruption insurance in amounts and under policies acceptable to Lender. The comprehensive general liability insurance must name Lender as an additional insured. The rental loss or business interruption insurance must be in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing.)

Mortgagor will give Lender and the insurance company immediate notice of any loss. All insurance proceeds will be applied to restoration or repair of the Property or to the Secured Debts, at Lender's option. If Lender acquires the Property in damaged condition, Mortgagor's rights to any insurance policies and proceeds will pass to Lender to the extent of the Secured Debts.

Mortgagor will immediately notify Lender of cancellation or termination of insurance. If Mortgagor fails to keep the Property insured Lender may obtain insurance to protect Lender's interest in the Property. This insurance may include coverages not originally required of Mortgagor, may be written by a company other than one Mortgagor would choose, and may be written at a higher rate than Mortgagor could obtain if Mortgagor purchased the insurance.

**20. ESCROW FOR TAXES AND INSURANCE.** Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

**21. CO-SIGNERS.** If Mortgagor signs this Security Instrument but does not sign the Secured Debts, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debts and Mortgagor does not agree to be personally liable on the Secured Debts. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws.

**22. WAIVERS.** Except to the extent prohibited by law, Mortgagor waives any rights relating to reinstatement, all rights of dower and distributive share and all homestead exemption rights relating to the Property.

**23. FIXTURE FILING.** Mortgagor gives to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

**24. PERSONAL PROPERTY.** Mortgagor gives to Lender a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property (all of which shall also be included in the term Property). The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

**25. APPLICABLE LAW.** This Security Instrument is governed by the laws of Iowa, except to the extent otherwise required by the laws of the jurisdiction where the Property is located, and the United States of America.

**26. JOINT AND INDIVIDUAL LIABILITY AND SUCCESSORS.** Each Mortgagor's obligations under this Security Instrument are independent of the obligations of any other Mortgagor. Lender may sue each Mortgagor individually or together with any other Mortgagor. Lender may release any part of the Property and Mortgagor will still be obligated under this Security Instrument for the remaining Property. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Mortgagor.

**27. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing and executed by Mortgagor and Lender. This Security Instrument is the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**28. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

**29. NOTICE, FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one party will be deemed to be notice to all parties. Mortgagor will inform Lender in writing of any change in Mortgagor's name, address or other application information. Mortgagor will provide Lender any financial statements or information Lender requests. All financial statements and information Mortgagor gives Lender will be correct and complete. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and to confirm Lender's lien status on any Property. Time is of the essence.

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

I understand that homestead property is in many cases protected from the claims of creditors and exempt from judicial sale and that by signing this contract, I voluntarily give up my rights to this protection for this property with respect to claims based upon this contract.

| _____ | _____ | _____ | _____ |
| (Signature) | (Date) | (Signature) | (Date) |

**SIGNATURES.**  By signing, Mortgagor agrees to the terms and covenants contained in this Security Instrument. Mortgagor also acknowledges receipt of a copy of this Security Instrument.

MORTGAGOR:

_____
Steven J. Weller

_____
Tami  Weller

**ACKNOWLEDGMENT.**
(Individual)

_Stote_ OF _Iowa_ County OF _Jasper_ ss.

On this _25_ day of _April_ , _2002_ before me, a Notary Public in the state of Iowa, personally appeared Steven J. Weller, and Tami  Weller, to me known to be the person(s) named in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their voluntary act and deed.

My commission expires:

_____
(Notary Public)

STEVEN L. RUSSELL
Commission Number 226278
My Commission Expires
October 28, 2002

E-FILED  2019 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

| DEBTOR NAME AND ADDRESS | SECURED PARTY NAME AND ADDRESS |
|---|---|
| STEVEN J. WELLER<br>3133 195TH STREET<br>ROSE HILL, IA 52586 | FIRST STATE BANK<br>413 EAST STREET<br>P.O. BOX #187<br>LYNNVILLE, IA 50153 |

Type: ☒ individual ☐ partnership ☐ corporation ☐ _____
State of organization/registration (if applicable)  IA _____
☐ If checked, refer to addendum for additional Debtors and signatures.

## COMMERCIAL SECURITY AGREEMENT

The date of this Commercial Security Agreement (Agreement) is 08-22-2007.

**SECURED DEBTS.** This Agreement will secure all sums advanced by Secured Party under the terms of this Agreement and the payment and performance of the following described Secured Debts (check one) ☒ Debtor ☐ _____ (Borrower) owes to Secured Party:

☐ **Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications, and replacements (describe):

☒ **All Debts.** All present and future debts, even if this Agreement is not referenced, the debts are also secured by other collateral, or the future debt is unrelated to or of a different type than the current debt. Nothing in this Agreement is a commitment to make future loans or advances.

**SECURITY INTEREST.** To secure the payment and performance of the Secured Debts, Debtor gives Secured Party a security interest in all of the Property described in this Agreement that Debtor owns or has sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property. This Agreement remains in effect until terminated in writing, even if the Secured Debts are paid and Secured Party is no longer obligated to advance funds to Debtor or Borrower.

**PROPERTY DESCRIPTION.** The Property is described as follows:

☒ **Accounts and Other Rights to Payment:** All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which Debtor may have by law or agreement against any account debtor or obligor of Debtor.

☒ **Inventory:** All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in Debtor's business.

☒ **Equipment:** All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule Debtor gives to Secured Party, but such a list is not necessary to create a valid security interest in all of Debtor's equipment.

☒ **Instruments and Chattel Paper:** All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

☒ **General Intangibles:** All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use Debtor's name.

☒ **Documents:** All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts.

☒ **Farm Products and Supplies:** All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in Debtor's farming operations.

☒ **Government Payments and Programs:** All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

☐ **Investment Property:** All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

☐ **Deposit Accounts:** All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

☐ **Specific Property Description:** The Property includes, but is not limited by, the following (if required, provide real estate description):

**USE OF PROPERTY.** The Property will be used for ☐ personal ☐ business ☒ agricultural ☐ _____ purposes.

**SIGNATURES.** Debtor agrees to the terms on pages 1 and 2 of this Agreement and acknowledges receipt of a copy of this Agreement.

| DEBTOR | SECURED PARTY |
|---|---|
| _signature_<br>STEVEN J. WELLER | FIRST STATE BANK<br>_signature_<br>BRAD VAN VARK<br>VICE PRESIDENT |

**EXHIBIT**

C

Page 1 of 2

E846727-0

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

FILED
SECRETARY OF STATE
IOWA

2007-06-25 11:17

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

FIRST STATE BANK

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

INITIAL FINANCING STATEMENT FILE #
P325961    *Steve Weller*

This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

☐ ASSIGNMENT (full or partial): Give name and address of assignee in section below.

AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor  or ☐ Secured Party of record. Check only one of these two boxes

Also check one of the following boxes and provide appropriate information in section below.

☐ CHANGE name and/or address: Give current record name, new name (if name change), and/or new address (if address change) in sections below.   ☐ DELETE name: Give record name to be deleted in section below.   ☐ ADD name: Complete Name, and also Address section below; also complete, Tax ID, Type Of Org., Juris., and Org. ID (if applicable).

CHANGED (NEW) OR ADDED INFORMATION

ORGANIZATION'S NAME

OR

| INDIVIDUALS LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| TAX ID# SSN OR EIN | ADDL INFO RE ORGANIZATION DEBTOR | TYPE OF ORGANIZATION | JURISDICTION OF ORGANIZATION | ORGANIZATIONAL ID # if any |
|---|---|---|---|---|
| | | | | |

AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

All of the following property that Debtor owns or has sufficient rights in which to transfer an interest, now or in the future, wherever the property is or will be located, all proceeds and products of the property, together with all parts, accessories, repairs, replacements, improvements, accessions to the property, and the following wherever located: ACCOUNTS AND OTHER RIGHTS TO PAYMENT: All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which Debtor may have by law or agreement against any account debtor or obligator of Debtor. INVENTORY: All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in Debtor's business. EQUIPMENT: All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The property includes any equipment described in a list or schedule Debtor gives to Secured Party, but such a list is not necessary to create or perfect a valid security interest in all of Debtor's equipment. INSTRUMENTS AND CHATTEL PAPER: All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper. GENERAL INTANGIBLES: All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use Debtor's name. DOCUMENTS: All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts. FARM PRODUCTS AND SUPPLIES: All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in Debtor's farming operations. GOVERNMENT PAYMENTS AND PROGRAMS: All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program. INVESTMENT PROPERTY: All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets. DEPOSIT ACCOUNTS: All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

ORGANIZATION'S NAME
First State Bank

OR

| INDIVIDUALS LAST NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| | | |

**EXHIBIT**
D

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

E15069615-3

FILED
SECRETARY OF STATE
IOWA

2015-11-05 12:06

**A. NAME & PHONE OF CONTACT AT FILER** (optional)

**B. E-MAIL CONTACT AT FILER** (optional)

**C. SEND ACKNOWLEDGEMENT TO:** (Name and Address)

FIRST STATE BANK

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**DEBTOR'S NAME:** Provide only one Debtor name - use exact, full name; do not omit, modify, or abbreviate any part of the debtor's name

| ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Weller Farms, LLC | | | |

| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3133 195th St. | Rose Hill | IA | 52586 | USA |

**SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name

| ORGANIZATION'S NAME | | | |
|---|---|---|---|
| First State Bank of Lynnville, Iowa | | | |

| INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| P.O. Box 187 | Lynnville | IA | 50153 | USA |

**COLLATERAL:** This financing statement covers the following collateral:

All of the following property that Debtor owns or has sufficient rights in which to transfer an interest, now or in the future, wherever the property is or will be located, all proceeds and products of the property, together with all parts, accessories, repairs, replacements, improvements, accessions to the property, and the following wherever located: ACCOUNTS AND OTHER RIGHTS TO PAYMENT: All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interest (including all liens) which Debtor may have by law or agreement against any account debtor or obligator of Debtor. INVENTORY: All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in Debtor's business. EQUIPMENT: All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The property includes any equipment described in a list or schedule Debtor gives to Secured Party, but such a list is not necessary to create or perfect a valid security interest in all of Debtor's equipment. INSTRUMENTS AND CHATTEL PAPER: All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper. GENERAL INTANGIBLES: All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use Debtor's name. DOCUMENTS: All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts. FARM PRODUCTS AND SUPPLIES: All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in Debtor's farming operations. GOVERNMENT PAYMENTS AND PROGRAMS: All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program. INVESTMENT PROPERTY: All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets. DEPOSIT ACCOUNTS: All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

Check only if applicable and check only one box: Collateral is: ☐ held in a Trust ☐ being administered by a Decedent's Personal Representative

| Check only if applicable and check only one box: | | | Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

OPTIONAL FILER REFERENCE DATA

☐ This FINANCING STATEMENT is to be filed [for record] (or          | This FINANCING STATEMENT:

**Exhibit A, Page 148 of 184**

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

| GUARANTOR NAME AND ADDRESS | LENDER NAME AND ADDRESS | |
|---|---|---|
| WELLER FARMS, LLC<br>3313 195TH ST<br>ROSE HILL, IA 52586 | FIRST STATE BANK OF LYNNVILLE, IOWA<br>413 EAST STREET<br>P.O. BOX #187<br>LYNNVILLE, IA 50153 | Number _____<br>Amount _____<br>Date JANUARY 04, 2016 |

## GUARANTY

DATE. The date of this Guaranty is 01-04-2016 .

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Lender (with its participants, successors and assigns), at its option, at any time or from time to time to make loans or extend other accommodations to or for the account of STEVEN J. WELLER

_____ (Borrower) or to engage in any other transactions with Borrower, the Guarantor hereby absolutely and unconditionally guarantees to the Lender the full and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of the debts, liabilities and obligations described as follows: INDEBTEDNESS.

☐  Specific Debts. The Guarantor guarantees to Lender the payment and performance of the debt, liability or obligation of Borrower to Lender evidenced by or arising out of the following:

_____ and any extensions, renewals or replacements thereof (Indebtedness).

☒  All Debts. Except as this Guaranty may otherwise provide, the Guarantor guarantees to Lender the payment and performance of each and every debt, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender (whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several, or joint and several; all such debts, liabilities and obligations (Indebtedness). Without limitation, this Guaranty includes the following described debt(s):

_____

Exclusions.

☐  Guarantor will be liable for $ _____ of the principal amount of the Indebtedness outstanding at default and for all of the accrued interest, and the expenses of collection, enforcement or protection of Lender's rights and remedies under this Guaranty, including reasonable attorneys' fees.

☐  Guarantor's liability will not exceed _____ % of the Indebtedness outstanding at default and all of the accrued interest, and the expenses of collection, enforcement or protection of Lender's rights and remedies under this Guaranty, including reasonable attorneys' fees.

☐  Indebtedness Excludes:

SECURITY.

☐  the Guaranty is unsecured.

☒  secured by  A SECURITY BREEMENT DATED 11/05/2015 AS WELL AS A $500,000 REM DATED 1/04/2016

IL only ☐  CONFESSION OF JUDGMENT. If Guarantor defaults, it authorizes any attorney to appear in a court of record and confess judgment against it in favor of Lender. The confession of judgment may be without process and for any amount due on this Guaranty including collection costs and reasonable attorneys' fees.

PA only ☐  WARRANT OF AUTHORITY TO CONFESS JUDGMENT. Upon default, in addition to all other remedies and rights available to Lender, by signing below Guarantor irrevocably authorizes the prothonotary, clerk, or any attorney to appear in any court of record having jurisdiction over this matter and to confess judgment against Guarantor at any time without stay of execution. Guarantor waives notice, service of process and process. Guarantor agrees and understands that judgment may be confessed against Guarantor for any unpaid principal, accrued interest and accrued charges due on this Note, plus collection costs and reasonable attorneys' fees up to 15 percent of the judgment. The exercise of the power to confess judgment will not exhaust this warrant of authority to confess judgment and may be done as often as Lender elects. Guarantor further understands that Guarantor's property may be seized without prior notice to satisfy the debt owed. Guarantor knowingly, intentionally, and voluntarily waives any and all constitutional rights Guarantor has to pre-deprivation notice and hearing under federal and state laws and fully understands the consequences of this waiver.

By signing immediately below, Guarantor agrees to the terms of the WARRANT OF AUTHORITY TO CONFESS JUDGMENT section.

SIGNATURES. By signing under seal, Guarantor agrees to the terms contained in this Guaranty (including those on page 2). Guarantor also acknowledges receipt of a copy of this Guaranty.

GUARANTOR:

WELLER FARMS, LLC
Entity Name

_____ (Seal)

Name, Title STEVEN J. WELLER, DIRECTOR          (Seal)

_____ (Seal)
Name, Title

EXHIBIT
tabbies
E

©2001 Wolters Kluwer Financial Services - Bankers Systems™ Form M-280  6/28/2006                                    (page 1 of 2)

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

ADDITIONAL PROVISIONS

The Guarantor further acknowledges and agrees with Lender that:

**1.** No act or thing need occur to establish the liability of the Guarantor hereunder, and no act or thing, except full payment and discharge of all indebtedness, shall in any way exonerate the Guarantor or modify, reduce, limit or release the liability of the Guarantor hereunder.

**2.** This is an absolute, unconditional and continuing Guaranty of payment of the Indebtedness and will continue to be enforceable against the Guarantor, whether or not all Indebtedness is paid in full, until this Guaranty is revoked by written notice actually received by the Lender. Any revocation shall not be effective as to any Indebtedness existing or committed to at the time of actual receipt of notice by the Lender, or as to any renewals, extensions and refinancings thereof.

The Guarantor represents and warrants to the Lender that the Guarantor has a direct and substantial economic interest in Borrower and expects to derive substantial benefits therefrom and from any loans and financial accommodations resulting from the creation of Indebtedness guaranteed hereby, and that this Guaranty is given for a business purpose. The Guarantor agrees to rely exclusively on its right to revoke this Guaranty prospectively as to future transactions by written notice actually received by Lender if at any time the benefits then being received by the Guarantor in connection with this Guaranty are not sufficient to warrant its continuance as a Guarantor as to future Indebtedness. Accordingly, the Lender may rely conclusively on a continuing warranty, hereby made, that the Guarantor continues to be benefited by this Guaranty and that the Lender has no duty to inquire into or confirm the receipt of any benefits, and that this Guaranty will be enforceable without regard to the receipt, nature or value of any such benefits.

**3.** If the Guarantor is dissolved or becomes insolvent, however defined, or revokes this Guaranty, then the Lender has the right to declare the full amount of all Indebtedness immediately due and payable, and the Guarantor will forthwith pay the Lender. If the Guarantor voluntarily commences or there is commenced involuntarily against the Guarantor a case under the United States Bankruptcy Code, the full amount of all Indebtedness, whether due and payable or unmatured, will become immediately due and payable without demand or notice thereof.

**4.** The Guarantor will be liable for all Indebtedness, without any limitation as to amount, plus accrued interest thereon and all other costs, fees, and expenses agreed to be paid under all agreements evidencing the Indebtedness and securing the payment of the Indebtedness, and all attorneys' fees, collection costs and enforcement expenses referable thereto. Indebtedness may be created and continued in any amount, whether or not in excess of such principal amount, without affecting or impairing the liability of the Guarantor hereunder. The Lender may apply any sums received by or available to the Lender on account of the Indebtedness from Borrower or any other person (except the Guarantor), from their properties, out of any collateral security or from any other source to payment of the excess. Such application of receipts will not reduce, affect or impair the liability of the Guarantor hereunder. If the liability of the Guarantor is limited pursuant to this paragraph 4, any payment made by the Guarantor under this Guaranty will be effective to reduce or discharge its liability only if accompanied by a written transmittal document, received by the Lender, advising that such payment is made under this Guaranty for that purpose.

**5.** The Guarantor will pay or reimburse the Lender for all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender in connection with the protection, defense or enforcement of this Guaranty in any litigation or bankruptcy or insolvency proceedings.

**6.** Whether or not any existing relationship between the Guarantor and Borrower has been changed or ended and whether or not this Guaranty has been revoked, the Lender may, but shall not be obligated to, enter into transactions resulting in the creation or continuance of Indebtedness, without any consent or approval by the Guarantor and without any notice to the Guarantor. The liability of the Guarantor will not be affected or impaired by any of the following acts or things (which the Lender is expressly authorized to do, omit or suffer from time to time, both before and after revocation of this Guaranty, without notice to or approval by the Guarantor): (i) any acceptance of collateral security, Guarantors, accommodation parties or sureties for any or all Indebtedness; (ii) any one or more extensions or renewals of Indebtedness (whether or not for longer than the original period) or any modification of the interest rates, maturities or other contractual terms applicable to any Indebtedness; (iii) any waiver, adjustment, forbearance, compromise or indulgence granted to Borrower, any delay or lack of diligence in the enforcement of Indebtedness, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect any Indebtedness; (iv) any full or partial release of, settlement with, or agreement not to sue, Borrower or any other Guarantor or other person liable in respect of any Indebtedness; (v) any discharge of any evidence of Indebtedness or the acceptance of any instrument in renewal thereof or substitution therefor; (vi) any failure to obtain collateral security (including rights of setoff) for Indebtedness, or to see to the proper or sufficient creation and perfection thereof, or to establish the priority thereof, or to protect, insure, or enforce any collateral security; or any release, modification, substitution, discharge, impairment, deterioration, waste, or loss of any collateral security; (viii) any foreclosure or enforcement of any collateral security; (viii) any transfer of any Indebtedness or any evidence thereof; (ix) any order of application of any payments or credits upon Indebtedness; (x) any election by the Lender under §1111(b)(2) of the United States Bankruptcy Code.

**7.** The Guarantor waives any and all defenses, claims and discharges of Borrower, or any other obligor, pertaining to Indebtedness, except the defense of discharge by payment in full. Without limiting the generality of the foregoing, the Guarantor will not assert, plead or enforce against the Lender any defense of waiver, release, estoppel, statute of limitations, res judicata,

statute of frauds, fraud, forgery, incapacity, minority, usury, illegality or unenforceability which may be available to Borrower or any other person liable in respect of any Indebtedness, or any setoff available against the Lender to Borrower or any such other person, whether or not on account of a related transaction. The Guarantor expressly agrees that the Guarantor will be liable, to the fullest extent permitted by applicable law, for any deficiency remaining after foreclosure of any mortgage or security interest securing Indebtedness, whether or not the liability of Borrower or any other obligor for such deficiency is discharged pursuant to statute or judicial decision. The Guarantor shall remain obligated, to the fullest extent permitted by law, to pay such amounts as though Borrower's obligations had not been discharged.

**8.** The Guarantor further agree(s) that Guarantor will be obligated to pay Indebtedness even though any other person obligated to pay Indebtedness, including Borrower, has such obligation discharged in bankruptcy or otherwise discharged by law. "Indebtedness" shall include post-bankruptcy petition interest and attorneys' fees and any other amounts which Borrower is discharged from paying or which do not accrue to Indebtedness due to Borrower's discharge, and Guarantor will be obligated to pay such amounts as fully as if Borrower's obligations had not been discharged.

**9.** If any payment applied by the Lender to Indebtedness is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of Borrower or any other obligor), the Indebtedness to which such payment was applied will for the purposes of this Guaranty be deemed to have continued in existence, notwithstanding such application, and this Guaranty will be enforceable as to such Indebtedness as fully as if such application had never been made.

**10.** Until the obligations of the Borrower to Lender have been paid in full, the Guarantor shall not have, any right, remedy or other right which the Guarantor may now have or hereafter acquire against Borrower or any other person obligated to pay Indebtedness arising out of the creation or performance of the Guarantor's obligation under this Guaranty, including, without limitation, any right of subrogation, contribution, reimbursement, indemnification, exoneration or any right to participate in any claim or remedy the Guarantor may have against the Borrower, collateral, or other party obligated for Borrower's debt, whether or not such claim, remedy, or right arises in equity, or under contract, statute or common law.

**11.** The Guarantor waives presentment, demand for payment, notice of dishonor or nonpayment, and protest of any instrument evidencing Indebtedness. The Lender will not be required first to resort for payment of the Indebtedness to Borrower or other persons or their properties, or first to enforce, realize upon or exhaust any collateral security for Indebtedness, before enforcing this Guaranty.

**12.** The liability of the Guarantor under this Guaranty is in addition to and is cumulative with all other liabilities of the Guarantor to the Lender as Guarantor or otherwise, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

**13.** To induce Lender to enter into the Loan, Guarantor makes these representations and warranties for as long as Guaranty is in effect. Guarantor is duly organized, validly existing and in good standing under the laws in the jurisdiction where Guarantor was organized and is duly qualified, validly existing and in good standing in all jurisdictions in which Guarantor operates or Guarantor owns or leases property. Guarantor has the power and authority to enter into this transaction and to carry on Guarantor's business or activity as now conducted. The execution, delivery and performance of this Guaranty and the obligation evidenced by this Guaranty are within Guarantor's duly authorized powers; have received all necessary governmental approval; will not violate any provision of law or order of court or governmental agency; and will not violate any agreement to which Guarantor is a party or to which Guarantor is or any of Guarantor's property is subject. Other than previously disclosed in writing to Lender, Guarantor has not changed Guarantor's name or principal place of business within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Guarantor does not and will not use any other name and will preserve Guarantor's existing name, trade names and franchises. Guarantor owns or leases all property that Guarantor needs to conduct Guarantor's business and activities. All of Guarantor's property is free and clear of all liens, security interests, encumbrances and other adverse claims and interests, except those Lender previously agreed to in writing. Guarantor is not violating any laws, regulations, rules, orders, judgments or decrees applicable to Guarantor or Guarantor's property, except for those that Guarantor is challenging in good faith through proper proceedings after providing adequate reserves to fully pay the claim and its challenge should Guarantor lose.

**14.** This Guaranty is effective upon delivery to the Lender, without further act, condition or acceptance by the Lender. It will be binding upon the Guarantor and the successors and assigns of the Guarantor and will inure to the benefit of the Lender and its participants, successors and assigns. If there be more than one Guarantor, all agreements and promises herein shall be construed to be, and are hereby declared to be, joint and several in each and every particular and shall be fully binding upon and enforceable against either, any or all the Guarantors. Any invalidity or unenforceability of any provision or application of this Guaranty will not affect other lawful provisions and application hereof, and to this end the provisions of this Guaranty are declared to be severable. Except as allowed by the terms herein, this Guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by the Guarantor and the Lender. This Guaranty shall be governed by the laws of the State in which it is executed. The Guarantor waives notice of the Lender's acceptance hereof.

(page 2 of 2)

©2001 Wolters Kluwer Financial Services - Bankers Systems™ Form BG-250  8/22/2008

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT



www.fsbankia.com
Member FDIC

6/14/2018

Steven J. Weller
3133 195th St
Rose Hill, IA 52586



## NOTICE OF RIGHT TO CURE DEFAULT

This notice is about your Promissory Loans #███22 & #███23 dated 1/04/2016 with First State Bank. You are now in default on your Promissory Loans #███22 & #███23. You have the right to correct this default until **7/30/2018.** If you do so, you may continue with this contract as though you did not default.

Your default consists of your failure to pay the payment on your Promissory Loan #64723 that was due on 3/30/2018. To correct this default, you must pay **$8,046.07.**

And,

Your default consists of your failure to pay the payments on your Promissory Loan #64722 that were due on 4/28/2018 and 5/28/2018. To correct this default, you must pay **$810.64.**

In order to correct this default, the above items must be paid by no later than **7/30/2018.**

**IF YOU DO NOT CORRECT YOUR DEFAULT BY THE ABOVE STATED DATE, WE MAY EXERCISE OUR RIGHTS AGAINST YOU UNDER THE LAW, INCLUDING BUT NOT LIMITED TO THE INITIATION OF A FORECLOSURE ACTION OR PROCEDURE.**

It is very important that you do not disregard this notice. If you default again in the next year, we may exercise our rights against you without sending you another notice like this one.

To make arrangements to cure your default by **7/30/2018** you may contact me at the First State Bank, 413 East Street, Lynnville, IA 50153, or by calling (641) 527-2535.

Sincerely,

Zachary I. Guinn
Asst. Vice President

| P.O. Box 187 | P.O. Box 278 | P.O. Box 532 | P.O. Box 447 | |
| --- | --- | --- | --- | --- |
| Lynnville, IA 50153 | Agency, IA 52530 | Brooklyn, IA 52211 | Grinnell, IA 50112 | |
| 641-527-2535 | 641-937-5236 | 641-522-9231 | 641-236-7700 | |



EXHIBIT

F

**Exhibit A, Page 151 of 184**

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT



**IOWA MEDIATION SERVICE**

*1441 -- 29th Street, Suite 120*
*West Des Moines, IA 50266*
*Phone: 515-331-8081*
*Website: www.iowamediationservice.com*

Case # *C1 - 070918*
Case # *C1 - 071618*

## MANDATORY MEDIATION RELEASE

This certification constitutes a release for the below-listed requesting party(ies) to initiate a proceeding to enforce a debt against agricultural property, which is real estate under Chapter 654, to forfeit a contract to purchase agricultural property under Chapter 656, to enforce a secured interest in agricultural property under Chapter 554, or to otherwise garnish, levy on, execute on, seize, or attach agricultural property.

This release certifies that:

( )   a mediation session was not held because the borrower failed to participate as prescribed by the rules established under Iowa Law (Chapter 654).

(X)   a mediation session was held and the parties listed below participated as required by Iowa Law (Chapter 654).

( )   the borrower waived his/her rights to mediation by executing a signed Waiver of Mediation form.

_Marla Dougty_____     _08-07-18_____
IMS Staff Signature                              Date

**Farm Borrower:**  _Steven J. Weller_

**Address:**  _Weller Farms, LLC_

_3133 195th St,_

_Rose Hill, IA 52586_

**Creditor:**  _First State Bank of Lynnville_

**Address:**  _413 East St._

_Lynnville, IA 50153_

**Loan Number(s)**  _64722_
_64723_
_66473_

**EXHIBIT**

G

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT



Matthew E. Laughlin
MattLaughlin@davisbrownlaw.com
phone: 515-246-7934
Des Moines Office

November 2, 2018

Weller Farms, LLC
3133 195th Street
Rose Hill, IA 52586

Re:    Loan No.: ███723

Dear Borrower:

First State Bank has turned its file over to our firm for foreclosure of the above-referenced loan. The name of the creditor is First State Bank.

The undersigned on behalf of the creditor hereby demands payment of the full balance due in fourteen (14) days in accordance with Iowa Code Section 654.4B. The amount due as of the date of this referral on October 25, 2018 was $308,565.81. If you will be paying this loan in full, please contact me for the exact amount before sending funds.

Enclosed is the Counseling and Mediation notice as prescribed by the Iowa Attorney General and as required by Iowa Code Section 654.4B(2).

Please contact the undersigned for a payoff quote (total amount due) and/or a reinstatement quote (amount to bring the loan current). All other inquiries should be made directly to the Loss Mitigation Department at First State Bank by calling 641-527-2535.

If you have filed a bankruptcy action and have received a discharge, the indebtedness described in this letter will be enforced only against the mortgaged property and no personal judgment will be sought against you.

If you are active duty military, please contact the undersigned immediately.

You are further advised that unless you notify the undersigned within thirty days of your receipt of this notice that you dispute the validity of the amount owed to First State Bank, or any portion thereof, the debt will be assumed to be valid.

The undersigned is a debt collector attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge, and the loan was not reaffirmed in the bankruptcy case, First State Bank will only exercise its right as against

#3015689
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500      THE DAVIS BROWN TOWER · 215 10 TH ST · STE. 1300 · DES MOINES, IA 50309
FIRM FAX 515.243.0654      THE HIGHLAND BUILDING · 4201 WESTOWN PKWY · STE. 300 · WEST DES MOINES, IA
WWW.DAVISBROWNLAW.COM      THE AMES OFFICE · 2605 NORTHRIDGE PKWY · AMES, IA 50010
THE EMMETSBURG OFFICE · 2004 MAIN ST. P.O. BOX 314, EMMETSBURG, IA 50536



EXHIBIT
H

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

Page 2

the property and is not attempting any act to collect the discharge debt from you personally. Please note the following provisions of the Fair Debt Collection Practices Act:

(a)  If the consumer notifies the debt collector in writing within the 30-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector;

(b)  If the consumer requests, upon the consumer's written request, within the 30-day period, the name and address of the original creditor, the debt collector will provide the consumer with the name and address of the original creditor if different from the current creditor; and

(c)  The debt collector shall cease collection of the debt or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor if different from the current creditor.

If you have the Abstract of Title and you do not intend to keep the property, please forward it to me immediately.  If you do not have the Abstract and you believe someone else has it, please let me know.

Sincerely,

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

Matthew E. Laughlin
Attorney at Law

MEL/sls
Enclosure

E-FILED  2018 NOV 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT



**Matthew E. Laughlin**
MattLaughlin@davisbrownlaw.com
phone: 515-246-7934
Des Moines Office

November 1, 2018

Steven J. Weller
3133 195th Street
Rose Hill, IA 52586

  **Re:** **Loan No.:** ⬛723

Dear Borrower:

  First State Bank has turned its file over to our firm for foreclosure of the above-referenced loan. The name of the creditor is First State Bank.

  The undersigned on behalf of the creditor hereby demands payment of the full balance due in fourteen (14) days in accordance with Iowa Code Section 654.4B. The amount due as of the date of this referral on October 25, 2018 was $308,565.81. If you will be paying this loan in full, please contact me for the exact amount before sending funds.

  Enclosed is the Counseling and Mediation notice as prescribed by the Iowa Attorney General and as required by Iowa Code Section 654.4B(2).

  Please contact the undersigned for a payoff quote (total amount due) and/or a reinstatement quote (amount to bring the loan current). All other inquiries should be made directly to the Loss Mitigation Department at First State Bank by calling 641-527-2535.

  If you have filed a bankruptcy action and have received a discharge, the indebtedness described in this letter will be enforced only against the mortgaged property and no personal judgment will be sought against you.

  If you are active duty military, please contact the undersigned immediately.

  You are further advised that unless you notify the undersigned within thirty days of your receipt of this notice that you dispute the validity of the amount owed to First State Bank, or any portion thereof, the debt will be assumed to be valid.

  The undersigned is a debt collector attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge, and the loan was not reaffirmed in the bankruptcy case, First State Bank will only exercise its right as against

#3015689
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500     THE DAVIS BROWN TOWER: 215 10th ST., STE. 1300, DES MOINES, IA 50309
FIRM FAX 515.243.0654   THE HIGHLAND BUILDING: 4201 WESTOWN PKWY, STE. 300, WEST DES MOINES, IA 50266
WWW.DAVISBROWNLAW.COM   THE AMES OFFICE: 2605 NORTHRIDGE PKWY, AMES, IA 50010
                        THE EMMETSBURG OFFICE: 3004 MAIN ST., P.O. BOX 314, EMMETSBURG, IA 50536

Exhibit A, Page 155 of 184

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

Page 2

the property and is not attempting any act to collect the discharge debt from you personally. Please note the following provisions of the Fair Debt Collection Practices Act:

(a)   If the consumer notifies the debt collector in writing within the 30-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector;

(b)   If the consumer requests, upon the consumer's written request, within the 30-day period, the name and address of the original creditor, the debt collector will provide the consumer with the name and address of the original creditor if different from the current creditor; and

(c)   The debt collector shall cease collection of the debt or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor if different from the current creditor.

If you have the Abstract of Title and you do not intend to keep the property, please forward it to me immediately.  If you do not have the Abstract and you believe someone else has it, please let me know.

Sincerely,

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

Matthew E. Laughlin
Attorney at Law

MEL/sls
Enclosure

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

# Mortgage Mediation Notice

You are receiving this notice because (1) your lender believes that your mortgage is seriously delinquent, or (2) a foreclosure petition was recently filed against you. The purpose of this notice is to inform you that help is available through Iowa Mortgage Help, a **State of Iowa-sponsored program.**

## *help is available*

Iowa Mortgage Help is a group of organizations partnering with the Iowa Attorney General's Office and the Iowa Finance Authority to offer all Iowans access to free, confidential mortgage counseling with local organizations located right here in Iowa. Iowa Mortgage Help is here to assist you in working through your situation.

**Please call 1-877-622-4866 as soon as possible.** The earlier you call, the more options that are available to you. When you call, you will be referred to a trained, professional counselor who will listen to your situation and offer free, confidential advice through each step of the process. In some cases, we are able to work with lenders and borrowers to restructure mortgage terms. While we are not able to help everyone, we are able to help the majority of homeowners who call Iowa Mortgage Help.

The fact that a foreclosure petition may be or has been filed against you does not necessarily mean that you will lose your house. It is NOT too late. There is still time for help.

**Do Not Delay. This may be your best chance for saving your home from foreclosure.**

**Call 1-877-622-4866 today or go to IowaMortgageHelp.com. This free call could save your home.**



Iowa Mortgage Help
1-877-622-4866
www.IowaMortgageHelp.com

This notice is being provided as required by Iowa Code section 654.4B(2).

| STEVEN J. WELLER<br>3133 195TH ST<br>ROSE HILL, IA 52586<br><br>**BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | FIRST STATE BANK OF LYNNVILLE, IOWA<br>413 EAST STREET<br>P.O. BOX #187<br>LYNNVILLE, IA 50153<br><br>**LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | AG OR COMM  COMM<br>Loan Number ████<br>Date 01-04-2018<br>Maturity Date 12-28-2020<br>Loan Amount $ 40,357.70<br>Renewal Of ___<br>LO INITIALS    ZIG |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of FORTY THOUSAND THREE HUNDRED FIFTY SEVEN AND 70/100 _____ Dollars $ 40,357.70

☒ **Single Advance:** I will receive all of this principal sum on 01-04-2018 _____. No additional advances are contemplated under this note.

☐ **Multiple Advance:** The principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
  I will receive the amount of $ _____ and future principal advances are contemplated.
  **Conditions:** The conditions for future advances are _____

  ☐ **Open End Credit:** You and I agree that I may borrow up to the maximum principal sum more than one time. This feature is subject to all
    other conditions and expires on _____
  ☐ **Closed End Credit:** You and I agree that I may borrow (subject to all other conditions) up to the maximum principal sum only one time.
**INTEREST:** I agree to pay interest on the outstanding principal balance from 01-04-2018 _____ at the rate of _____ 8.000 %
  per year until 12-28-2020 _____.
☐ **Variable Rate:** This rate may then change as stated below.
  ☐ **Index Rate:** The future rate will be _____ the following index rate: _____
    _____
  ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
  ☐ **Frequency and Timing:** The rate on this note may change as often as _____
    A change in the interest rate will take effect _____
  ☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than
    _____ %. The rate may not change more than _____ % each _____
  **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
  ☐ The amount of each scheduled payment will change.     ☐ The amount of the final payment will change.
    ☐ _____
**ACCRUAL METHOD:** Interest will be calculated on a ACTUAL/365 _____ basis.
**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
  ☐ on the same fixed or variable rate basis in effect before maturity (as indicated above).
  ☒ at a rate equal to 12.0%
☒ **LATE CHARGE:** If a payment is made more than 10 _____ days after it is due, I agree to pay a late charge of $30.00 _____.

☒ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☒ are  ☐ are not  included in the principal amount
  above: _____
**PAYMENTS:** I agree to pay this note as follows:
59 MONTHLY PAYMENTS OF $448.12 BEGINNING 01-28-2018 AND 1 BALLOON PAYMENT OF $23,500.28 ON 12-28-2020. THE ACTUAL AMOUNT OF MY FINAL PAYMENT WILL
DEPEND ON MY PAYMENT RECORD.



  ☐ **Unpaid Interest:** Any accrued interest not paid when due (whether due by reason of a schedule of payments or due because of Lender's demand)
    will become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided for in this
    agreement.
**PURPOSE:** The purpose of this loan is REFI OSKALOOSA OFFICE BUILDING & 2018 REPAIRS _____
**ADDITIONAL TERMS:**
I AGREE THAT THIS PROMISSORY LOAN DATED TODAY IS ALSO SECURED BY A $300,000 REAL ESTATE MORTGAGE DATED 4/26/2002, A $50,000 REAL ESTATE MORTGAGE
DATED 1/5/2007, A SECURED GUARANTY BY WELLER FARMS, LLC DATED 1/4/2018, & A SECURITY AGREEMENT DATED 8/22/2007.

**EXHIBIT**
J

(page 1 of 3)   SJW

E-FILED 2018 MAR 15 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

## SECURITY

**SECURITY INTEREST:** I give you a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

☒ **Accounts and Other Rights to Payment:** All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which I have by law or agreement against any account debtor or obligor.

☒ **Inventory:** All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

☒ **Equipment:** All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule I give to you, but such a list is not necessary to create a valid security interest in all of my equipment.

☒ **Instruments and Chattel Paper:** All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

☒ **General Intangibles:** All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use my name.

☒ **Documents:** All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts.

☒ **Farm Products and Supplies:** All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

☒ **Government Payments and Programs:** All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

☒ **Investment Property:** All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

☒ **Deposit Accounts:** All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

☐ **Specific Property Description:** The Property includes, but is not limited by, the following:

_____

If this agreement covers timber to be cut, enter real estate description and record owner information: _____

_____

The Property will be used for a ☐ personal ☒ business ☐ agricultural ☐ _____ purpose.

Borrower/Owner State of organization/registration (if applicable) ☒ _____

## ADDITIONAL TERMS OF THE SECURITY AGREEMENT

**GENERALLY** - This agreement secures this note and any other debt I have with you, now or later. However, it will not secure other debts if you fail with respect to such other debts, to make any required disclosure about this security agreement or if you fail to give any required notice of the right of rescission. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located.

**NAME AND LOCATION** - My name indicated on page 1 is my exact legal name. If I am an individual, my address is my principal residence. If I am not an individual, my address is the location of my chief executive offices or sole place of business. If I am an entity organized and registered under state law, my address is located in the state in which I am registered, unless otherwise indicated on page 2. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.

**OWNERSHIP AND DUTIES TOWARD PROPERTY** - I represent that I own all of the Property, or to the extent this is a purchase money security interest I will acquire ownership of the Property with the proceeds of the loan. I will defend it against any other claim. Your claim to the Property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of others. I will not do anything to harm your position. I will not use the Property for a purpose that will violate any laws or subject the Property to forfeiture or seizure.

I will keep books, records and accounts about the Property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the Property.

I will keep the Property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 1 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.

I will keep the Property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the Property is to be used in another state, I will give you a list of those states. I will not try to sell the Property unless it is inventory or I receive your written permission to do so. If I sell the Property I will have the payment made payable to the order of you and me.

You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent: (1) a beneficial interest in the debtor is sold or transferred, or (2) there is a change in either the identity or number of members of a partnership, or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.

I will pay all taxes and charges on the Property as they become due. You have the right of reasonable access in order to inspect the Property. I will immediately inform you of any loss or damage to the Property.

If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law or this security agreement.

**PURCHASE MONEY SECURITY INTEREST** - For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any nonpurchase money loan also secured by this agreement will not be deemed to apply to the Purchase Money Loan, and (b) payments on the Purchase Money Loan will be deemed to apply first to the nonpurchase money portion of the loan, if any, and then to the purchase money obligations in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase Money Loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancing of such loan.

**PAYMENTS BY LENDER** - You are authorized to pay, on my behalf, charges I am or may become obligated to pay to preserve or protect the secured property (such as property insurance premiums). You may treat those payments as advances and add them to the unpaid principal under the note secured by this agreement or you may demand immediate payment of the amount advanced.

**INSURANCE** - I agree to buy insurance on the Property against the risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the Property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the Property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may buy it yourself.

**WARRANTIES AND REPRESENTATIONS** - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so. You may exercise my rights with respect to obligations of any account debtors, or other persons obligated on the Property, to pay or perform, and you may enforce any security interest that secures those obligations.

If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the Property, or at a minimum price established between you and me.

If this agreement covers farm products I will provide you, at your request, a written list of the buyers, commission merchants or selling agents to or through whom I may sell my farm products. You may notify

| Any person who signs within this box does so to give you a security interest in the Property described on this page. This person does not promise to pay the note. "I" as used in this security agreement will include the borrower and any person who signs within this box. |
|---|
| Date _____ |
| Signed _____ |

ExpressSM ©1994, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNI-LAZ-IA 1/23/2001

(page 2 of 3)

additional potential buyers regarding your security interest if you provide me with the name and address of the potential buyer any time prior to such notification. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

If this agreement covers chattel paper or instruments, either as original collateral or proceeds of the Property, I will note your interest on the face of the chattel paper or instruments.

REMEDIES - I will be in default on this security agreement if I am in default on any note this agreement secures or if I fail to keep any promise contained in the terms of this agreement. If I default, you have all of the rights and remedies provided in the note and under the Uniform Commercial Code. You may require me to make the secured property available to you at a place which is reasonably convenient. You may take possession of the secured property and sell it as provided by law. The proceeds will be applied first to your expenses and then to the debt. I agree that 10 days written notice sent to my last known address by first class mail will be reasonable notice under the Uniform Commercial Code. My current address is on page 1.

PERFECTION OF SECURITY INTEREST - I authorize you to file a financing statement covering the Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining possession of or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code.

## ADDITIONAL TERMS OF THE NOTE

DEFINITIONS - As used on pages 1 and 2, "I," "me," or "my" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

APPLICABLE LAW - The law of the state of Iowa will govern this agreement. Any term of this agreement which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

PAYMENTS - Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

INTEREST - Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal then outstanding at that time. You and I may provide in this agreement for accrued interest not paid when due to be added to principal. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to in this note (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

INDEX RATE - The index will serve only as a device for setting the interest rate on this note. You do not guarantee by selecting this index, or this margin, that the interest rate on this note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers.

POST MATURITY RATE - For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

SINGLE ADVANCE LOANS - If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph on page 2, or if we have agreed that accrued interest not paid when due may be added to principal.

MULTIPLE ADVANCE LOANS - If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

SET-OFF - I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my

interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any Individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right to set-off.

DEFAULT - I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the Property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

REMEDIES - Except as provided in the next paragraph, if this note is secured by agricultural land (as defined in Iowa Code § 172C.1) and I am in default on this note, you will give me notice of my right to cure. You may exercise your remedies only if I fail to cure my default within 45 days after you mail the notice (or 45 days after actual delivery if you use a means other than certified mail).

A notice of right to cure is not necessary and you may immediately exercise your remedies if you have: a) given me the notice with respect to two prior defaults, b) you have given me the notice with respect to a default occurring within 12 months before the current default, or I voluntarily surrender the agricultural land and you accept it in full satisfaction of the debt.

Subject to the above limitations and any limitations imposed by Iowa Code Chapter 654A, if I am in default on this note you have, but are not limited to, the following remedies:
(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued unpaid charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "SET-OFF" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.
(6) You may make use of any remedy given to you in any agreement securing this note.

By selecting any one or more of these remedies you do not give up your right to use later any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to consider later the event a default if it continues or happens again.

COLLECTION COSTS AND ATTORNEYS' FEES - I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

WAIVER - I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest); or
(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

OBLIGATIONS INDEPENDENT - I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may without notice release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not require me to pay this note. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign my obligation under this agreement without your prior written approval.

FINANCIAL INFORMATION - I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

NOTICE - Except as limited by the "GENERALLY" section on page two, any security agreement on page two includes all debts I may owe you now or in the future whether or not the debt is secured by any collateral or indicates that it is secured by this agreement.

SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE (INCLUDING THOSE ON PAGES 1, 2 AND 3). I have received a copy on today's date.

STEVEN J. WELLER

SIGNATURE FOR LENDER:
ZACHARY BUNN, LOAN OFFICER

ExperSoft ©1984, 1991 Bankers Systems, Inc., St. Cloud, MN  Form IWN-LAZ-IA  1/23/2001

(page 3 of 3)

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

Document 2007- *101*        Page *1* of *10*

Book ___ Page ___         Fee: *52.00*

Date: *Jan. 10* ,2007   Time: *10:51 AM*

*Diane Upton Crookham- Mahaska County Recorder*
106 S. 1st Street, Oskaloosa, Iowa 52577

——— State of Iowa ———        ——— Space Above This Line For Recording Data ———

**Prepared By:**   BRAD VAN VARK
FIRST STATE BANK
413 EAST STREET, LYNNVILLE, IA
50153 (641) 527-2535

**Return To:**   FIRST STATE BANK
413 EAST STREET
P.O. BOX #187    *cms*
LYNNVILLE, IA 50153

## OPEN-END REAL ESTATE MORTGAGE
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Mortgage is 01-05-2007 _____ and the parties and their addresses are as follows:

MORTGAGOR: STEVEN J. WELLER, A SINGLE
PERSON
3133 195TH STREET
ROSE HILL, IA 52586

☐ Refer to the Addendum which is attached and incorporated herein for additional Mortgagors. The Addendum is located on _____ .

LENDER: FIRST STATE BANK
ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF IOWA
413 EAST STREET
P.O. BOX #187 LYNNVILLE, IA 50153

2. **MORTGAGE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (hereafter defined), Mortgagor grants, bargains, warrants, conveys and mortgages to Lender the following described property: (If the legal description of the property is not on page one of this Mortgage, it is located on EXHIBIT A —Page 10 .)

*SJW*

**IOWA - AGRICULTURAL/COMMERCIAL REAL ESTATE SECURITY INSTRUMENT**      *(page 1 of 9)*
(NOT FOR FNMA, FHLMC, FHA OR VA USE, AND NOT FOR CONSUMER PURPOSES)
*Exþere* ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IA 10/24/2005

**EXHIBIT**

**K**

E-FILED  2018 MAR 25 4:03 PM MAHASKA - CLERK OF DISTRICT COURT

The property is located in <u>MAHASKA</u> at <u>301 NORTH MARKET</u>
(County)
<u>STREET</u> , <u>OSKALOOSA</u> , Iowa <u>52577</u>
(Address)                                    (City)                          (Zip Code)

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property"). The term Property also includes, but is not limited to, any and all water wells, water, ditches, reservoirs, reservoir sites and dams located on the real estate and all riparian and water rights associated with the Property, however established.

NOTICE: THIS MORTGAGE SECURES CREDIT IN THE AMOUNT OF $ <u>50,000.00</u> .
LOANS AND ADVANCES UP TO THIS AMOUNT, TOGETHER WITH INTEREST, ARE SENIOR TO INDEBTEDNESS TO OTHER CREDITORS UNDER SUBSEQUENTLY RECORDED OR FILED MORTGAGES AND LIENS.

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount of the Secured Debt (hereafter defined) secured by this Mortgage at any one time shall not exceed the amount stated above. This limitation of amount does not include interest, loan charges, commitment fees, brokerage commissions, attorneys' fees and other charges validly made pursuant to this Mortgage and does not apply to advances (or interest accrued on such advances) made under the terms of this Mortgage to protect Lender's security and to perform any of the covenants contained in this Mortgage. Future advances are contemplated and, along with other future obligations, are secured by this Mortgage even though all or part may not yet be advanced. Nothing in this Mortgage, however, shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment would need to be agreed to in a separate writing.

4. **SECURED DEBT DEFINED.** The term "Secured Debt" includes, but is not limited to, the following:
    A. The promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all extensions, renewals, modifications or substitutions (Evidence of Debt) *(e.g., borrower's name, note amount, interest rate, maturity date)*:

    PROMISSORY LOAN
    DATED 1/5/07

    B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt existing now or executed after this Mortgage whether or not this Mortgage is specifically referred to in the evidence of debt and whether or not such future advances or obligations are incurred for any purpose that was related or unrelated to the purpose of the Evidence of Debt.
    C. All obligations Mortgagor owes to Lender, which now exist or may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.
    D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Mortgage, plus interest at the highest rate in effect, from time to time, as provided in the Evidence of Debt.
    E. Mortgagor's performance under the terms of any instrument evidencing a debt by Mortgagor to Lender and any Mortgage securing, guarantying, or otherwise relating to the debt.

    If more than one person signs this Mortgage as Mortgagor, each Mortgagor agrees that this Mortgage will secure all future advances and future obligations described above that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. This Mortgage will not secure any other debt if Lender fails, with respect to such other debt, to make any required disclosure about this Mortgage or if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Mortgagor agrees to make all payments on the Secured Debt when due and in accordance with the terms of the Evidence of Debt or this Mortgage.

6. **WARRANTY OF TITLE.** Mortgagor covenants that Mortgagor is lawfully seized of the estate conveyed by this Mortgage and has the right to grant, bargain, warrant, convey, sell, and mortgage the Property and warrants that the Property is unencumbered, except for encumbrances of record.

7. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the

*(page 2 of 9)*

Experi© ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA 10/24/2006

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Mortgage. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses which Mortgagor may have against parties who supply labor or materials to improve or maintain the Property.

8. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property and that may have priority over this Mortgage, Mortgagor agrees:
   A. To make all payments when due and to perform or comply with all covenants.
   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
   C. Not to make or permit any modification or extension of, and not to request or accept any future advances under any note or agreement secured by, the other mortgage, deed of trust or security agreement unless Lender consents in writing.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of any lien, encumbrance, transfer, or sale, or contract for any of these on the Property. However, if the Property includes Mortgagor's residence, this section shall be subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. For the purposes of this section, the term "Property" also includes any interest to all or any part of the Property. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Mortgage is released.

10. **TRANSFER OF AN INTEREST IN THE MORTGAGOR.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Lender may demand immediate payment if (1) a beneficial interest in Mortgagor is sold or transferred; (2) there is a change in either the identity or number of members of a partnership or similar entity; or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation or similar entity. However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Mortgage.

11. **ENTITY WARRANTIES AND REPRESENTATIONS.** If Mortgagor is an entity other than a natural person (such as a corporation or other organization), Mortgagor makes to Lender the following warranties and representations which shall be continuing as long as the Secured Debt remains outstanding:
   A. Mortgagor is an entity which is duly organized and validly existing in the Mortgagor's state of incorporation (or organization). Mortgagor is in good standing in all states in which Mortgagor transacts business. Mortgagor has the power and authority to own the Property and to carry on its business as now being conducted and, as applicable, is qualified to do so in each state in which Mortgagor operates.
   B. The execution, delivery and performance of this Mortgage by Mortgagor and the obligation evidenced by the Evidence of Debt are within the power of Mortgagor, have been duly authorized, have received all necessary governmental approval, and will not violate any provision of law, or order of court or governmental agency.
   C. Other than disclosed in writing Mortgagor has not changed its name within the last ten years and has not used any other trade or fictitious name. Without Lender's prior written consent, Mortgagor does not and will not use any other name and will preserve its existing name, trade names and franchises until the Secured Debt is satisfied.

12. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor will give Lender prompt notice of any loss or damage to the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor will not initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restriction limiting or defining the uses which may be made of the Property or any part of the Property, without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims, and actions against Mortgagor or any other owner made under law or regulation regarding use, ownership and occupancy of the Property. Mortgagor will comply with all legal requirements and restrictions, whether public or private, with respect to the use of the Property. Mortgagor also agrees that the nature of the occupancy and use will not change without Lender's prior written consent.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Mortgagor has the right to remove items of personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Mortgage. Mortgagor shall not partition or subdivide the Property without Lender's prior written consent. Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

13. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any of Mortgagor's duties under this Mortgage, or any other mortgage, deed of trust, security agreement or other lien document that has priority over this Mortgage, Lender may, without notice, perform the duties or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any

*(page 3 of 9)*

Express® ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN Form AGCO-RESI-IA 10/24/2005

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

amount necessary for performance. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may do whatever is necessary to protect Lender's security interest in the Property. This may include completing the construction.

Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Mortgage. Any amounts paid by Lender for insuring, preserving or otherwise protecting the Property and Lender's security interest will be due on demand and will bear interest from the date of the payment until paid in full at the interest rate in effect from time to time according to the terms of the Evidence of Debt.

14. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor assigns, grants, bargains, warrants, conveys and mortgages to Lender as additional security all the right, title and interest in the following (Property).

    A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to, any extensions, renewals, modifications or replacements (Leases).

    B. Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Mortgagor may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the Property (Rents).

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

Mortgagor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default. Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent. Upon default, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds. When Lender so directs, Mortgagor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting and preserving the Property, and other necessary expenses. Mortgagor agrees that this Security instrument is immediately effective between Mortgagor and Lender and effective as to third parties on the recording of this Assignment. This Security Instrument will remain effective during any statutory redemption period until the Secured Debts are satisfied.

As long as this Assignment is in effect, Mortgagor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Mortgagor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Mortgagor or any party to the Lease defaults or fails to observe any applicable law, Mortgagor will promptly notify Lender. If Mortgagor neglects or refuses to enforce compliance with the terms of the Leases, then Lender may, at Lender's option, enforce compliance.

Mortgagor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's consent. Mortgagor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent. Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses and damages due to Lender's gross negligence or intentional torts. Otherwise, Mortgagor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

15. **CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

16. **DEFAULT.** Mortgagor will be in default if any of the following occur:

    A. Any party obligated on the Secured Debt fails to make payment when due;

    B. A breach of any term or covenant in this Mortgage, any prior mortgage or any construction loan agreement, security agreement or any other document evidencing, guarantying, securing or otherwise relating to the Secured Debt;

    C. The making or furnishing of any verbal or written representation, statement or warranty to Lender that is false or incorrect in any material respect by Mortgagor or any person or entity obligated on the Secured Debt;

    D. The death, dissolution, or insolvency of, appointment of a receiver for, or application of any debtor relief law to, Mortgagor or any person or entity obligated on the Secured Debt;

*(page 4 of 9)*

Experé ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA 10/24/2006

E. A good faith belief by Lender at any time that Lender is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment is impaired or the value of the Property is impaired;

F. A material adverse change in Mortgagor's business including ownership, management, and financial conditions, which Lender in its opinion believes impairs the value of the Property or repayment of the Secured Debt; or

G. Any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

17. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure, mediation notices or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Mortgage in a manner provided by law if this Mortgagor is in default. Upon a default by the Mortgagor, the Lender may take possession of the Property itself or through a court appointed receiver, without regard to the solvency or insolvency of the Mortgagor, the value of the Property, the adequacy of the Lender's security, or the existence of any deficiency judgment, and may operate the Property and collect the rents and apply them to the costs of operating the Property and/or to the unpaid debt.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the Evidence of Debt, other evidences of debt, this Mortgage and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether expressly set forth or not. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

18. **REDEMPTION.** Mortgagor agrees that in the event of foreclosure of this Mortgage, at the sole discretion of Lender, Lender may elect to reduce or extend the period of redemption for the sale of the Property to a period of time as may then be authorized under the circumstances and under any section of Iowa Code Chapter 628, or any other Iowa Code section, now in effect or as may be in effect at the time of foreclosure.

19. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Mortgage. Mortgagor will also pay on demand all of Lender's expenses incurred in collecting, insuring, preserving or protecting the Property or in any inventories, audits, inspections or other examination by Lender in respect to the Property. Mortgagor agrees to pay all costs and expenses incurred by Lender in enforcing or protecting Lender's rights and remedies under this Mortgage, including, but not limited to, attorneys' fees, court costs, and other legal expenses. Once the Secured Debt is fully and finally paid, Lender agrees to release this Mortgage and Mortgagor agrees to pay for any recordation costs. All such amounts are due on demand and will bear interest from the time of the advance at the highest rate in effect, from time to time, as provided in the Evidence of Debt and as permitted by law.

20. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) "Environmental Law" means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) "Hazardous Substance" means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law. Mortgagor represents, warrants and agrees that, except as previously disclosed and acknowledged in writing:

A. No Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Mortgagor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Mortgagor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor will take all necessary remedial action in accordance with Environmental Law.

STW

_____ _____ _____ _____ (page 5 of 9)

Experes® ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA 10/24/2006

D. Mortgagor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Mortgagor or any tenant of any Environmental Law. Mortgagor will immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Mortgagor and every tenant have been, are and shall remain in full compliance with any applicable Environmental Law.

F. There are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Mortgagor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Mortgagor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Mortgagor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Mortgagor agrees, at Mortgagor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Mortgagor's obligations under this section at Mortgagor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Mortgagor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Mortgage and in return Mortgagor will provide Lender with collateral of at least equal value to the Property secured by this Mortgage without prejudice to any of Lender's rights under this Mortgage.

L. Notwithstanding any of the language contained in this Mortgage to the contrary, the terms of this section shall survive any foreclosure or satisfaction of this Mortgage regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

21. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any action, real or threatened, by private or public entities to purchase or take any or all of the Property, including any easements, through condemnation, eminent domain, or any other means. Mortgagor further agrees to notify Lender of any proceedings instituted for the establishment of any sewer, water, conservation, ditch, drainage, or other district relating to or binding upon the Property or any part of it. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims and to collect and receive all sums resulting from the action or claim. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Mortgage. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

22. **INSURANCE.** Mortgagor agrees to maintain insurance as follows:

A. Mortgagor shall keep the improvements now existing or hereafter built on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Mortgage.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "lender loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.                    *(page 6 of 9)*

Exper̄ā ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA  10/24/2005

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

Unless Lender and Mortgagor otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Debt, whether or not then due, with any excess paid to Mortgagor. If Mortgagor abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Secured Debt whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Mortgagor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of scheduled payments or change the amount of the payments. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

B.  Mortgagor agrees to maintain comprehensive general liability insurance naming Lender as an additional insured in an amount acceptable to Lender, insuring against claims arising from any accident or occurrence in or on the Property.

C.  Mortgagor agrees to maintain rental loss or business interruption insurance, as required by Lender, in an amount equal to at least coverage of one year's debt service, and required escrow account deposits (if agreed to separately in writing), under a form of policy acceptable to Lender.

23. **NO ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Mortgagor will not be required to pay to Lender funds for taxes and insurance in escrow.

24. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem necessary. Mortgagor warrants that all financial statements and information Mortgagor provides to Lender are, or will be, accurate, correct, and complete. Mortgagor agrees to sign, deliver, and file as Lender may reasonably request any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Mortgage and Lender's lien status on the Property. If Mortgagor fails to do so, Lender may sign, deliver, and file such documents or certificates in Mortgagor's name and Mortgagor hereby irrevocably appoints Lender or Lender's agent as attorney in fact to do the things necessary to comply with this section.

25. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Mortgage are joint and individual. If Mortgagor signs this Mortgage but does not sign the Evidence of Debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. Mortgagor agrees that Lender and any party to this Mortgage may extend, modify or make any change in the terms of this Mortgage or the Evidence of Debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Mortgage. The duties and benefits of this Mortgage shall bind and benefit the successors and assigns of Mortgagor and Lender.

If this Mortgage secures a guaranty between Lender and Mortgagor and does not directly secure the obligation which is guarantied, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation including, but not limited to, anti-deficiency or one-action laws.

26. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Mortgage is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Mortgage is complete and fully integrated. This Mortgage may not be amended or modified by oral agreement. Any section or clause in this Mortgage, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section or clause of this Mortgage cannot be enforced according to its terms, that section or clause will be severed and will not affect the enforceability of the remainder of this Mortgage. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Mortgage are for convenience only and are not to be used to interpret or define the terms of this Mortgage. Time is of the essence in this Mortgage.

27. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Mortgage, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

28. **WAIVERS.** Except to the extent prohibited by law, Mortgagor waives any rights relating to reinstatement, the marshalling of liens and assets, all rights of dower and distributive share and all homestead exemption rights relating to the Property.

29. **U.C.C. PROVISIONS.** If checked, the following are applicable to, but do not limit, this Mortgage:

☐  **Construction Loan.** This Mortgage secures an obligation incurred for the construction of an improvement on the Property.

☐  **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property.

*(page 7 of 9)*

Exjoerd® ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA  10/24/2005

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

☐ **Crops; Timber; Minerals; Rents, Issues and Profits.** Mortgagor grants to Lender a security interest in all crops, timber and minerals located on the Property as well as all rents, issues and profits of them including, but not limited to, all Conservation Reserve Program (CRP) and Payment in Kind (PIK) payments and similar governmental programs (all of which shall also be included in the term "Property").

☐ **Personal Property.** Mortgagor grants to Lender a security interest in all personal property located on or connected with the Property. This security interest includes all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property Mortgagor owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property. The term "personal property" specifically excludes that property described as "household goods" secured in connection with a "consumer" loan as those terms are defined in applicable federal regulations governing unfair and deceptive credit practices.

☐ **Filing As Financing Statement.** Mortgagor agrees and acknowledges that this Mortgage also suffices as a financing statement and as such, may be filed of record as a financing statement for purposes of Article 9 of the Uniform Commercial Code. A carbon, photographic, image or other reproduction of this Mortgage is sufficient as a financing statement.

**30. OTHER TERMS.** If checked, the following are applicable to this Mortgage:

☒ **Purchase Money Mortgage.** This is a purchase money mortgage as defined by Iowa law.

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Mortgage will remain in effect until released.

☐ **Agricultural Property.** Mortgagor covenants and warrants that the Property will be used principally for agricultural or farming purposes and that Mortgagor is an individual or entity allowed to own agricultural land as specified by law.

☐ **Separate Assignment.** The Mortgagor has executed or will execute a separate assignment of leases and rents. If the separate assignment of leases and rents is properly executed and recorded, then the separate assignment will supersede this Security Instrument's "Assignment of Leases and Rents" section.

☐ **Additional Terms.**

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Mortgage and in any attachments. Mortgagor also acknowledges receipt of a copy of this Mortgage on the date stated above on Page 1.

☐ Actual authority was granted to the parties signing below by resolution signed and dated
_____ .

Entity Name:_____

_____     1-5-07
(Signature)STEVEN J. WELLER                                                              (Date)

_____     _____
(Signature)                                                                                          (Date)

_____     _____
(Signature)                                                                                          (Date)

_____     _____
(Signature)                                                                                          (Date)

Experes® ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA 10/24/2005

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

**ACKNOWLEDGMENT:**

(Individual)

STATE OF IOWA_____, COUNTY OF JASPER_____ } ss.
On this 5TH____ day of JANUARY, 2007____ before me, a Notary Public in the
state of Iowa, personally appeared STEVEN J. WELLER, A SINGLE PERSON

to me known to be the person(s) named in and who executed the foregoing instrument, and
acknowledged that he/she/they
executed the same as his/her/their_____ voluntary act and deed.
My commission expires: 11-18-2008

(Notary Public)
BRADLEY J. VAN VARK

> BRADLEY J. VAN VARK
> Commission Number 719615
> My Commission Expires
> November 18, 2008

(Business
or Entity
Acknowl-
edgment)

STATE OF _____, COUNTY OF _____ } ss.
On this ____ day of _____ before me, a Notary Public in the
state of Iowa, personally appeared _____

to me personally known, who being by me duly sworn or affirmed did say that that person is

of said entity, that (the seal affixed to said instrument is the seal of said entity or no seal has
been procured by said entity) and that said instrument was signed and sealed, if applicable, on
behalf of the said entity by authority of its board of directors/partners/members and the said

acknowledged the execution of said instrument to be the voluntary act and deed of said entity
by it voluntarily executed.
My commission expires: _____

(Notary Public)

(In the following statement "I" means the Mortgagor.) I understand that homestead property is in
many cases protected from the claims of creditors and exempt from judicial sale; and that
by signing this contract, I voluntarily give up my rights to this protection for this property
with respect to claims based upon this contract.

1-5-07

(Signature) STEVEN J. WELLER                                (Date)

(Signature)                                                 (Date)

(page 9 of 9)
Expere® ©1993, 2001 Bankers Systems, Inc., St. Cloud, MN  Form AGCO-RESI-IA 10/24/2005

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

# Exhibit A

Commencing one hundred fifty feet south of the northeast corner of Lot Three of the Subdivision of Out Lot Fourteen of the Original Plat of the City of Oskaloosa, Iowa, running thence west one hundred twenty feet, thence south to the south line of said Lot Three, thence east to the southeast corner of said Lot Three, thence north to the place of beginning.

SJW

10-10

**Exhibit A, Page 170 of 184**

E-FILED  2018 NOV 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT



Matthew E. Laughlin
MattLaughlin@davisbrownlaw.com
phone: 515-246-7934
Des Moines Office

November 2, 2018

Steven J. Weller
3133 195th Street
Rose Hill, IA 52586

      **Re:**    *Loan No.:* ▮722

Dear Borrower:

First State Bank has turned its file over to our firm for foreclosure of the above-referenced loan. The name of the creditor is First State Bank.

The undersigned on behalf of the creditor hereby demands payment of the full balance due in fourteen (14) days in accordance with <u>Iowa Code</u> Section 654.4B. The amount due as of the date of this referral on October 25, 2018 was $36,520.43. If you will be paying this loan in full, please contact me for the exact amount before sending funds.

Enclosed is the Counseling and Mediation notice as prescribed by the Iowa Attorney General and as required by <u>Iowa Code</u> Section 654.4B(2).

Please contact the undersigned for a payoff quote (total amount due) and/or a reinstatement quote (amount to bring the loan current). All other inquiries should be made directly to the Loss Mitigation Department at First State Bank by calling 641-527-2535.

If you have filed a bankruptcy action and have received a discharge, the indebtedness described in this letter will be enforced only against the mortgaged property and no personal judgment will be sought against you.

If you are active duty military, please contact the undersigned immediately.

You are further advised that unless you notify the undersigned within thirty days of your receipt of this notice that you dispute the validity of the amount owed to First State Bank, or any portion thereof, the debt will be assumed to be valid.

The undersigned is a debt collector attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge, and the loan was not reaffirmed in the bankruptcy case, First State Bank will only exercise its right as against

#3015689
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500
FIRM FAX 515.243.0654
WWW.DAVISBROWNLAW.COM
THE DAVIS BROWN TOWER, 215 10TH ST., STE. 1300, DES MOINES, IA 50309
THE HIGHLAND BUILDING, 4201 WESTOWN PKWY., STE. 300, WEST DES MOINES, IA
THE AMES OFFICE, 2605 NORTHRIDGE PKWY., AMES, IA 50010
THE EMMETSBURG OFFICE, 3004 MAIN ST., P.O. BOX 314, EMMETSBURG, IA 5053



EXHIBIT
L

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

Page 2

the property and is not attempting any act to collect the discharge debt from you personally. Please note the following provisions of the Fair Debt Collection Practices Act:

(a)   If the consumer notifies the debt collector in writing within the 30-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector;

(b)   If the consumer requests, upon the consumer's written request, within the 30-day period, the name and address of the original creditor, the debt collector will provide the consumer with the name and address of the original creditor if different from the current creditor; and

(c)   The debt collector shall cease collection of the debt or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor if different from the current creditor.

If you have the Abstract of Title and you do not intend to keep the property, please forward it to me immediately. If you do not have the Abstract and you believe someone else has it, please let me know.

Sincerely,

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

Matthew E. Laughlin
Attorney at Law

MEL/sls
Enclosure

E-FILED  2018 NOV 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT



**DAVISBROWN**®
LAW FIRM

**Matthew E. Laughlin**
MattLaughlin@davisbrownlaw.com
phone: 515-246-7934
Des Moines Office

November 2, 2018

Weller Farms, LLC
3133 195th Street
Rose Hill, IA 52586

    **Re:**   **Loan No.:** ▉722

Dear Borrower:

    First State Bank has turned its file over to our firm for foreclosure of the above-referenced loan. The name of the creditor is First State Bank.

    The undersigned on behalf of the creditor hereby demands payment of the full balance due in fourteen (14) days in accordance with Iowa Code Section 654.4B. The amount due as of the date of this referral on October 25, 2018 was $36,520.43. If you will be paying this loan in full, please contact me for the exact amount before sending funds.

    Enclosed is the Counseling and Mediation notice as prescribed by the Iowa Attorney General and as required by Iowa Code Section 654.4B(2).

    Please contact the undersigned for a payoff quote (total amount due) and/or a reinstatement quote (amount to bring the loan current). All other inquiries should be made directly to the Loss Mitigation Department at First State Bank by calling 641-527-2535.

    If you have filed a bankruptcy action and have received a discharge, the indebtedness described in this letter will be enforced only against the mortgaged property and no personal judgment will be sought against you.

    If you are active duty military, please contact the undersigned immediately.

    You are further advised that unless you notify the undersigned within thirty days of your receipt of this notice that you dispute the validity of the amount owed to First State Bank, or any portion thereof, the debt will be assumed to be valid.

    The undersigned is a debt collector attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge, and the loan was not reaffirmed in the bankruptcy case, First State Bank will only exercise its right as against

#3015689
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500      THE DAVIS BROWN TOWER, 215 10TH ST., STE. 1300, DES MOINES, IA 50309
FIRM FAX 515.243.0654   THE HIGHLAND BUILDING, 4201 WESTOWN PKWY., STE. 300, WEST DES MOINES, IA 50266
WWW.DAVISBROWNLAW.COM   THE AMES OFFICE, 2605 NORTHRIDGE PKWY., AMES, IA 50010
                        THE EMMETSBURG OFFICE, 3004 MAIN ST., P.O. BOX 314, EMMETSBURG, IA 50536

**Exhibit A, Page 173 of 184**

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

Page 2

the property and is not attempting any act to collect the discharge debt from you personally. Please note the following provisions of the Fair Debt Collection Practices Act:

    (a)    If the consumer notifies the debt collector in writing within the 30-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector;

    (b)    If the consumer requests, upon the consumer's written request, within the 30-day period, the name and address of the original creditor, the debt collector will provide the consumer with the name and address of the original creditor if different from the current creditor; and

    (c)    The debt collector shall cease collection of the debt or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor if different from the current creditor.

If you have the Abstract of Title and you do not intend to keep the property, please forward it to me immediately. If you do not have the Abstract and you believe someone else has it, please let me know.

Sincerely,

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

Matthew E. Laughlin
Attorney at Law

MEL/sls
Enclosure

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

| | | |
|---|---|---|
| WELLER FARMS, LLC<br>3133 195TH ST<br>ROSE HILL, IA 52586 | FIRST STATE BANK OF LYNNVILLE, IOWA<br>413 EAST STREET<br>P.O. BOX #187<br>LYNNVILLE, IA 50153 | AG OR COMM  AG<br>Loan Number _____<br>Date 03-30-2017<br>Maturity Date 03-15-2022<br>Loan Amount $ 60,117.87<br>Renewal Of _____ |
| **BORROWER'S NAME AND ADDRESS**<br>"I" includes each borrower above, jointly and severally. | **LENDER'S NAME AND ADDRESS**<br>"You" means the lender, its successors and assigns. | LD INITIALS   ZIG |

For value received, I promise to pay to you, or your order, at your address listed above the PRINCIPAL sum of SIXTY THOUSAND ONE HUNDRED SEVENTEEN AND 87/100 _____ Dollars $ 60,117.87

☒ **Single Advance:** I will receive all of this principal sum on 03-30-2017 _____. No additional advances are contemplated under this note.

☐ **Multiple Advance:** This principal sum shown above is the maximum amount of principal I can borrow under this note. On _____
   I will receive the amount of $ _____ and future principal advances are contemplated.
   **Conditions:** The conditions for future advances are _____

   ☐ **Open End Credit:** You and I agree that I may borrow up to the maximum principal sum more than one time. This feature is subject to all other conditions and expires on _____
   ☐ **Closed End Credit:** You and I agree that I may borrow (subject to all other conditions) up to the maximum principal sum only one time.

**INTEREST:** I agree to pay interest on the outstanding principal balance from 03-30-2017 _____ at the rate of _____ 6.790 % per year until 03-15-2022 _____.

☐ **Variable Rate:** This rate may then change as stated below.
   ☐ **Index Rate:** The future rate will be _____ the following index rate: _____

   ☐ **No Index:** The future rate will not be subject to any internal or external index. It will be entirely in your control.
   ☐ **Frequency and Timing:** The rate on this note may change as often as _____
      A change in the interest rate will take effect _____
   ☐ **Limitations:** During the term of this loan, the applicable annual interest rate will not be more than _____ % or less than
      _____ %. The rate may not change more than _____ % each _____
   **Effect of Variable Rate:** A change in the interest rate will have the following effect on the payments:
   ☐ The amount of each scheduled payment will change.      ☐ The amount of the final payment will change.
   ☐ _____

**ACCRUAL METHOD:** Interest will be calculated on a ACTUAL/365 _____ basis.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, as stated below:
   ☐ on the same fixed or variable rate basis in effect before maturity (as indicated above).
   ☒ at a rate equal to 17.0% _____

☒ **LATE CHARGE:** If a payment is made more than 10 _____ days after it is due, I agree to pay a late charge of $ 430.00 _____.

☐ **ADDITIONAL CHARGES:** In addition to interest, I agree to pay the following charges which ☐ are ☐ are not included in the principal amount above: _____

**PAYMENTS:** I agree to pay this note as follows:
4 ANNUAL PAYMENTS OF $14,308.43 BEGINNING 03-15-2018 AND 1 PAYMENT OF $14,308.43 ON 03-15-2022. THE ACTUAL AMOUNT OF MY FINAL PAYMENT WILL DEPEND ON MY PAYMENT RECORD.

☐ **Unpaid interest:** Any accrued interest not paid when due (whether due by reason of a schedule of payments or due because of Lender's demand) will become part of the principal thereafter, and will bear interest at the interest rate in effect from time to time as provided for in this agreement.

**PURPOSE:** The purpose of this loan is PURCHASE 28HD COWS _____

**ADDITIONAL TERMS:**
I AGREE THAT THIS PROMISSORY LOAN DATED TODAY IS ALSO SECURED BY A SECURITY AGREEMENT DATED 11/5/2015 AS WELL AS A $500,000.00 REAL ESTATE MORTGAGE DATED 1-4-2016..

I AGREE TO PAY A MINIMUM FINANCE CHARGE OF $7.50 IF I PAY THIS LOAN OFF BEFORE YOU HAVE EARNED THAT MUCH IN FINANCE CHARGES.

**EXHIBIT**
M

UNIVERSAL NOTE AND SECURITY AGREEMENT
Experi  ©1984, 1991 Bankers Systems, Inc., St. Cloud, MN  Form UNS-LAZ-IA  1/2   (page 1 of 3) _____

**SECURITY**

SECURITY INTEREST: I give you a security interest in all of the Property described below that I own or have sufficient rights in which to transfer an interest, now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property. "Property" includes all parts, accessories, repairs, replacements, improvements, and accessions to the Property; any original evidence of title or ownership; and all obligations that support the payment or performance of the Property. "Proceeds" includes anything acquired upon the sale, lease, license, exchange, or other disposition of the Property; any rights and claims arising from the Property; and any collections and distributions on account of the Property.

☒ Accounts and Other Rights to Payment: All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which I have by law or agreement against any account debtor or obligor.

☒ Inventory: All inventory held for ultimate sale or lease, or which has been or will be supplied under contracts of service, or which are raw materials, work in process, or materials used or consumed in my business.

☒ Equipment: All equipment including, but not limited to, machinery, vehicles, furniture, fixtures, manufacturing equipment, farm machinery and equipment, shop equipment, office and record keeping equipment, parts, and tools. The Property includes any equipment described in a list or schedule I give to you, but such a list is not necessary to create a valid security interest in all of my equipment.

☒ Instruments and Chattel Paper: All instruments, including negotiable instruments and promissory notes and any other writings or records that evidence the right to payment of a monetary obligation, and tangible and electronic chattel paper.

☒ General Intangibles: All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trademarks, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use my name.

☒ Documents: All documents of title including, but not limited to, bills of lading, dock warrants and receipts, and warehouse receipts.

☒ Farm Products and Supplies: All farm products including, but not limited to, all poultry and livestock and their young, along with their produce, products, and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or produced in my farming operations.

☒ Government Payments and Programs: All payments, accounts, general intangibles, and benefits including, but not limited to, payments in kind, deficiency payments, letters of entitlement, warehouse receipts, storage payments, emergency assistance and diversion payments, production flexibility contracts, and conservation reserve payments under any preexisting, current, or future federal or state government program.

☒ Investment Property: All investment property including, but not limited to, certificated securities, uncertificated securities, securities entitlements, securities accounts, commodity contracts, commodity accounts, and financial assets.

☒ Deposit Accounts: All deposit accounts including, but not limited to, demand, time, savings, passbook, and similar accounts.

☐ Specific Property Description: The Property includes, but is not limited by, the following:

If this agreement covers timber to be cut, enter real estate description and record owner information: _____

The Property will be used for a  ☐ personal  ☐ business  ☒ agricultural  ☐ _____ purpose.
Borrower/Owner State of organization/registration (if applicable) IA

**ADDITIONAL TERMS OF THE SECURITY AGREEMENT**

GENERALLY - This agreement secures this note and any other debt I have with you, now or later. However, it will not secure other debts if you fail with respect to such other debts, to make any required disclosure about this security agreement or if you fail to give any required notice of the right of rescission. If property described in this agreement is located in another state, this agreement may also, in some circumstances, be governed by the law of the state in which the Property is located.
NAME AND LOCATION - My name indicated on page 1 is my exact legal name. If I am an individual, my address is my principal residence. If I am not an individual, my address is the location of my chief executive offices or sole place of business. If I am an entity organized and registered under state law, my address is located in the state in which I am registered, unless otherwise indicated on page 2. I will provide verification of registration and location upon your request. I will provide you with at least 30 days notice prior to any change in my name, address, or state of organization or registration.
OWNERSHIP AND DUTIES TOWARD PROPERTY - I represent that I own all of the Property, or to the extent this is a purchase money security interest I will acquire ownership of the Property with the proceeds of the loan. I will defend it against any other claim. Your claim to the Property is ahead of the claims of any other creditor. I agree to do whatever you require to protect your security interest and to keep your claim in the Property ahead of the claims of other creditors. I will not do anything to harm your position. I will not use the Property for a purpose that will violate any laws or subject the Property to forfeiture or seizure.
   I will keep books, records and accounts about the Property and my business in general. I will let you examine these records at any reasonable time. I will prepare any report or accounting you request, which deals with the Property.
   I will keep the Property in my possession and will keep it in good repair and use it only for the purpose(s) described on page 1 of this agreement. I will not change this specified use without your express written permission. I represent that I am the original owner of the Property and, if I am not, that I have provided you with a list of prior owners of the Property.
   I will keep the Property at my address listed on page 1 of this agreement, unless we agree I may keep it at another location. If the Property is to be used in another state, I will give you a list of those states. I will not try to sell the Property unless it is inventory or I receive your written permission to do so. If I sell the Property I will have the payment made payable to the order of you and me.
   You may demand immediate payment of the debt(s) if the debtor is not a natural person and without your prior written consent; (1) a beneficial interest in the debtor is sold or transferred, or (2) there is a change in either the identity or number of members of a partnership, or (3) there is a change in ownership of more than 25 percent of the voting stock of a corporation.
   I will pay all taxes and charges on the Property as they become due. You have the right of reasonable access in order to inspect the Property. I will immediately inform you of any loss or damage to the Property.
   If I fail to perform any of my duties under this security agreement, or any mortgage, deed of trust, lien or other security interest, you may without notice to me perform the duties or cause them to be performed. Your right to perform for me shall not create an obligation to perform and your failure to perform will not preclude you from exercising any of your other rights under the law or this security agreement.

PURCHASE MONEY SECURITY INTEREST - For the sole purpose of determining the extent of a purchase money security interest arising under this security agreement: (a) payments on any nonpurchase money loan also secured by this agreement will not be deemed to apply to the Purchase Money Loan, and (b) payments on the Purchase Money Loan will be deemed to apply first to the nonpurchase money portion of the loan, if any, and then to the purchase money obligation in the order in which the items of collateral were acquired or if acquired at the same time, in the order selected by you. No security interest will be terminated by application of this formula. "Purchase Money Loan" means any loan the proceeds of which, in whole or in part, are used to acquire any collateral securing the loan and all extensions, renewals, consolidations and refinancing of such loan.
PAYMENTS BY LENDER - You are authorized to pay, on my behalf, charges I am or may become obligated to pay to preserve or protect the secured property (such as property insurance premiums). You may treat these payments as advances and add them to the unpaid principal under the note secured by this agreement or you may demand immediate payment of the amount advanced.
INSURANCE - I agree to buy insurance on the Property against the risks and for the amounts you require and to furnish you continuing proof of coverage. I will have the insurance company name you as loss payee on any such policy. You may require added security if you agree that insurance proceeds may be used to repair or replace the Property. I will buy insurance from a firm licensed to do business in the state where you are located. The firm will be reasonably acceptable to you. The insurance will last until the Property is released from this agreement. If I fail to buy or maintain the insurance (or fail to name you as loss payee) you may purchase it yourself.
WARRANTIES AND REPRESENTATIONS - If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so. You may exercise my rights with respect to obligations of any account debtors, or other persons obligated on the Property, to pay or perform, and you may enforce any security interest that secures such obligations.
   If this agreement covers inventory, I will not dispose of it except in my ordinary course of business at the fair market value for the Property, or at a minimum price established between you and me.
   If this agreement covers farm products I will provide you, at your request, a written list of the buyers, commission merchants or selling agents to or through whom I may sell my farm products. You notify

Any person who signs within this box does so to give a security interest in the Property described on this page. This person does not promise to pay this note. "I" as used in this security agreement will include the borrower and any person who signs within this box.

Date _____

Signed _____

ExperTA  ©1994, 1991 Bankers Systems, Inc., St. Cloud, MN Form UNS-LAZ4A 1/23/2001   (page 2 of 3)

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

additional potential buyers regarding your security interest if you provide me with the name and address of the potential buyer any time prior to such notification. In this paragraph the terms farm products, buyers, commission merchants and selling agents have the meanings given to them in the Federal Food Security Act of 1985.

If this agreement covers chattel paper or instruments, either as original collateral or proceeds of the Property, I will note your interest on the face of the chattel paper or instruments.

**REMEDIES** - I will be in default on this security agreement if I am in default on any note this agreement secures or if I fail to keep any promise contained in the terms of this agreement. If I default, you have all of the rights and remedies provided in the note and under the Uniform Commercial Code. You may require me to make the secured property available to you at a place which is reasonably convenient. You may take possession of the secured property and sell it as provided by law. The proceeds will be applied first to your expenses and then to the debt. I agree that 10 days written notice sent to my last known address by first class mail will be reasonable notice under the Uniform Commercial Code. My current address is on page 1.

**PERFECTION OF SECURITY INTEREST** - I authorize you to file a financing statement covering the Property. I will comply with, facilitate, and otherwise assist you in connection with obtaining possession of or control over the Property for purposes of perfecting your security interest under the Uniform Commercial Code.

## ADDITIONAL TERMS OF THE NOTE

**DEFINITIONS** - As used on pages 1 and 2, "I," "me" and "my" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). "You" or "your" means the Lender and its successors and assigns.

**APPLICABLE LAW** - The law of the state of Iowa will govern this agreement. Any term of this agreement which is contrary to applicable law will not be effective, unless the law permits you and me to agree to such a variation. If any provision of this agreement cannot be enforced according to its terms, this fact will not affect the enforceability of the remainder of this agreement. No modification of this agreement may be made without your express written consent. Time is of the essence in this agreement.

**PAYMENTS** - Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on this note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary).

**INTEREST** - Interest accrues on the principal remaining unpaid from time to time, until paid in full. If I receive the principal in more than one advance, each advance will start to earn interest only when I receive the advance. The interest rate in effect on this note at any given time will apply to the entire principal sum outstanding at that time. You and I may provide in this agreement for accrued interest not paid when due to be added to principal. Notwithstanding anything to the contrary, I do not agree to pay and you do not intend to charge any rate of interest that is higher than the maximum rate of interest you could charge under applicable law for the extension of credit that is agreed to in this note (either before or after maturity). If any notice of interest accrual is sent and is in error, we mutually agree to correct it, and if you actually collect more interest than allowed by law and this agreement, you agree to refund it to me.

**INDEX RATE** - The Index will serve only as a device for setting the interest rate on this note. You do not guarantee by selecting this Index, or the margin, that the interest rate on this note will be the same rate you charge on any other loans or class of loans you make to me or other borrowers.

**POST MATURITY RATE** - For purposes of deciding when the "Post Maturity Rate" (shown on page 1) applies, the term "maturity" means the date of the last scheduled payment indicated on page 1 of this note or the date you accelerate payment on the note, whichever is earlier.

**SINGLE ADVANCE LOANS** - If this is a single advance loan, you and I expect that you will make only one advance of principal. However, you may add other amounts to the principal if you make any payments described in the "PAYMENTS BY LENDER" paragraph on page 2, or if we have agreed that accrued interest not paid when due may be added to principal.

**MULTIPLE ADVANCE LOANS** - If this is a multiple advance loan, you and I expect that you will make more than one advance of principal. If this is closed end credit, repaying a part of the principal will not entitle me to additional credit.

**SET-OFF** - I agree that you may set off any amount due and payable under this note against any right I have to receive money from you.

"Right to receive money from you" means:
(1) any deposit account balance I have with you;
(2) any money owed to me on an item presented to you or in your possession for collection or exchange; and
(3) any repurchase agreement or other nondeposit obligation.

"Any amount due and payable under this note" means the total amount of which you are entitled to demand payment under the terms of this note at the time you set off. This total includes any balance the due date for which you properly accelerate under this note.

If my right to receive money from you is also owned by someone who has not agreed to pay this note, your right of set-off will apply to my interest in the obligation and to any other amounts I could withdraw on my sole request or endorsement. Your right of set-off does not apply to an account or other obligation where my rights are only as a representative. It also does not apply to any individual Retirement Account or other tax-deferred retirement account.

You will not be liable for the dishonor of any check when the dishonor occurs because you set off this debt against any of my accounts. I agree to hold you harmless from any such claims arising as a result of your exercise of your right to set-off.

**REMEDIES** - I will be in default if any one or more of the following occur: (1) I fail to make a payment on time or in the amount due; (2) I fail to keep the Property insured, if required; (3) I fail to pay, or keep any promise, on any debt or agreement I have with you; (4) any other creditor of mine attempts to collect any debt I owe him through court proceedings; (5) I die, am declared incompetent, make an assignment for the benefit of creditors, or become insolvent (either because my liabilities exceed my assets or I am unable to pay my debts as they become due); (6) I make any written statement or provide any financial information that is untrue or inaccurate at the time it was provided; (7) I do or fail to do something which causes you to believe you will have difficulty collecting the amount I owe you; (8) any collateral securing this note is used in a manner or for a purpose which threatens confiscation by a legal authority; (9) I change my name or assume an additional name without first notifying you before making such a change; (10) I fail to plant, cultivate and harvest crops in due season if I am a producer of crops; (11) any loan proceeds are used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity, as further explained in 7 C.F.R. Part 1940, Subpart G, Exhibit M.

**REMEDIES** - Except as provided in the next paragraph, if this note is secured by agricultural land (as defined in Iowa Code § 172C.1) and I am in default on this note, you will give me notice of my right to cure. You may exercise your remedies only if I fail to cure my default within 45 days after you mail the notice (or 45 days after actual delivery if you use a means other than certified mail).

A notice of right to cure is not necessary and you may immediately exercise your remedies if you have: a) given me the notice with respect to two prior defaults, b) you have given me the notice with respect to a default occurring within 12 months before the current default, or I voluntarily surrender the agricultural land and you accept it in full satisfaction of the debt.

Subject to the above limitations and any limitations imposed by Iowa Code Chapter 654A, if I am in default on this note you have, but are not limited to, the following remedies:

(1) You may demand immediate payment of all I owe you under this note (principal, accrued unpaid interest and other accrued unpaid charges).
(2) You may set off this debt against any right I have to the payment of money from you, subject to the terms of the "SET-OFF" paragraph herein.
(3) You may demand security, additional security, or additional parties to be obligated to pay this note as a condition for not using any other remedy.
(4) You may refuse to make advances to me or allow purchases on credit by me.
(5) You may use any remedy you have under state or federal law.
(6) You may make use of any remedy given to you in any agreement securing this note.

By selecting any one or more of these remedies you do not give up your right to use later any other remedy. By waiving your right to declare an event to be a default, you do not waive your right to consider later the event a default if it continues or happens again.

**COLLECTION COSTS AND ATTORNEY'S FEES** - I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**WAIVER** - I give up my rights to require you to do certain things. I will not require you to:
(1) demand payment of amounts due (presentment);
(2) obtain official certification of nonpayment (protest); or
(3) give notice that amounts due have not been paid (notice of dishonor).

I waive any defenses I have based on suretyship or impairment of collateral.

**OBLIGATIONS INDEPENDENT** - I understand that I must pay this note even if someone else has also agreed to pay it (by, for example, signing this form or a separate guarantee or endorsement). You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may without release or release any party to this agreement without releasing any other party. If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. Any extension of new credit to any of us, or renewal of this note by all or less than all of us will not release me from my duty to pay it. (Of course, you are entitled to only one payment in full.) I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. I will not assign nor obligation under this agreement without your prior written approval.

**FINANCIAL INFORMATION** - I agree to provide you, upon request, any financial statement or information you may deem necessary. I warrant that the financial statements and information I provide to you are or will be accurate, correct and complete.

---

**NOTICE** - Except as limited by the "GENERALLY" section on page two, the security agreement on page two secures all debts I may owe you now or in the future whether or not the debt is secured by any other collateral or indicates that it is secured by this agreement.

---

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE INCLUDING THOSE ON PAGES 1, 2 AND 3). I have received a copy on today's date.**

WELLER FARMS, LLC

_____
STEVEN A. WELLER, MEMBER

---

SIGNATURE FOR LENDER:

_____
ZACHARY ROAN, ASSISTANT VICE PRESIDENT   1/23/2001

ExperEq © 1984, 1991 Bankers Systems, Inc., St. Cloud, MN Form AG/CD-AGCO-IA 1/23/2001

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT



STATE
BANK
www.fsbankia.com
Member FDIC

6/14/2018

Weller Farms, LLC
3133 195ᵗʰ St
Rose Hill, IA 52586



### NOTICE OF RIGHT TO CURE DEFAULT

This notice is about your Promissory Loan #_____473 dated 6/30/2017 with First State Bank.  You are now in default on your Promissory Loan #_____473.  You have the right to correct this default until **7/30/2018.**  If you do so, you may continue with this contract as though you did not default.

Your default consists of your failure to pay the payment on your Promissory Loan #66473 that was due on 3/15/2018.  To correct this default, you must pay **$6,803.20.**

In order to correct this default, the above items must be paid by no later than **7/30/2018.**

**IF YOU DO NOT CORRECT YOUR DEFAULT BY THE ABOVE STATED DATE, WE MAY EXERCISE OUR RIGHTS AGAINST YOU UNDER THE LAW, INCLUDING BUT NOT LIMITED TO THE INITIATION OF A FORECLOSURE ACTION OR PROCEDURE.**

It is very important that you do not disregard this notice.  If you default again in the next year, we may exercise our rights against you without sending you another notice like this one.

To make arrangements to cure your default by **7/30/2018** you may contact me at the First State Bank, 413 East Street, Lynnville, IA 50153, or by calling (641) 527-2535.

Sincerely,

Zachary I. Guinn
Asst. Vice President

| P.O. Box 187 | P.O. Box 278 | P.O. Box 532 | P.O. Box 447 | P.O. |
|---|---|---|---|---|
| Lynnville, IA 50153 | Agency, IA 52530 | Brooklyn, IA 52211 | Grinnell, IA 50112 | Sully |
| 641-527-2535 | 641-937-5236 | 641-522-9231 | 641-236-7700 | 641 |

**EXHIBIT**

N

E-FILED  2018 NOV 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT



**Matthew E. Laughlin**
MattLaughlin@davisbrownlaw.com
phone: 515-246-7934
Des Moines Office

November 2, 2018

Weller Farms, LLC
3133 195th Street
Rose Hill, IA 52586

>       *Re:      Loan No.: ███473*

Dear Borrower:

First State Bank has turned its file over to our firm for foreclosure of the above-referenced loan.  The name of the creditor is First State Bank.

The undersigned on behalf of the creditor hereby demands payment of the full balance due in fourteen (14) days in accordance with Iowa Code Section 654.4B.  The amount due as of the date of this referral on October 25, 2018 was $28,274.24.  If you will be paying this loan in full, please contact me for the exact amount before sending funds.

Enclosed is the Counseling and Mediation notice as prescribed by the Iowa Attorney General and as required by Iowa Code Section 654.4B(2).

Please contact the undersigned for a payoff quote (total amount due) and/or a reinstatement quote (amount to bring the loan current).  All other inquiries should be made directly to the Loss Mitigation Department at First State Bank by calling 641-527-2535.

If you have filed a bankruptcy action and have received a discharge, the indebtedness described in this letter will be enforced only against the mortgaged property and no personal judgment will be sought against you.

If you are active duty military, please contact the undersigned immediately.

You are further advised that unless you notify the undersigned within thirty days of your receipt of this notice that you dispute the validity of the amount owed to First State Bank, or any portion thereof, the debt will be assumed to be valid.

The undersigned is a debt collector attempting to collect a debt, and any information obtained will be used for that purpose.  However, if you have received a discharge, and the loan was not reaffirmed in the bankruptcy case, First State Bank will only exercise its right as against

#3015689
DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

EXHIBIT

O

**Exhibit A, Page 179 of 184**

E-FILED 2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

Page 2

the property and is not attempting any act to collect the discharge debt from you personally. Please note the following provisions of the Fair Debt Collection Practices Act:

(a)   If the consumer notifies the debt collector in writing within the 30-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector;

(b)   If the consumer requests, upon the consumer's written request, within the 30-day period, the name and address of the original creditor, the debt collector will provide the consumer with the name and address of the original creditor if different from the current creditor; and

(c)   The debt collector shall cease collection of the debt or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor if different from the current creditor.

If you have the Abstract of Title and you do not intend to keep the property, please forward it to me immediately. If you do not have the Abstract and you believe someone else has it, please let me know.

Sincerely,

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

Matthew E. Laughlin
Attorney at Law

MEL/sls
Enclosure

E-FILED  2018 NOV 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT



**Matthew E. Laughlin**
MattLaughlin@davisbrownlaw.com
phone: 515-246-7934
Des Moines Office

November 2, 2018

Steven J. Weller
3133 195th Street
Rose Hill, IA 52586

      *Re:   Loan No.:* ███*473*

Dear Borrower:

    First State Bank has turned its file over to our firm for foreclosure of the above-referenced loan. The name of the creditor is First State Bank.

    The undersigned on behalf of the creditor hereby demands payment of the full balance due in fourteen (14) days in accordance with <u>Iowa Code</u> Section 654.4B. The amount due as of the date of this referral on October 25, 2018 was $28,274.24. If you will be paying this loan in full, please contact me for the exact amount before sending funds.

    Enclosed is the Counseling and Mediation notice as prescribed by the Iowa Attorney General and as required by <u>Iowa Code</u> Section 654.4B(2).

    Please contact the undersigned for a payoff quote (total amount due) and/or a reinstatement quote (amount to bring the loan current). All other inquiries should be made directly to the Loss Mitigation Department at First State Bank by calling 641-527-2535.

    If you have filed a bankruptcy action and have received a discharge, the indebtedness described in this letter will be enforced only against the mortgaged property and no personal judgment will be sought against you.

    If you are active duty military, please contact the undersigned immediately.

    You are further advised that unless you notify the undersigned within thirty days of your receipt of this notice that you dispute the validity of the amount owed to First State Bank, or any portion thereof, the debt will be assumed to be valid.

    The undersigned is a debt collector attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge, and the loan was not reaffirmed in the bankruptcy case, First State Bank will only exercise its right as against

#3015689

DAVIS BROWN KOEHN SHORS & ROBERTS P.C.

PHONE 515.288.2500   THE DAVIS BROWN TOWER, 215 10ᵗʰ ST., STE. 1300, DES MOINES, IA 50309
FIRM FAX 515.243.0654   THE HIGHLAND BUILDING, 4201 WESTOWN PKWY., STE. 300, WEST DES MOINES, IA 50266
WWW.DAVISBROWNLAW.COM   THE AMES OFFICE, 2605 NORTHRIDGE PKWY., AMES, IA 50010
THE EMMETSBURG OFFICE, 3004 MAIN ST., P.O. BOX 314, EMMETSBURG, IA 50536

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

Page 2

the property and is not attempting any act to collect the discharge debt from you personally. Please note the following provisions of the Fair Debt Collection Practices Act:

(a)    If the consumer notifies the debt collector in writing within the 30-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector;

(b)    If the consumer requests, upon the consumer's written request, within the 30-day period, the name and address of the original creditor, the debt collector will provide the consumer with the name and address of the original creditor if different from the current creditor; and

(c)    The debt collector shall cease collection of the debt or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor if different from the current creditor.

If you have the Abstract of Title and you do not intend to keep the property, please forward it to me immediately.  If you do not have the Abstract and you believe someone else has it, please let me know.

Sincerely,

DAVIS, BROWN, KOEHN, SHORS & ROBERTS, P.C.

Matthew E. Laughlin
Attorney at Law

MEL/sls
Enclosure

E-FILED  2018 MAR 25 8:03 PM MAHASKA - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR MAHASKA COUNTY

| | | |
|---|---|---|
| FIRST STATE BANK, | ) | EQUITY NO. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ATTORNEY'S FEE ATTESTATION |
| STEVEN J. WELLER REVOCABLE TRUST; | ) | |
| STEVEN J. WELLER; SPOUSE OF STEVEN J. | ) | |
| WELLER; WELLER FARMS, LLC; TAMI LYNN | ) | |
| WELLER; STATE OF IOWA; CHRISTINA L. | ) | |
| KRUSE, INDIVIDUALLY AND AS MOTHER | ) | |
| AND NEXT FRIEND OF HARLEY J. HUDSON; | ) | |
| THE GUARDIANSHIP AND | ) | |
| CONSERVATORSHIP OF CHRISTINA KRUSE | ) | |
| BY AND THROUGH CHARLES KRUSE AND | ) | |
| VERDA KRUSE, AS CO-GUARDIANS AND | ) | |
| CO-CONSERVATORS OF CHRISTINA L. | ) | |
| KRUSE, ON BEHALF OF CHRISTINA L. | ) | |
| KRUSE, INDIVIDUALLY AND AS MOTHER | ) | |
| AND NEXT FRIEND OF HARLEY J. HUDSON; | ) | |
| AND THE GUARDIANSHIP AND | ) | |
| CONSERVATATORSHIP OF HARLEY | ) | |
| HUDSON, BY AND THROUGH CHARLES | ) | |
| KRUSE AND VERDA KRUSE, AS CO- | ) | |
| GUARDIANS AND CO-CONSERVATORS OF | ) | |
| HARLEY J. HUDSON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, Matthew E. Laughlin, state that I am a member of the firm of Davis, Brown, Koehn, Shors & Roberts, P.C., the attorneys for the Plaintiff in the above-entitled cause; that I have read the foregoing Petition and am familiar with the contents thereof, and the allegations contained therein are true as I verily believe.

I further state that I am a regularly practicing attorney in the Courts of the State of Iowa; that the attorney's fees prayed for herein are for services rendered and to be rendered by me as attorney for the Plaintiff in this action; that there has been no agreement, express or implied between me and any other

EXHIBIT "I"

E-FILED  2018 MAR 25 8:08 PM MAHASKA - CLERK OF DISTRICT COURT

person or persons except other practicing attorneys engaged with me in this action, for a division or
sharing of the attorney's fees prayed for herein.

I certify under penalty of perjury and pursuant to the laws of the State of Iowa that the preceding
is true and correct.

_11/21/18_____
Date

Matthew E. Laughlin